1   **JOSEPH W. COTCHETT**
    (SBN 36324; jcotchett@cpmlegal.com)
2   **BLAIR V. KITTLE**
    (SBN 336367; bkittle@cpmlegal.com)
3   **VASTI S. MONTIEL**
    (SBN 346409; vmontiel@cpmlegal.com)
4   **DAVID G. HOLLENBERG**
    (SBN 325408; dhollenberg@cpmlegal.com)
5   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
6   840 Malcolm Road, Suite 200
    Burlingame, CA 94010
7   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
8
    **ELIZABETH J. CABRASER**
9   (SBN 83151; ecabraser@lchb.com)
    **RICHARD M. HEIMANN**
10  (SBN 63607; rheimann@lchb.com)
    **KATHERINE LUBIN BENSON**
11  (SBN 259826; kbenson@lchb.com)
    **MICHAEL K. SHEEN**
12  (SBN 288284; msheen@lchb.com)
    **LIEFF CABRASER HEIMANN &**
13  **BERNSTEIN, LLP**
    275 Battery Street, 29th Floor
14  San Francisco, CA 94111
    Telephone: (415) 956-1000
15  Fax: (415) 956-1008

    **DAVID S. CASEY, JR.**
    (SBN 60768; dcasey@cglaw.com)
    **FREDERICK SCHENK**
    (SBN 86392; fschenk@cglaw.com)
    **GAYLE M. BLATT**
    (SBN 122048; gmb@cglaw.com)
    **P. CAMILLE GUERRA**
    (SBN 326546; camille@cglaw.com)
    **MICHAEL J. BENKE**
    (SBN 271292; mbenke@cglaw.com)
    **CASEY GERRY SCHENK FRANCAVILLA**
    **BLATT & PENFIELD LLP**
    110 Laurel St.
    San Diego, CA 92101
    Telephone: (619) 238-1811
    Facsimile (619) 544-9232

16  *Attorneys for Plaintiffs and the Proposed Class and Subclass*

17                **UNITED STATES DISTRICT COURT**

18        **NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

| | |
|---|---|
| 19   **RICHARD ALLEN CLARIDGE**, individual and trustee of the Joint Revocable Trust of Richard Allen Claridge Jr. & Capri Lynn Winser; | Case No. 4:24-cv-04093-JST |
| 20 | **FIRST AMENDED CLASS ACTION** |
| 21   **CAPRI LYNN WINSER**; individual and trustee of the Joint Revocable Trust of | **COMPLAINT** |
| 22   Richard Allen Claridge Jr. & Capri Lynn Winser; | |
| 23   **TODD MICHERO**, an individual; **LORI MICHERO**, an individual; | |
| 24   **SCOTT A. WALKER**, individual and trustee of The Walker Family Living Trust; and | |
| 25   **ELIZABETH L. WALKER**, individual and trustee of The Walker Family Living Trust, | |
| 26   on behalf of themselves and all others similarly situated, | |
| 27                        Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| 28 | |

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**

1

2        versus

3    **TIMOTHY J. LEFEVER**, an individual;
     **KENNETH W. MATTSON**, an individual;
4    **KS MATTSON PARTNERS, LP**, a limited
     partnership; and
5    **SPECIALTY PROPERTIES PARTNERS,
     LP**, a limited partnership,

6                    Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PARTIES .................................................................................................................6

    A.   Plaintiffs .....................................................................................................6

    B.   Defendants .................................................................................................6

    C.   Relevant Non-Parties ................................................................................8

JURISDICTION AND VENUE ..............................................................................9

FACTUAL ALLEGATIONS ................................................................................10

    A.   LeFever and Mattson Start a Real Estate Business ...............................10

    B.   The Investment Scheme ..........................................................................12

    C.   LeFever Mattson's Investment Properties .............................................17

    D.   Defendant LeFever's Role in the Investment Scheme ...........................19

    E.   Defendants Fail to Manage the Investment Properties ..........................23

    F.   Defendants Used a Complex Web of Corporate Entities to Effectuate Their Fraudulent Scheme..............................................................................................28

    G.   Revelations About the Investment Scheme Emerge From Defendants LeFever's and Mattson's Lawsuits Against One Another ...................................................33

    1.   Dispute Over The Divi Divi Tree Limited Partnership .........................33

    2.   Mattson's Departure From LeFever Mattson ........................................36

    H.   Recent Revelations About the Investment Scheme ...............................38

    I.   Potential Dissipation of Investor Assets ...............................................41

    J.   LeFever Mattson Entities File for Bankruptcy .....................................43

PLAINTIFFS' EXPERIENCES WITH THE INVESTMENT SCHEME ...................44

    A.   Claridge and Winser Plaintiffs ..............................................................44

    B.   Michero Plaintiffs ..................................................................................49

    C.   Walker Plaintiffs ....................................................................................52

CLASS ACTION ALLEGATIONS .....................................................................57

CLAIMS FOR RELIEF .......................................................................................60

    **FIRST CLAIM FOR RELIEF**
    (Fraud) (Against All Defendants) ...............................................................60

    **SECOND CLAIM FOR RELIEF**
    (Breach of Fiduciary Duty) (Against All Defendants) ...............................62

    **THIRD CLAIM FOR RELIEF**
    (Conversion) (Against All Defendants) ......................................................62

    **FOURTH CLAIM FOR RELIEF**
    (Constructive Trust) (Against All Defendants)...........................................63

    **FIFTH CLAIM FOR RELIEF**
    (Aiding and Abetting Fraud) (Against Defendant LeFever)........................64

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

**SIXTH CLAIM FOR RELIEF**
(Violation of Cal. Welf. and Inst. Code § 15610.30 for Financial Abuse of Elders)
(Against All Defendants) ................................................................66

**SEVENTH CLAIM FOR RELIEF**
(Unjust Enrichment)  (Against All Defendants) ........................................66

**EIGHTH CLAIM FOR RELIEF**
(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*)
(Against All Defendants) ................................................................67

**NINTH CLAIM FOR RELIEF**
(Appointment of a Receiver and Provision of an Accounting)(Against All
Defendants) ................................................................................68

**TENTH CLAIM FOR RELIEF**
(Negligent Misrepresentation)  (Against All Defendants) ..............................69

**PRAYER FOR RELIEF** ......................................................................**70**

**DEMAND FOR A JURY TRIAL** ...........................................................**71**

## EXHIBITS TO COMPLAINT

**EXHIBIT A**:  A list of the limited partnerships and limited liability companies involved with LeFever Mattson.

**EXHIBIT B**:  The complete June 27, 2024 email from Defendant LeFever to investors.

**EXHIBIT C**:  Timothy LeFever, et al. v. Kenneth W. Mattson, et al.; Sonoma Superior Court, Case No. 24CV03485

**EXHIBIT D**:  Kenneth W. Mattson v. Timothy LeFever, et al.; Sacramento Superior Court, Case No. 24CV011305

Lead Plaintiffs Richard Allen Claridge, Capri Lynn Winser, Todd Michero, Lori Michero, Scott A. Walker, and Elizabeth L. Walker (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following against Defendants Timothy J. LeFever, Kenneth W. Mattson, KS Mattson Partners, LP ("KS Mattson Partners"), and/or Specialty Properties Partners, LP ("Specialty Properties Partners") (together, "Defendants")[1] based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, an investigation conducted by and through Plaintiffs' attorneys, which included a review of the Defendants' and the Chapter 11 Entities' public documents and announcements, filings in bankruptcy court, press releases published by and regarding Defendants and the Chapter 11 Entities, Watchdog reports and advisories about Defendants and the Chapter 11 Entities,  information readily obtainable on the Internet, documents obtained from LeFever Mattson, Inc., and information and belief as to all other matters.[2]   Plaintiffs believe that additional substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      On June 27, 2024, Plaintiffs and the Class received this unwelcomed news:

> Decades ago, LeFever Mattson began investing in multi-family properties throughout California. Many of you considered Ken Mattson to be your financial advisor, and with his help you invested in the LeFever Mattson led partnerships which owned these properties. Over the last decade, many of these properties were sold and the profits reinvested in other properties. . . .

> Monthly distributions have been a welcome source of income for each of you . . . But these partnerships are not insulated from the

---

[1]  On September 12, 2024, LeFever Mattson, Inc. ("LeFever Mattson"), LeFever Mattson I, LLC, and Home Tax Service of America, Inc. (d/b/a LeFever Mattson Property Management) ("LM Property Management") (together, the "Chapter 11 Entities") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of California. ECF No. 58. These Chapter 11 Entities are relevant third parties. The allegations that refer or relate to the Chapter 11 Entities are not intended to circumvent the automatic stay in place with respect to the Chapter 11 Entities resulting from the filing of those bankruptcy proceedings.

[2] Footnotes in this complaint are for ease of reference.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

> realities of the real estate market, the economy in general, or the chaos caused by the problems related to Ken Mattson. . . .
>
> It is tough to hear from investors that believed that checks would always come and want to know when they will get the next one. It is even harder to hear from those that put so much trust and resources with Ken, and now say that they regret "putting all of their eggs in one basket". And I know that my inability to give specifics on when to expect the next monthly distribution is painful. . . .
>
> -- June 27, 2024 Tim LeFever Email to LeFever Mattson, Inc. Investors[3]

2.      This case arises from one of the largest investment frauds in recent history and seeks relief for hundreds of investors, many of whom entrusted their life's savings and many of whom are elderly, who were harmed by the massive investment fraud perpetrated and enabled by Defendants.  This action is brought as a class action on behalf of the Class and Elder Subclass described in this Complaint, in order to preserve, protect from dissipation and misappropriation, recover, and transparently and equitably distribute all Class members' investments.  All Class and Subclass members made investments and reinvestments, throughout the Class Period, in what were promoted, represented, and sold to them by Defendants as percentage interests in specific and separate limited partnerships and other investment vehicles in real property assets.[4]   Plaintiffs' investments now appear not to have been invested or managed as Defendants represented.  Instead, Plaintiffs' investments now appear, as described in recent revelations, to have been commingled, used to purchase unidentified properties, sold without distribution to investors, and otherwise diverted and misused in an investment scheme controlled and run by Defendants (the "Investment Scheme").

3.      Specifically, during the Class Period, LeFever Mattson, Defendant KS Mattson Partners, Defendant Mattson, and Defendant LeFever made the following representations to Plaintiffs, the Class, and the Subclass to induce them to invest: first, that money invested with

---

[3] The complete June 27, 2024 email from Tim LeFever to LeFever Mattson investors is attached hereto as Exhibit B.

[4] A list of the limited partnerships and limited liability companies known to investors is attached hereto as Exhibit A.

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**      2

LeFever Mattson, KS Mattson Partners, Mattson, or LeFever, or any of the affiliated LPs and LLCs, would be applied to the acquisition of a specific real property owned by the partnership; second, that the percentage of the purported partnership an investor received for a particular investment was based on the value of the property; third, that the partnership would maintain a separate bank account in the name of the partnership into which the proceeds would be deposited; and fourth, that payments to investors would come from the partnership's proceeds through the management and sale of those properties, consistent with their purported partnership interest. As set forth herein, each of those representations was false and misleading when made. The Investment Scheme used a uniform, defining feature that encouraged investors to make additional investments and recommend that others do so: the regular and consistent payments of interest on investments (which Defendants called "distributions"), as well as the promise of increase in the value of the underlying real property assets over time. These consistent payments sustained the Investment Scheme's façade that masked growing disarray and overextension, until the Investment Scheme finally collapsed, with the cessation of regular payments to most investors in or about the Spring of 2024.

4.      Recent communications to investors further reveal the fraudulent nature of the Investment Scheme.  On June 27, 2024, Defendant Timothy LeFever notified investors that he was in the process of selling properties and returning proceeds to the investors, and implicitly acknowledged the illegal commingling of investment money across partnerships and properties:

> As discussed above, LeFever Mattson has a long term goal of selling the properties held in these partnerships and returning proceeds to the investors. But here also, many investors want more information than I can give at this time. ***We have started selling properties and proceeds have been paid to investors. We are receiving offers on properties every week. Some of these offers are very good, while others are below market value and we are continuing to negotiate. For all of these properties, I will bring the investors into the process and inform them concerning a property sale as soon as it is appropriate***. (Emphasis added).[5]

---

[5] *See* Exhibit B.

5.     Plaintiffs are informed and believe, and thereon allege,[6] that the proceeds from the sales of existing properties have not been distributed to the investors whose investments were used to purchase the properties, but instead were used to pay past-due distributions to investors across a variety of partnerships, suggesting ongoing commingling of investor funds.

6.     LeFever Mattson and sixty associated entities, including LPs and LLCs, filed for voluntary Chapter 11 bankruptcy between August and October 2024. Preliminary bankruptcy filings suggest several elements of the fraudulent Investment Scheme designed and implemented by Defendants, in particular Defendant Mattson and his wholly-owned entities, Defendants KS Mattson Partners and Specialty Properties Partners. According to those bankruptcy filings, Mattson and KS Mattson Partners used LeFever Mattson and its associated LPs and LLCs to facilitate a years-long campaign of self-serving transactions, many of which are not reflected in LeFever Mattson's books and records. On information and belief, this particular part of the Investment Scheme had two elements:

7.     First, Mattson and KS Mattson Partners made fraudulent sales of purported equity interests in at least twenty five of the LeFever Mattson LPs and LLCs to hundreds of investors, including Plaintiffs and the Class and Subclass, that were not recorded with LeFever Mattson or the appropriate LP or LLC. On information and belief, and based on assertions made by the new Chief Restructuring Officer of LeFever Mattson appointed through the bankruptcy proceedings, Mattson and KS Mattson Partners raised at least $45 million in investor money through these fraudulent equity sales between May 2017 and March 2024. According to the bankruptcy filings, LeFever Mattson has no record of those sales or the tens of millions of dollars raised by Mattson and KS Mattson Partners. Plaintiffs' investments are among Mattson and KS Mattson Partners' fraudulent sales during this period. On information

---

[6] Certain necessary information about the Investment Scheme lies solely within Defendants' control, and Defendants have and continue to conceal such information from Plaintiffs. Thus, Plaintiffs are not privy to such information and can only access such information through discovery. Plaintiffs' allegations are based on their own investment experience, representations by Defendants, and counsel's investigation of the Investment Scheme. Allegations "on information and belief" are appropriate in such circumstances to establish the particularity requirement of Rule 9(b).

and belief, Mattson and KS Mattson Partners enriched themselves through these fraudulent sales, commingled the funds into a single bank account at Bank of the West (now BMO Bank) or other financial institutions, and have not returned these investments to Plaintiffs, the Class, or the Subclass, nor provided an accounting of those funds. As a result, the location and precise amount of these funds remains unknown to LeFever Mattson, Plaintiffs and the Class and Subclass, and on information and belief such information is only in the possession of Defendants Mattson, KS Mattson Partners, and Specialty Properties Partners.

8.     Second, according to filings in the LeFever Mattson bankruptcy, Mattson caused certain of the LeFever Mattson LPs and LLCs to purchase properties owned by KS Mattson Partners by executing the transactions himself on behalf of both buyer and seller. Some of these sales were made at inflated prices to the LeFever Mattson LPs and LLCs, and/or encumbered by high-interest loans with balloon payments taken out by Mattson and KS Mattson Partners. Mattson and KS Mattson Partners have defaulted on many of these loans, resulting in losses to the value of the LPs and LLCs, and clouded title on the LeFever Mattson real estate portfolio and the Plaintiffs' and the Class and Subclasses' investments.

9.     Mattson's years-long fraudulent conduct was made possible by the already-established LeFever Mattson Investment Scheme. Over a decade before Defendant Mattson began selling fraudulent equity interests in the LPs and LLCs, the investors that had purported to purchase equity interests in these LPs and LLCs were consistently subject to apparent self-dealing by Mattson, LeFever, and LeFever Mattson. This self-dealing included LeFever Mattson, and Mattson and LeFever as co-owners of the corporation, failing to provide investors with accurate valuation of the properties, failing to provide investors with documentation reflecting the profits and losses of the properties held by the LPs and LLCs, engaging in self-dealing transactions that profited Mattson, LeFever, and LeFever Mattson at the investors' expense, and the commingling of funds between and among LPs and LLCs.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

10.     The Investment Scheme has caused and continues to cause substantial financial loss and severe personal distress for Class members, many of whom are senior citizens, and who invested their life savings in the Investment Scheme described in this Complaint.

## PARTIES

### A.     Plaintiffs

11.     Plaintiffs are citizens of Virginia, Oklahoma, and Colorado.

12.     Plaintiff **Richard Allen Claridge, Jr**. ("Plaintiff Claridge") is, and at all relevant times has been, an individual and a trustee of the Joint Revocable Trust of Richard Allen Claridge Jr. & Capri Lynn Winser residing in Goochland, Virginia.  Plaintiff Claridge is currently fifty-eight years old.  He is married to Plaintiff Capri Lynn Winser.

13.     Plaintiff **Capri Lynn Winser** ("Plaintiff Winser") is, and at all relevant times has been, an individual and a trustee of the Joint Revocable Trust of Richard Allen Claridge Jr. & Capri Lynn Winser residing in Goochland, Virginia.  Plaintiff Winser is currently sixty-eight years old.  She is married to Plaintiff Richard Allen Claridge, Jr.

14.     Plaintiffs **Todd Michero and Lori Michero** ("Michero Plaintiffs") have been citizens of the state of Oklahoma since September 2024. Prior to that, they were citizens of the state of Alaska since 2013. Mr. and Ms. Michero are currently both sixty-five years old.

15.     Plaintiffs and married couple **Scott A. Walker and Elizabeth Lull Walker** ("Walker Plaintiffs") are, and have been, individuals and trustees of The Walker Family Living Trust residing in Arvada, Colorado since June 2020. Prior to that, they were citizens of the state of California, Mr. Walker is currently sixty-nine years old, and Mrs. Walker is sixty-eight years old.

### B.     Defendants

16.     Defendant **Timothy J. LeFever** ("LeFever") is, and at relevant times has been, an individual citizen of the State of California, residing in Citrus Heights, California and is over the age of 18.  Until recently LeFever was the Chief Executive Officer, Chief Financial Officer, Director, and Agent for Service of Process, and 50% owner of LeFever Mattson, a

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

stock corporation that buys and sells real estate to a substantial number of investors.  Prior to April 1, 2024, LeFever served as Director, Secretary, Agent for Service of Process, and 50% owner of LeFever Mattson.  Plaintiffs are informed and believe and thereon allege that LeFever and his affiliated entities described below, facilitate real estate investments on behalf of numerous investors, including Plaintiffs.

17.     Defendant **Kenneth W. Mattson** ("Mattson") is, and at relevant times has been, an individual citizen of the State of California, residing in Sonoma and Piedmont, California, and is over the age of 18.  Mattson is a Director of LeFever Mattson, a stock corporation that buys and sells real estate to a substantial number of investors.  Prior to April 1, 2024, Mattson served as Chief Executive Officer and Chief Financial Officer of LeFever Mattson.  Plaintiffs are informed and believe and thereon allege that Mattson and his affiliated entities described below, facilitate real estate investment on behalf of individual investors, including Plaintiffs. At all times relevant, upon information and belief, Mattson was acting on behalf and had authority to act on behalf of Defendants KS Mattson Partners, LP and Specialty Properties Partners, LP.

18.     Defendant **KS Mattson Partners, LP** ("KS Mattson Partners") is, and at all relevant times has been, a limited partnership organized under the laws of the State of California with its principal place of business in Vacaville, California.  Plaintiffs are informed and believe and thereon allege that KS Mattson Partners is a real estate investment entity. According to the California Secretary of State's website, Mattson is the registered agent for KS Mattson Partners. Plaintiffs are informed and believe and thereon allege that Mattson is the owner of KS Mattson Partners and controls the entity's operations.

19.     Defendant **Specialty Properties Partners, LP** ("Specialty Properties") is, and at all relevant times has been, a limited partnership organized under the laws of the State of California with its principal place of business in Citrus Heights, California.  Specialty Properties is a real estate investment partnership.

20.     All Defendants shall be referred to herein collectively as "Defendants."  At all times mentioned herein, each of the Defendants were and acted as the agents and servants of

their co-defendants, and in doing the things hereinafter alleged, were acting in concert with each other, aiding and abetting each other and acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of their codefendants.  There may be other individuals, partnerships, corporations or other entities that were involved, and Plaintiffs will amend this Complaint to add further entities.

**C.** **Relevant Non-Parties**

21.    **LeFever Mattson, Inc.** ("LeFever Mattson") is, and at all relevant times has been, a corporation organized under the laws of the State of California with its principal place of business in Citrus Heights, California.  Plaintiffs are informed and believe and thereon allege LeFever Mattson is a real estate investment entity with a portfolio of real estate, claimed by LeFever to be valued at over $400 million.[7]   Plaintiffs are informed and believe and thereon allege that at relevant times herein, Mattson was President, Chief Executive Officer, Chief Financial Officer, and a 50% co-owner of LeFever Mattson, with LeFever.  Plaintiffs are informed and believe and thereon allege that on or about April 1, 2024, Mattson resigned his positions as Chief Executive Officer and Chief Financial Officer of LeFever Mattson based in large part upon the fraudulent conduct described herein.  Thereafter, from  April 1, 2024, LeFever  served as Chief Executive Officer and Chief Financial Officer of LeFever Mattson until he resigned from those positions on or about September 16, 2024. LeFever Mattson filed for voluntary Chapter 11 bankruptcy on September 12, 2024.

22.    **LeFever Mattson I, LLC** is a California Limited Liability Company not in good standing and not authorized to do business in the state of California.  It is a wholly-owned subsidiary of LeFever Mattson.  Its principal place of business is 6539 Auburn Blvd, Ste. B, Citrus Heights, CA 95621. According to the California Secretary of State's website, LeFever is the registered agent for LeFever Mattson I, LLC.  Plaintiffs are informed and believe and

---

[7] Declaration of Timothy LeFever in support of LeFever Mattson, Inc. and Divi Divi Tree, LP's Opposition to Plaintiff's Motion for Preliminary Injunction ("LeFever Decl."), *Charlene Hultman v. Kenneth W. Mattson*, Case No. 4:24-cv-03381-JST (N.D. Cal. June 5, 2021), Dkt. 36-1.

1  thereon allege that LeFever Mattson I, LLC is a wholly owned subsidiary of LeFever Mattson,

2  which at all times herein relevant controlled the entity's operations. LeFever Mattson I, LLC

3  filed for voluntary Chapter 11 bankruptcy on September 12, 2024.

4      23.   **Home Tax Service of America, Inc.** (d/b/a LeFever Mattson Property

5  Management) ("LM Property Management") is, and at all relevant times has been, a

6  corporation organized under the laws of the State of California with its principal place of

7  business in Citrus Heights, California.  Plaintiffs are informed and believe and thereon allege

8  that LeFever is an owner and officer of LM Property Management, and at all times herein

9  relevant controlled the entity's operations. LM Property Management filed for voluntary

10  Chapter 11 bankruptcy on September 12, 2024.

11      24.   **Divi Divi Tree, LP** ("Divi Divi") is, and at all relevant times has been, a limited

12  partnership organized under the laws of the State of California with its principal place of

13  business in Citrus Heights, California. Divi Divi is a real estate investment partnership. Divi

14  Divi filed for voluntary Chapter 11 bankruptcy on September 12, 2024.

15                    <u>**JURISDICTION AND VENUE**</u>

16      25.   Subject matter jurisdiction is proper in this Court pursuant 28 U.S.C. §

17  1332(a)(1) because all Plaintiffs are citizens of different States from all Defendants, and

18  Plaintiffs each assert claims where the amount in controversy exceeds the sum or value of

19  $75,000, exclusive of interest and costs.  The Court has supplemental jurisdiction over the

20  Class and Elder Subclass members' claims pursuant to 28 U.S.C. § 1367.

21      26.   This Court has personal jurisdiction over Defendants, all of whom are citizens of

22  the State of California.

23      27.   Venue is proper under 28 U.S.C. § 1391(b) because (i) Defendants maintain their

24  principal place of businesses in this District; (ii) one or more of Defendants reside in this

25  District; (iii) a substantial portion of the transactions and wrongs complained of in this

26  Complaint occurred in this District; and (iv) Defendants received substantial compensation in

27

28

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**     9

this District by doing business here and engaging in numerous activities that had effects in this District.

28.     This action is related to another action pending before this Court, *Hultman v. Kenneth W. Mattson, et al*., Case No. 4:24-cv-03381-JST, within the meaning of L.R. 3-12(a).

29.     Under Local Rule 3-2(d), this action should be assigned to the San Francisco or Oakland division.

## FACTUAL ALLEGATIONS

### A.     LeFever and Mattson Start a Real Estate Business



*1979 High School Yearbook Photo of Ken Mattson and Tim LeFever*
*(Photo from Press Democrat)*

30.     Defendants LeFever and Mattson have been friends for decades.  They were classmates together at Cordova High School in Rancho Cordova, and again at UC Berkeley. Each was the best man in the other's wedding.  LeFever considered Mattson his best friend.[8]

31.     Mattson, according to a complaint filed by LeFever, is described and known as a "financial genius," a perception which was largely formed around his impressive investment portfolio, as well as "his uncanny ability to predict the economic future."[9]

---

[8] *See* Exhibit C, Complaint at 1, *Timothy LeFever, v. Kenneth W. Mattson*., Case No. 24CV03485 (Sonoma Superior Court, filed June 06, 2024).

[9] *Id.* at 3.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP



***Ken Mattson's Piedmont Home***
***(Photo from Press Democrat)***

32.    The duo have been business partners since 1990, when LeFever acquired a 50% interest in the company KWM Inc., a real estate investment company formed by Mattson around August 1989.[10]  The company later became known as LeFever Mattson.  According to Defendant LeFever, LeFever Mattson does not have and has never had any employees.  Until LeFever Mattson added a third director in early 2024, and prior to LeFever Mattson's bankruptcy filing, LeFever and Mattson were the only officers and directors of LeFever Mattson.[11]

33.    At all times since the formation of LeFever Mattson, LeFever and Mattson have each owned 50% of the company shares.   LeFever Mattson manages a portfolio of over 200 properties comprised of commercial, residential, office, and mixed-use real estate, as well as vacant land, throughout Northern California, primarily Sonoma, Sacramento, and Solano

---

[10] *Id.* at 2.

[11] LeFever Decl. ¶ 9, Dkt. 36-1.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1   Counties.  LeFever recently stated that LeFever Mattson's portfolio of real estate is valued at

2   over $400 million.[12]

3        34.    As LeFever Mattson grew, LeFever, in his capacity as a real estate broker and

4   attorney, started and operated LM Property Management, as well as the real estate brokerage

5   company California Investment Properties ("CIP").[13]   LM Property Management describes

6   itself as a California-wide commercial and residential real estate management and maintenance

7   company, with a portfolio of over 1,000 rental units and 600,000 square feet of commercial

8   space.[14] LM Property Management has 45 employees.

9        35.    In August of 1999, Mattson created his own real estate investment entity, KS

10  Mattson Partners LP.  Mattson is the registered agent for KS Mattson Partners.

11       **B.**     **The Investment Scheme**

12       36.    In the late 1990s, LeFever Mattson generally offered real estate opportunities to

13  outside investors by acquiring the real estate in a co-tenancy with investors.[15]

14       37.    That early business model changed over time: instead of acquiring real estate in

15  its own name, LeFever Mattson and KS Mattson Partners would create a wide range of

16  LeFever Mattson and KS Mattson Partners-owned investment limited partnerships ("LPs"), and

17  limited liability companies ("LLCs") that would each purchase one or more real properties (the

18  "Properties"). This structure allowed LeFever Mattson to pool more capital by selling limited

19  interests to a small number of accredited investors while typically reserving an ownership

20  interest in the investment entity for itself as general partner or managing member.  Defendant

21  Mattson consistently executed the Partnership Agreements as President of LeFever Mattson,

22  Inc. or Manager of KS Mattson Partners LP, depending on which entity was the general partner

23  or managing member of the Partnership. LeFever Mattson and KS Mattson Partners, LP,

24  _____

    [12] *Id.* at ¶11.

25      [13] *Id.* at 2.

26      [14] https://www.lefevermattson.com/ (last accessed October 16, 2024).

27      [15] *See* Exhibit C Complaint at 14, *Timothy LeFever, v. Kenneth W. Mattson.*, Case No.
    24CV03485 (Sonoma Superior Court, filed June 06, 2024).

28

1  through the efforts of LeFever and Mattson themselves, solicited investments from investors,

2  and reserved an ownership share in each LP for LeFever Mattson and KS Mattson Partners, LP

3  themselves.   According to LeFever, "most of the outside investors were Mattson's current or

4  former clients or other Mattson contacts."[16]

5       38.    LeFever Mattson also has ownership interests in four California corporations:

6  Debtor Home Tax Service of America, Inc., dba LeFever Mattson Property Management (the

7  "Property Manager"), which provides property management services, including to those

8  properties owned by the LPs and the LLCs; California Investment Properties ("CIP"), a

9  California corporation, which is a real estate brokerage; and Pineapple Bear, a California

10  corporation (which offers hospitality and catering services) and Harrow Cellars, a California

11  corporation (which operates a winery and related businesses).

12       39.    Since 1990, LeFever Mattson has grown substantially and by 2024 directly or

13  indirectly controlled or had an ownership interest in at least fifty LPs and eight LLCs and

14  managed a portfolio of more than 200 Properties, comprised of commercial, residential, office,

15  and mixed-use real estate, as well as vacant land, located throughout Northern California,

16  primarily in Sonoma, Sacramento, and Solano Counties. The Properties allegedly generate

17  income through rents and use the proceeds to fund their operations and pay distributions to

18  investors including Plaintiffs.

19       40.    Defendants Mattson and LeFever in their capacity as agents for LeFever Mattson

20  and KS Mattson Partners made several misrepresentations to investors in soliciting their

21  investments in the LPs and LLCs: first, that money invested with LeFever Mattson, KS

22  Mattson Partners, Mattson, or LeFever, or any of the affiliated LPs and LLCs, would be

23  applied to the acquisition of a specific real property owned by the partnership; second, that the

24  percentage of the purported partnership an investor received for a particular investment was

25  based on the value of the property; third, that the partnership would at all times maintain a

26  separate bank account in the name of the partnership into which the proceeds would be

27  _____
   [16] LeFever Decl. ¶ 12, Dkt. 36-1.

28

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

deposited; and fourth, that payments to investors would come from the partnership's proceeds through the management and sale of those properties, consistent with their purported partnership interest. As detailed herein, these representations were untrue.  While LeFever Mattson purported to maintain separate bank accounts for the LPs and LLCs, at various times throughout the Class Period the proceeds were commingled, and proceeds from certain LPs were used as loans for other LP property purchases and used to acquire different real properties. In many instances, continuing through today, LeFever Mattson, Mattson, LeFever, and KS Mattson Partners paid investor "distributions" from a single account with Bank of the West (now BMO Bank). Further, the percentages of an investors interest in the property was not based on the value of the underlying real property, and the payments to investors did not come from the management and sale of those properties.

41.     Documentation for the investments was scarce or, in some instances, non-existent.  For example, when soliciting investments, LeFever Mattson, KS Mattson Partners, and Defendants LeFever and Mattson individually, failed to  provide investors with information about the fair market value of the property which their pooled money would purportedly be used to purchase.  Investors also did not receive prospectuses or private placement memoranda, which, among other things, would have described their business plan, details regarding the proposed investments, and the various risks known to Defendants and the Chapter 11 Entities.  Instead, investors were made to rely on LeFever Mattson's and KS Mattson Partners' (and by extension, Mattson and LeFever's) representations as to the value of the properties, as well as the percentage ownership the investors would receive in exchange for a particular financial investment.

42.     In offering the limited partnership interests, Mattson and LeFever, LeFever Mattson and KS Mattson Partners represented to investors that they could expect regular distributions reflecting a fixed percentage return on their investments based on the net income derived from the operations of the real estate assets.  For years, investors did indeed receive monthly distribution checks reflecting those returns. Although, many times late or delayed, the

distribution checks remained consistent regardless of actual income generated from the operations of the commercial real estate assets, rate of occupancy for the rental properties, or changes in the real estate market.

43.    For example, if the rental income on a particular real property owned by an LP increased, the investors' distribution checks remained consistent. On information and belief, during the first several years of the Class Period, LeFever Mattson, KS Mattson Partners, LeFever, and Mattson rarely provided investors financial account statements reflecting the profits and losses of the investments, the current fair market value of the properties held by the LPs, or documentation reflecting that their distribution checks were the product of the properties' yearly profits. When financial account statements were provided, the statements were often incomplete, vague, and contained dubious line items. If properties held by the LPs were sold and the cash used to reinvest in further properties, LeFever Mattson and KS Mattson Partners, provided no documentation of the sale to the LP investors, nor an accounting reflecting the sale value, the proceeds from the sale, or the appreciation, if any, of the value of their interest in the partnership.

44.    Plaintiffs are informed and believe and thereon allege that early in the Class Period, LeFever Mattson, KS Mattson Partners, Mattson, and LeFever provided purported financial account statements to certain investors in LPs and LLCs; however, the financial account statements appear to be inaccurate and/or incomplete. None of the Plaintiffs named herein have received a complete financial account statement for their investments in the LeFever Mattson LPs and LLCs.

45.    Plaintiffs are informed and believe and thereon allege that LeFever Mattson set a minimum investment amount of $50,000 per investor per LP.  However, many LeFever Mattson investors invested far more, across a series of LPs, spanning several years and in some instances more than a decade. Plaintiffs are informed and believe and thereon allege that LeFever Mattson currently has hundreds of investors in its LPs, whose investments range from high five figures up to several million dollars.

46.     Unbeknownst to investors, after initiating the Investment Scheme, LeFever Mattson, KS Mattson Partners, Mattson, and LeFever began commingling funds that were intended for specific investments across all the LP and LLC investments that LeFever and Mattson controlled through their various legal entities.   Distribution checks to investors for various LPs were sent from a single bank account at Bank of the West, held in the name of LeFever Mattson, suggesting that they did not keep LP investment funds separated as required by law and by the partnership contracts.   Instead, they effectuated their Investment Scheme by, among other things, paying the above-described "distributions" to investors to maintain their ruse.  The regular distribution of checks to investors sustained their belief in the security of their investments and led to additional investments in the Investment Scheme.

47.     Since the Investment Scheme was revealed, Mattson has continued to send distribution checks to some (but not all) investors.  Up until earlier this year, distribution checks sent to Plaintiffs and other investors came from an account at Bank of the West held in the name of LeFever Mattson, with an account ending –1059 ("Bank of the West Account").  Checks from this single Bank of the West Account were sent to investors in several different LPs and LLCs, suggesting commingling of investor funds. The checks were signed by Defendants Mattson and LeFever on behalf of LeFever Mattson.

48.     Earlier this year, investors began receiving checks from a new account, with BMO Bank, with an account number ending –1380 ("BMO Account"). Unlike the earlier Bank of the West Account, the BMO Account was in the name of KS Mattson Partners, LP, not LeFever Mattson. Checks from the BMO account were sent to investors who purportedly invested in different LPs, suggesting continued commingling of investor funds. Defendant Mattson signed the checks on behalf of KS Mattson Partners. Mattson, on behalf of KS Mattson Partners, and mailed these distribution checks from California to investors in different states.

49.     To date, some investors continue to receive distribution checks, while others do not. Mattson and KS Mattson Partners have not provided investors with any information about

the  which real properties or partnerships their money is invested in (if any), the status of those

real properties , or how Mattson and KS Mattson Partners are  making decisions about which

investors will continue to receive distribution checks while others do not.

     **C.**    **LeFever Mattson's Investment Properties**

    50.    For nearly two decades, LeFever Mattson used the proceeds of the Investment

Scheme to purchase properties throughout the state of California, including, *inter alia*,

Redwood City, Vacaville, Riverside, Santa Barbara, Roseville, and Sacramento.[17]

    51.    LeFever Mattson frequently sells or transfers property from one company under

its control to another.  LeFever Mattson also often sells or purchases shared interests in specific

parcels, making ownership even more difficult to trace.[18]  Although most of the property is

purchased and sold through LeFever Mattson's various entities, Plaintiffs are informed and

believe and thereon allege that LeFever and Mattson also enlisted their spouses and adult

children as participants and enablers of their fraudulent Investment Scheme.

    52.    According to a *Press Democrat* article, as of March 2023, Defendants LeFever

and Mattson and their various entities own at least 116 properties in or around Sonoma, valued

at more than $240 million.[19]

    53.    Kenneth Mattson and his wife Stacy Mattson first started to buy property in

Sonoma Valley nearly ten years ago, often using an entity called KS Mattson Partners LP "KS

Mattson Trust" to make investments.  For example, in March of 2016, according to the deeds

filed with the Sonoma County Recorder's Office, KS Mattson Partners LP purchased Sonoma's

Best Deli and Cottages located at1190 E Napa Street from Thomas A & Gayle M. Jenkins.  By

---

[17] Phil Barber, *Sisters who invested $2 million with embattled Sonoma developer Ken Mattson sue to get money back*, The Press Democrat (Jun. 21, 2024), https://www.pressdemocrat.com/article/news/mattson-lawsuit-breach-of-contract/.

[18] Phil Barber, *LeFever Mattson and the real estate buys that have Sonoma residents alarmed*, The Press Democrat (Mar. 16, 2023), https://www.pressdemocrat.com/article/news/lefever-mattson-and-the-real-estate-buys-that-have-sonoma-residents-alarmed/.

[19] Phil Barber, *Mattson and LeFever: Who are the men behind the sweeping series of Sonoma real estate transactions?* The Press Democrat (Mar. 23, 2023), https://www.pressdemocrat.com/article/news/mattson-and-lefever-who-are-the-men-behind-the-sweeping-series-of-sonoma-r/.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

2019, KS Mattson Partners LP had spent approximately $80 million to purchase approximately26 different properties in Sonoma Valley, according to a *Press Democrat* article.[20] As of May 2021, Kenneth and Stacy Mattson's names appeared on the deeds of nearly 50 Sonoma Valley properties.[21]



***Aerial View of LeFever Mattson's Investment Properties in Sonoma Valley***
***(Aerial Photo from The Press Democrat)***

54.     Some notable purchases, either by  KS Mattson Partners LP or by LeFever Mattson and its various LLCs/LPs and entities, include Cornerstone Sonoma marketplace on Arnold Drive, Ramekins culinary school , and the General's Daughter event space on West Spain Street, the Leland Fishing Ranch property on Arnold Drive, the former Cocoa Planet building on Broadway, Cottage Inn & Spa in the downtown, the Mercado building on the Plaza, the Sojourn tasting room building on East Napa Street, the old Ravenswood Winery

---

[20] Lorna Sheridan, *Sonoma developers lambasted for anti-gay comments*, The Press Democrat (Apr. 25, 2019), https://www.pressdemocrat.com/article/business/sonoma-developers-lambasted-for-anti-gay-comments/.

[21] Lorna Sheridan, *Mattsons continue Sonoma Valley buying spree*, The Press Democrat (May 3, 2021), https://www.pressdemocrat.com/article/north-bay/mattsons-continue-sonoma-valley-buying-spree/.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

property, the Sonoma Cheese Factory on Spain Street and, most recently, the former Church Mouse building in the Springs.[22]

### D. Defendant LeFever's Role in the Investment Scheme

55.     Defendant LeFever, as 50% owner and Vice President of LeFever Mattson had sufficient information to have reasonably suspected Defendant Mattson's fraudulent transfers and self-serving transactions. Defendant LeFever participated or assisted in several of these self-serving transactions during the Class Period.

56.     In furtherance of the Investment Scheme, Defendant LeFever would often send cover letters on behalf of LeFever Mattson to new investors. The cover letters would usually state variations of the following, which was disseminated in March 2007:

> Congratulations. We are nearing the end of the process of the purchase of the Water's Edge Apartments, Sacramento, California.
>
> Enclosed you will find a number of documents related to this purchase. Some are for your review and records and others are for signature and return.
>
> You intend to be a co-tenant in the ownership of the Water's Edge Apartments and a copy of the co-tenancy agreement is attached.
>
> Schedule A of the co-tenancy agreement details owner contributions and corresponding ownership interests approximated as of close of escrow. These numbers may change by the time of close. According to the terms of the agreement, Schedule A will be modified should actual contributions made or required for close of escrow differ from those stated in that document.
>
> Please sign and return copies of this letter and the disclosure letter that follows. Please also sign and return a copy of the assignment agreement and signature pages for the co-tenancy agreement and exhibits.
>
> **After you have signed those copies that are marked for signature, please send these back in the attached envelope <u>as soon as possible</u>.**
>
> If your funds are coming from a source other than a property exchange, you will need to make arrangements for transferring funds.

---

[22] *Id.*

You will also need to make arrangements to sign the other financing documents that should be available soon.

**Please contact Toni Gay at Fidelity Title, Vacaville, to make arrangements for transferring funds and for signing the financing documents. Toni can be reached at (707) 449-3472.**

If you have any questions about the purchase, your contributions, or any documents you will need to sign, please call me at (707) 678-8867.

Tim LeFever
Real Estate Broker

57.     Investors, including the Walker Plaintiffs, received this cover letter from Defendant LeFever when investing in a new property. The enclosed documents including the co-tenancy agreement would often include a signature line for Defendant Mattson to execute the agreement as President of LeFever Mattson, INC. a California Corporation. Other documents, such as the Purchase and Sale Agreement for the underlying property were executed by Defendant LeFever as Vice President of LeFever Mattson, INC.

58.     In addition to the property purchase cover letter, Defendant LeFever also sent cover letters on behalf of LeFever Mattson when selling properties to roll investors into a partnership agreement. The cover letters would usually consist of the following, such as the below sent in August 2016:

Dear Country Oaks Owners,

Much has happened in the last month. As owners of the Country Oaks Apartments we entered into an agreement to sell the apartment complex. While these transactions are never certain until completed, it appears the sale will go through.

We intend to use the proceeds to purchase two new properties, an eight story office building five blocks from the California State Capitol, and one from the new Kings' arena, as well as a shopping center that adjoins a Walmart neighborhood grocery store in Vacaville.

Of course all three of these transactions are complex. But we are trying to make the process as easy as possible on all of us that have invested.

1
2
3
4
5

A number of documents are attached. For purposes of the new loans on these properties, the lenders will require that all current owners be members of an entity such as a limited partnership. Many of you are already members of Country Oaks I, LP. For you, we have included an updated operating agreement that reflects the anticipated transactions—sale of Country Oaks Apartments and purchase of the office building g and shopping center. For those of you that are outside of that limited partnership, we have created a new LP, River Tree Partners, LP. All of us (including LeFever Mattson) will need to deed our interests to the new LP. This action will require a Notary.

6
7

Jennifer Borges will include a checklist of what each of you needs to do. It is imperative that each of you review, sign and return these documents as soon as possible to keep us within the time frame of the purchase contracts.

8
9

Many of you have asked already about how these transactions will affect the amount of distributions. While we do not have final numbers, it is our intent to increase distributions significantly by the end of the year.

10

We are asking you to sign this and return to us as soon as possible

11
12

If you have any questions, please feel free to contact me at 707 330-5001 or tlefever@levefermattson.com.

13

Thank you,
Tim LeFever

14
15
16
17
18

59.     In this example, the attached Disclosures for Country Oaks I, LP includes a signature line for Defendant LeFever to execute the agreement as Vice President of LeFever Mattson, a California Corporation. The Disclosure also includes a signature line for Defendant Mattson to execute the agreement as President of "LeFever Mattson, Inc. a California Corporation."

19
20
21
22

60.     In addition to the property purchase and investor roll over cover letters, Defendant LeFever also sent cover letters on behalf of LeFever Mattson when LeFever Mattson proposed to change the type of ownership entity from an LLC to an LP. The cover letters would usually consist of the following, such as the below sent in November 2012:

23
24

Members of the Pinewood Condominiums, LLC:

25
26
27

As managing member of Pinewood Condominiums, LLC, LeFever Mattson is proposing a change in the type of ownership entity from a limited liability company (LLC) to a limited partnership (LP). In California there is an extra tax (the gross revenues tax) that is assessed on all income including rents that come into an LLC. By changing to an LP, we can avoid this extra cost.

28

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

You will find documents enclosed that provide for the change of entity.

If you have any questions, please call me. My contract information appears below.

Tim LeFever
For LeFever Mattson

61.     In this example, the attached Disclosures, Written Consent Agreement, and Plan of Conversion for the Pinewood Condominiums, LLC to convert to Pinewood Condominiums, LP includes a signature line for Defendant Mattson to execute the agreements as President of "LeFever Mattson, Inc. a California Corporation" for each document. The Certificate of Limited Partnership – Conversion filed with the State of California is executed by Defendant LeFever as Vice President of LeFever Mattson.

62.     In furtherance of the Investment Scheme, Defendant LeFever also used his expertise as a real estate broker to facilitate the self-dealing transactions between LeFever Mattson entities alongside Defendant Mattson. In one example, on April 9, 2018, LeFever Mattson entity, Windtree, LP purchased the property at 333-411 Wilkerson Ave. in Perris, CA for $8,500,000 from KS Mattson Partners, LP. Defendant Mattson executed the purchase agreement on behalf of both the buyer Windtree, LP and the seller KS Mattson Partners, LP. The Purchase Agreement is also signed by Defendant LeFever on behalf of LeFever Mattson, and as the Real Estate Broker (Listing Firm) for the Perris property.  According to the Purchase Agreement, the Buyer was to pay a 3% commission to the broker, allowing LeFever Mattson earn $255,000 from this self-dealing transaction. It is unclear whether Windtree, LP Investors understood or even sanctioned the self-dealing transaction.

63.     In a more recent example, Defendant LeFever also used his expertise as a real estate broker to facilitate the self-dealing transactions between Firetree III, LP, and KS Mattson Partners, LP again alongside Defendant Mattson. On April 13, 2022. LeFever Mattson entity, Firetree III, LP purchased the property located at 453-459 2nd, West, Sonoma, CA for $2,000,000 from KS Mattson Partners, LP. Defendant Mattson executed the purchase agreement on behalf of both the buyer Firetree III, LP and the seller KS Mattson Partners, LP.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

The Purchase Agreement is also signed by Defendant LeFever on behalf of LeFever Mattson, the Real Estate Broker (Listing Firm) for the Sonoma property. In executing the purchase agreement, Defendant Mattson includes his mrskwm@hotmail.com email address (a personal email address held in the name of Mattson's wife but used for Mattson's business purposes) while Defendant LeFever includes his LeFever Mattson email address tlefever@lefma.com as the designated electronic delivery address.

### E.    Defendants Fail to Manage the Investment Properties

64.    Defendants LeFever and Mattson's Investment Scheme included neglecting properties purchased with investor money, allowing them to fall into disrepair and depreciating the value of the investments.[23]  Many of the properties owned by LeFever Mattson are under-utilized, in disrepair, and/or completely vacant. Plaintiffs are informed and believe and thereon allege that Defendant LeFever and Mattson's mismanagement of the investment properties occurred while investors in LPs associated with these real properties continued to receive regular distribution checks. These continued distribution checks highlight Defendants' misrepresentation that payments to investors would come from the partnership's proceeds through the management and sale of those properties, consistent with their purported partnership interest. Continuing to issue checks from neglected properties allowed Defendants to effectuate their Investment Scheme by paying the agreed upon distributions to investors to maintain their ruse.  The regular distribution of checks to investors sustained their belief in the security of their investments and led Defendants LeFever and Mattson to obtain additional investments in the Investment Scheme.

65.    Defendant Mattson, through KS Mattson Partners and with the assistance of other Defendants including LeFever, would often purchase and/or refinance these neglected properties through hard money lenders such as Socotra Capital and its various entities. Plaintiffs are informed and believe and thereon allege that when investors invested in the LPs

---

[23] Lorna Sheridan, *Mattsons continue Sonoma Valley buying spree*, The Press Democrat (May 3, 2021), https://www.pressdemocrat.com/article/north-bay/mattsons-continue-sonoma-valley-buying-spree/.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

and LLCs, they were unaware that these underlying properties were encumbered by high-interest loans with balloon payments.

66.     When asked about the Mattsons' presence in Sonoma by the *Index-Tribune* (newspaper) in 2021, then-Sonoma Mayor Logan Harvey stated that the Mattsons appeared to "have a strategy of purchasing properties, closing down the existing business, and holding the property until the land value goes up."[24] Indeed, several of the properties that the Mattsons owned in 2021 were inactive or vacant, including CocoaPlanet located at 921 Broadway Sonoma, California purchased on April 3, 2018, the General's Daughter located at 400 W Spain St, Sonoma, California, the Leland Fishing Ranch located at 24120 Arnold Drive, Sonoma, California and the former Ravenswood property located at 18701 Gehricke Road, Sonoma, California.[25]

67.     KS Mattson Partners originally purchased CocoaPlanet for $2,500,000. On May 20, 2022, KS Mattson Partners sold CocoaPlanet to RT Capitol Mall LP for $1,900,000. KS Mattson Partners then purchased the property back from RT Capitol Mall LP. On September 21, 2022, RT Capitol Mall LP once again purchased CocoaPlanet from KS Mattson Partners.

68.     KS Mattson Partners originally purchased the Ravenswood property and then sold it to Sienna Pointe LLC, which then sold it to Windscape Apartments LLC. The General's Daughter, however, was originally purchased by LeFever Mattson who then sold it to Windscape Apartments LLC. Finally, KS Mattson Partners purchased the Leland Fishing Ranch and then sold it to Windscape Apartments LLC. Sonoma County records reflect that the deeds to Windscape Apartments LLC were all recorded in and around June 2023.

69.     Sonoma Mayor, Logan Harvey, expressed concern about the impact the properties' condition would have on the Sonoma real estate market more broadly, explaining

---

[24] *Id.*

[25] *Id.*

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

"[w]e can't just have a town of boarded-up storefronts and empty homes. Sonoma is a community, we must work to protect it."[26]



***CocoaPlanet Boarded and Fenced
(Photo from The Sonoma Index-Tribune)***

70.     There are a number of additional abandoned properties owned by LeFever Mattson in Sonoma, including 22 Boyes Blvd., behind the historic Boyes Post Office, which was empty when KS Mattson Partners acquired it in 2020 and which remains empty today.[27]

71.     The former Ravenswood Winery on Gehricke Road and the General's Daughter wedding venue are abandoned.

---

[26] *Id.*

[27] Lorna Sheridan, *Mattsons continue Sonoma Valley buying spree*, The Press Democrat (May 3, 2021), https://www.pressdemocrat.com/article/north-bay/mattsons-continue-sonoma-valley-buying-spree/.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP



***Boarded Entrance to the Former Ravenswood Winery***
***(Photo from San Francisco Chronicle)***

72.    In an interview conducted by the *San Francisco Chronicle*, Josette Browse-Eicher, vice-president of the activist group Wake Up Sonoma, described the former Ravenswood Winery as "a totally decayed property."[28]  California Department of Alcoholic Beverage Control records reflect Defendants or the Chapter 11 Entities never sought a liquor license for the Ravenswood property, suggesting they had no plans to re-open it or develop the property in any way.

---

[28] Jess Lander, *A 'derelict' winery and abandoned tasting rooms: How a Sonoma wine empire crumbled*, San Francisco Chronicle (June 17, 2024), https://www.sfchronicle.com/food/wine/article/mattson-ravenswood-cornerstone-sonoma-19511028.php.

73.     The former Ravenswood Winery remains deserted, five years after LeFever Mattson purchased and subsequently closed it in 2019.[29]



***Debris Filled lot of Former Ravenswood Winery***
***(Photo from San Francisco Chronicle)***

74.     The lot at 18010 Sonoma Highway, known as the Lanning Structure property, is another example.  Mattson had initially proposed a modern commercial development using shipping containers at this site, yet the lot remained vacant, completely untouched for eight years.[30]

75.     LeFever Mattson properties have also gathered significant outstanding tax balances.  As of February 1, 2024, various LeFever Mattson entities owed approximately

---

[29] *Id.*

[30] Phil Barber, *LeFever Mattson leaving a trail of lawsuits, broken promises amid sweeping Sonoma real estate buys*, The Press Democrat (Mar. 23, 2023), https://www.pressdemocrat.com/article/news/lefever-mattson-leaving-a-trail-of-lawsuits-broken-promises-amid-sweeping/.

$550,000 across over thirty properties.  Since then, LeFever Mattson has made partial payments, yet there remain substantial outstanding balances on other properties.[31]

### F.      **Defendants Used a Complex Web of Corporate Entities to Effectuate Their Fraudulent Scheme**

76.      Defendants LeFever and Mattson used a complex web of corporate entities to acquire real estate in California, making it difficult to track exactly which limited partnership funds are used to purchase property.  Defendant LeFever acts as the Registered Agent for nearly all of LeFever Mattson's 100-plus LLCs and LPs. The majority of LeFever Mattson companies are incorporated in California, with a few incorporated in Delaware.

77.      On October 7, 2022, two LeFever Mattson limited partnerships, Ginko Tree LP and Buckeye Tree LP, acquired three properties close to the intersection of Broadway and Maple Street in Sonoma.[32]

78.      Less than six weeks later, LeFever Mattson's Sienna Pointe LLC acquired two Sonoma parcels, one on Larkin Drive and the other on Studley Street.[33]

79.      Similarly, LeFever Mattson's Black Walnut LP and Red Spruce LP purchased two properties in December of 2022 for a total of over $23 million.[34]

80.      Plaintiffs are informed and believe and thereon allege that the creation and use of these LLCs and LPs to acquire property was part of LeFever Mattson's deliberate attempts to veil the Investment Scheme from the public and investors themselves.

81.      Defendants Mattson and LeFever appear to have used LeFever Mattson, KS Mattson Partners, LP and many of the LPs and LLCs to facilitate a years-long campaign of

---

[31] Phil Barber, *New Mattson investment pitch for downtown Sonoma has opponents on edge*, The Press Democrat (Feb. 28, 2024), https://www.pressdemocrat.com/article/news/new-mattson-investment-pitch-for-downtown-sonoma-has-opponents-on-edge/.

[32] Phil Barber, *LeFever Mattson and the real estate buys that have Sonoma residents alarmed*, The Press Democrat (Mar. 16, 2023), https://www.pressdemocrat.com/article/news/lefever-mattson-and-the-real-estate-buys-that-have-sonoma-residents-alarmed/.

[33] *Id.*

[34] *Id.*

Law Offices
Cotchett, Pitre &
McCarthy, LLP

self-serving transactions, many of which were not recorded in the books and records of LeFever Mattson or any of the other LPs or LLCs.

82.    Defendant Mattson, through KS Mattson Partners and with the assistance of LeFever Mattson and LeFever, appear to have used LeFever Mattson and KS Mattson Partners to sell equity interests in many of the LPs and LLCs to hundreds of investors through transactions that were not recorded in the books and records of LeFever Mattson or the appropriate LP or LLC. The proceeds of these sales— which, based on initial investigation and statements to the bankruptcy court, amounted to over $45 million during the period of May 2017 through March 2024—appear to have been misappropriated by Defendant Mattson and/or KS Mattson Partners, rather than been invested with the appropriate LeFever Mattson LP or LLC.

83.    A *Press Democrat* investigation uncovered that LeFever and Mattson, by and through LeFever Mattson, KS Mattson Partners, and the various LPs and LLCs, regularly transferred or sold properties between different companies, and that they would frequently buy or sell shared interests in specific parcels, further complicating the tracing of ownership.   For example, KS Mattson Partners purchased the Fruit Basket property in Sonoma for $5.5 million on August 2, 2021.  Three days later, KS Mattson Partners LP transferred the property to the Sienna Pointe LLC (a LeFever Mattson LLC), according to tax records.[35]  Defendant LeFever is the Registered Agent of Sienna Pointe LLC.

84.    Sales of LeFever Mattson properties were most often made to other entities controlled by Defendants, and often sold at inflated prices.  For example, KS Mattson Partners purchased 151 E. Napa St. for $3.8 million on June 1, 2021.  Just nine days later, KS Mattson Partners sold the property to a LeFever Mattson LP, River Birch LP, for $3.95 million.  This represented a $150,000 increase in price in just nine days.  Four months later, River Birch LP transferred ownership again, this time to LeFever Mattson Inc.

---

[35] Jason Walsh, *Schellville, Fruit Basket sells to Mattsons*, The Press Democrat (Apr. 18, 2022), https://www.pressdemocrat.com/article/north-bay/schellville-fruit-basket-sells-to-mattsons/.

85.     In his complaint against Mattson filed earlier this year, LeFever alleges that 430 W. Napa St. was initially purchased by Tradewinds Apartments LP, KS Mattson Partners, and Peak Napa Street Associates LLC, all LeFever Mattson or KS Mattson-related entities.  Later on, Peak Napa Street Associates LLC sold its ownership stake to KS Mattson, which subsequently transferred it to Tradewinds Apartments LP (another LeFever Mattson LP), which eventually sold to LeFever Mattson Inc.[36]

86.     Another example is the Inn 2 Remember on West Spain Street. The property was purchased by KS Mattson Partners for $2.4 million in July 2021.  It was sold the next month, August 2021, to LeFever Mattson's Sienna Point LLC for $1.18 million.

87.     A further example includes the property located at 103/105 Commerce Ct in Fairfield, California. KS Mattson Partners originally acquired this property on May 4, 2017, and quickly sold percentage interests in the property to sixteen separate investors including the Winser and Claridge Plaintiffs. Defendants LeFever and Mattson then created a separate limited partnership, Treehouse Investments LP and made the investors quitclaim their interest in the property to Treehouse Investments LP. Solano County records show that all original investors quitclaimed their deeds to the Commerce Ct property in and around May 2020. On August 20, 2020, Treehouse Investments LP sold the Commerce Court property to LeFever Mattson for $2,500,000. That same day, LeFever Mattson sold the property to Nut Pine LP for the same amount.

88.     In a similar scheme, KS Mattson Partners acquired the property located at 4950 Allison Parkway in Vacaville, California on February 26, 2016, for $3,675,000 and shortly thereafter sold percentage shares in the property to eight separate investors. The initial investment shares in the property totaled approximately $4,299.000, well over the initial purchase price. Defendants LeFever and Mattson then created a separate limited partnership, Golden Tree LP, and made investors quitclaim their interest in the property to Golden Tree.

---

[36] Phil Barber, *LeFever Mattson and the real estate buys that have Sonoma residents alarmed*, The Press Democrat (Mar. 16, 2023), https://www.pressdemocrat.com/article/news/lefever-mattson-and-the-real-estate-buys-that-have-sonoma-residents-alarmed/.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

Solano County records show that all original investors quitclaimed their deeds to the Allison Parkway property in and around March 2020. On August 07, 2020, Golden Tree LP sold part of the property to Beach Pine LP for $6,500,000. On August 19, 2020, Golden Tree LP again sold the remainder of the property to Beach Pine LP for an additional $2,500,000. On June 15, 2023, Beach Pine LP sold the property to Windscape Apartments LLC for $2,700,000.

89.     The real property transactions described herein are examples that illustrate the convoluted workings of the Investment Scheme:  LeFever Mattson and KS Mattson Partners constantly created and replaced entities under their control, moving properties between the various LPs and LLCs using investor money.  Plaintiffs are informed and believe and thereon allege that investors were not informed about these transactions between the LPs and underlying investment properties.

90.     In furtherance of the Investment Scheme, Defendant Mattson would inform investors that an investment property needed to be "refinanced." As a result, Defendant Mattson would request that investors deed their portion of the property over to KS Mattson Partners while committing to place the investor back on the deed once Defendant Mattson had completed the refinancing.  Instead of refinancing the property, Defendant Mattson would take out a substantial loan, often worth over $1,000,000, through a hard money lender such as Socotra Capital or one of its various entities including Socotra Reit I LLC.  Often, the investor would not be placed back on the deed.

91.     Over 25 companies registered to Defendant LeFever have either been converted out (changed from an LLC to an LP or vice versa) or shut down.  One example, Home Tax Service of America (dba LM Property Management), has been suspended and revived five times since its inception in 2000.[37]

92.     Some of these sales were at inflated prices, and some conveyed properties encumbered by high-interest loans with balloon payments, which Defendant Mattson took out through KS Mattson Partners and on which he has now defaulted. The sales have clouded title

---

[37] *Id.*

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

on a significant portion of the LeFever Mattson real estate portfolio, and several LPs and LLCs now hold properties that are encumbered by loans that are in default.

93.     Many of LeFever Mattson's transactions in Sonoma were funded through Socotra Capital, a Sacramento-based firm specializing in "hard money" loans secured by real estate rather than credit.  Socotra pools investors to finance deals typically avoided by traditional lenders, often at high interest rates ranging from 10% to 12%.[38]  Neither Defendant LeFever nor Mattson have made the required payments on the Socotra loans. As a result, the properties encumbered by these loans are currently subject to foreclosure proceedings by Socotra.

94.     An investigation conducted by the Press Democrat revealed that LeFever Mattson, LeFever, and Mattson sometimes purchased homes before they were even listed on the market, as reported by several Sonoma Valley real estate agents.  LeFever and Mattson (through LeFever Mattson) use an out-of-town title company for their paperwork, as evidenced by multiple documents filed by LeFever Mattson.  Additionally, the Press Democrat found that the two request sellers to sign nondisclosure agreements, as confirmed by three anonymous sources.[39]

95.     LeFever Mattson also purchased approximately forty lots in Truckee, California in January 2018.  These lots were being promoted as 'move-in ready' homes under the name Pinyon Creek II Homes.  The seller of these lots was Pinyon Partners LLC, with Adham Sbeih, CEO of Socotra Capital, serving as the registered agent for the company.[40]

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**G.      Revelations About the Investment Scheme Emerge From Defendants LeFever's and Mattson's Lawsuits Against One Another**

**1.      Dispute Over The Divi Divi Tree Limited Partnership**

96.     According to a lawsuit filed by Mattson against LeFever, a dispute arose between LeFever and Mattson in 2023 involving Divi Divi Tree LP,[41] a limited partnership formed to facilitate the purchase of the Sienna Pointe Apartments, an apartment complex in Moreno Valley, Riverside County California.   As set forth in their competing complaints, Mattson and LeFever disagree about whether Mattson had authority, as CEO of LeFever Mattson, to transfer LeFever Mattson's interests in Divi Divi to new investors.

97.     The Divi Divi partnership was formed between a Sacramento-based religious nonprofit corporation and LeFever Mattson I, LLC (a now suspended subsidiary of LeFever Mattson).[42]

98.     Mattson's complaint against LeFever, filed in June 2024, provided that "Divi originally owned a 400-unit apartment building located in Riverside, California.  At one time, LeFever Mattson owned a significant interest in Divi Divi.  However, over the years, LeFever Mattson sold its interests to new investors and deposited investment proceeds in a separate operational account for the benefit of LeFever Mattson."[43]  The "'400-unit apartment complex located in Riverside, California'" Mattson references in this complaint is the same Sienna Pointe Apartment complex LeFever identifies in his complaint against Mattson. On information and belief, Divi Divi sold its interest in the Sienna Pointe Apartments to Sienna Pointe LLC, a LeFever Mattson entity.

---

[41] *See* Exhibit D Complaint at 3, *Kenneth W. Mattson v. Timothy LeFever.*, Case No. 24CV011305 (Sacramento Superior Court, filed June 06, 2024).

[42]  *See* Exhibit C Complaint at 9, *Timothy LeFever, v. Kenneth W. Mattson.*, Case No. 24CV03485 (Sonoma Superior Court, filed June 06, 2024).

[43] *See* Exhibit D Complaint at 3, *Kenneth W. Mattson v. Timothy LeFever.*, Case No. 24CV011305 (Sacramento Superior Court, filed June 06, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**     33

99.     Mattson alleges that he had the authority to sell and transfer these limited partnership interests to new investors in Divi Divi given his position as CEO of LeFever Mattson and given the significant interest it held in Divi Divi at the time.[44]

100.    Mattson's complaint claims that these transactions were properly documented through Purchase and Sales Agreements.[45]

101.    LeFever's complaint contests Mattson's assertions.  LeFever contends that the only authorized distributions made by Divi Divi were made exclusively to the investors of record, who as of September 2015 included LeFever Mattson as the general partner and a limited partner holding a 26.522% interest in Divi along with 18 limited partners and their respective ownership interests: (1) The Richard V. Treakle and Carolyn C. Treakle Revocable Trust with a 14.442% interest, (2) The Anderson 2001 Revocable Trust with a 11.903% interest, (3) Chase Family Trust restated 1992 with a 3.74% interest, (4) John and Jean Kelley Revocable Trust with a 1.714% interest, (5) Solomon Living Trust dtd 3/20/01, Arthur M. Solomon and Donna Solomon, TTEE with a 1.444% interest, (6) Chris McCartney and Donna McCartney with a 2.407% interest, (7) Bob and Sarah Ganyo with a 4.212% interest, (8) Terry and Joyce Goff with a 4.212% interest, (9) The Taylor Marital Trust, Iris Murphy, trustee with a 1.253% interest, (10) Ron and Fran Perue with a 1.442% interest, (11) The Leonardini Family Trust, Richard Leonardini and Carla Leonardini, trustees with a 4.814% interest, (12) Willis and Linda Rice with a 4.814% interest, (13) The Specht Living Trust with a 1.87% interest, (14) Taffe Family Trust dtd 10/16/00 with a 2.02% interest, (15) David and Iris Murphy and Jeffrey Murphy with a 3.561% interest, (16) Keith and Anne Gockel with a 4.814% interest, (17) Kevin and Amy Kelley with a 4.814% interest, and (18) Youth For Christ Ministries with a 0.001% interest.[46]

---

[44] *Id*. at 10.

[45] *Id*. at 3.

[46] *See* Exhibit C, Complaint at 2 and 10, *Timothy LeFever, v. Kenneth W. Mattson*., Case No. 24CV03485 (Sonoma Superior Court, filed June 06, 2024); *See also* LeFever Decl. ¶ 22, Dkt. 36-1.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

102.   As set forth herein, Mattson, KS Mattson Partners, and LeFever Mattson fraudulently sold the Walker Plaintiffs, and the Michero Plaintiffs purported equity interests in Divi Divi Tree LP. LeFever Mattson has told the Walter and Michero Plaintiffs that they are not investors of record in Divi Divi Tree LP.

103.   Moreover, LeFever's complaint against Mattson asserts that purported Divi Divi interests sold to putative investors likely exceeded the total amount of Divi Divi interest that both KS Mattson Partners and LeFever Mattson owned together.  In other words, Mattson, KS Mattson, and LeFever Mattson sold more than 100% of total interest in value to investors. [47]

104.   According to LeFever, Mattson opened a bank account for LeFever Mattson with Bank of the West, with account ending –1059—the Bank of the West Account described above— that Mattson had ensured "he alone could access," to allow Mattson to "execute and manage the Putative Divi Sales and other self-dealing transactions without leaving a paper trail of bank records that LeFever or LM [LeFever Mattson] could find."[48]  However, LeFever's declaration filed in the related Hultman investor action acknowledges that LeFever had signing authority on the Bank of the West account and in some instances signed checks from the account.[49]  That Bank of the West account was held by LeFever Mattson. The Walker and Michero Plaintiffs received checks from this Bank of the West Account purporting to represent distributions of their interests in Divi Divi Tree LP. Beginning earlier this year, the Michero Plaintiffs began receiving  checks from the BMO Account in the name of KS Mattson Partners purporting to represent distributions of the interest in Divi Divi Tree LP.

105.   LeFever alleges that distributions made to investors were not on behalf of LeFever Mattson, but rather made in Mattson's personal capacity.[50]

---

[47] *Id*. at 18.

[48] *Id*. at 13.

[49] *See* LeFever Decl. ¶ 25, Dkt. 36-1.

[50] *See* Exhibit C, Complaint at 13-14, *Timothy LeFever, v. Kenneth W. Mattson*., Case No. 24CV03485 (Sonoma Superior Court, filed June 06, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**      35

1

2.      **Mattson's Departure From LeFever Mattson**

106.    In February 2024, LeFever called a Special Board Meeting of LeFever Mattson. At this Board meeting, LeFever presented Mattson with an indemnity agreement which Mattson later signed.[51]

107.    Mattson has since claimed in his lawsuit against LeFever that he did not read through the indemnity agreement thoroughly and that he signed the agreement under duress, relying on the representations made by LeFever and Scott Smith (LeFever Mattson's in-house counsel) during the meeting.  Mattson further claimed that the agreement contained false recitals and wrongly pinned blame for the Investment Scheme on him.  Mattson also believed that Smith represented the interests of LeFever Mattson, and not LeFever as an individual at the time.[52]

108.    On April 1, 2024, Tim LeFever sent an email to investors notifying them that: "Ken Mattson has resigned from his positions as Chief Executive Officer and Chief Financial Officer of LeFever Mattson. Tim LeFever has been elected to both of those positions in his place."  The email also notified investors that "[t]he Board of Directors of LeFever Mattson" (at that point just LeFever and Smith) "is pausing discretionary monthly distributions for all limited partnerships and LLCs where LeFever Mattson is the general partner or managing member while management evaluates the future direction of each limited partnership and LLC."  The letter went on: "Any distributions you've received from Mr. Mattson related to Divi Divi were not paid by Divi Divi and do not correlate to the actual distributions paid by Divi Divi to its partners of record. Instead, any distributions to you were paid by Mr. Mattson individually."[53]

---

[51] *See* Exhibit D, Complaint at 4; Kenneth W. Mattson v. Timothy LeFever, et al.; Sacramento Superior Court, Case No. 24CV011305.

[52] *Id.* at 5.

[53] *See* Complaint at 7, *Charlene Hultman v. Kenneth W. Mattson,* Case No. 4:24-cv-03381-JST (N.D. Cal. June 05, 2024).

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**      36

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1    109.    That same day, April 1, 2024, Mattson resigned as CEO of LeFever Mattson.[54]

2    110.    LeFever's communication to investors came just one week after the revelation

3    that companies affiliated with LeFever and Mattson were responsible for almost $1.2 million in

4    overdue payments for mortgages and property taxes on 15 properties throughout Sonoma

5    Valley.[55]

6    111.    In late May 2024, Mattson, speaking through his legal team, told investors that

7    "Any transfer of an interest in Divi Divi over the years by LeFever-Mattson to you (the

8    investors) was documented and approved by me.  All proceeds from such sales were deposited

9    with and used by LeFever Mattson, not me."  He further stated "I understand Tim LeFever has

10   ceased all regular monetary distributions to the Divi Divi investors.  This is his decision, not

11   mine."[56]

12   112.    The *Press Democrat* reported that on May 24, 2024, the Federal Bureau of

13   Investigation raided Mattson's Sonoma County home.[57]  Mattson is also under investigation by

14   the Department of Justice, the United States Attorney for the Northern District of California,

15   and the Office of the Inspector General of the United States Postal Service.

16   113.    LeFever's lawsuit also alleges that Mattson had purchased property for his own

17   personal use and then put the property in his own name or that of KS Mattson Partners through

18   LeFever Mattson including Mattson's Sonoma mansion.[58]

---

[54] Chase Hunter, *Ken Mattson resigns as CEO of LeFever Mattson Property Management*, The Press Democrat (Apr. 8, 2024), https://www.pressdemocrat.com/article/news/ken-mattson-resigns-as-ceo-of-lefever-mattson-property-management/.

[55] *Id*.

[56] *Read embattled Sonoma developer Ken Mattson's full statement addressing accusations of wrongdoing made by former business partner,* The Press Democrat (May 31, 2024), https://www.pressdemocrat.com/article/news/mattson-statement-in-full/.

[57] Phil Barber, *FBI raids Sonoma home of embattled local real estate developer Ken Mattson*, The Press Democrat (May 24, 2024), https://www.pressdemocrat.com/article/news/mattson-sonoma-fbi/.

[58] *See* Exhibit C Complaint at 14, *Timothy LeFever, v. Kenneth W. Mattson*., Case No. 24CV03485 (Sonoma Superior Court, filed June 06, 2024).

114.   Several investors have taken action in response to the revelations about the Investment Scheme.

115.   For example, on June 20, 2024, Tamara Migliozzi, an in-law of Mattson[59] filed a civil action in Sonoma Superior Court against Mattson for Fraud, Breach of Fiduciary Duty, Breach of Contract, and Securities Fraud.

116.   The complaint alleges that in or around October 3, 2017, Migliozzi invested her retirement funds amounting to $310,500 into Divi Divi Tree, L.P, under Mattson's recommendations.  Following Mattson's instructions, Migliozzi then transferred the funds via the Madison Trust Company, which was to administer Migliozzi's self-directed IRA investment to the LeFever Mattson, Inc.-Divi Divi Tree, L.P. beneficiary account of Bank of the West.[60]  In connection with this investment, an agreement was signed by Mattson on behalf of LeFever Mattson.

117.   On January 29, 2024, Migliozzi requested to withdraw her investment from Divi Divi Tree LP.  In response, Mattson "hesitated and balked," informing her that it would take 60 to 90 days to accomplish.[61]  The lawsuit claims damages in the amount of $410,000.[62]

**H.   Recent Revelations About the Investment Scheme**

118.   Since the Investment Scheme came to light, Defendant LeFever has continued to make misrepresentations to investors concerning their investments with Defendants and the Chapter 11 Entities. These communications further reveal the scope, complexity, and ongoing nature of the Investment Scheme.

---

[59] Phil Barber, *Another lawsuit against Ken Mattson, but this one has a twist: It was filed by one of his in-laws*, The Press Democrat (Jun 26, 2024), https://www.pressdemocrat.com/article/news/mattson-lawsuit-in-law-sonoma/.

[60] *See* Complaint at 4; *Tamara D. Migliozzi v. Kenneth W. Mattson*, Case No. 24CV03663 (Sonoma Superior Court, filed June 20, 2024).

[61] *Id.* at 5.

[62] *Id.* at 9.

Law Offices
COTCHETT, PITRE & McCARTHY, LLP

119.   For example, on June 21, 2024, LeFever circulated an "open letter" to a group of investors, via a listserv titled "Mattson Inquiries."[63]  The letter claimed LeFever was himself a victim of the Investment Scheme, and made the following statements:

- Asking Mattson to "come clean" on what he has done, and to "… make arrangements to reimburse your victims because this is the right thing to do."[64]

- Telling Mattson to "consider the consequences as your many lies start to unravel", and relaying the experiences of other investors, who told LeFever about "losing everything" to Mattson who "… came back again and again to take their retirement savings, the proceeds from the sale of a home, their inheritances.[65]

- Claiming that Mattson had already admitted wrongdoing in private conversations between the two: "On May 6, 2024, in one of the more remorseful moments, you called me and apologized.  You said there was no explanation for what you had done.  You also said that you would liquidate everything and that you were just asking for the ability to sit with each person, tell them what you have done, and make it right."[66]

120.   Publicly available information and statements from LeFever himself reveal that Mattson may be hastily selling properties.  On June 20, 2024, the Press Democrat reported that police received a report of individuals removing items from the Mattson-owned Sonoma's Best

---

[63] Phil Barber, *Tim LeFever wrote Sonoma developer Tim Mattson a letter urging him to 'come clean.' Then he circulated it to investors*, The Press Democrat (Jun. 21, 2024), https://www.pressdemocrat.com/article/news/mattson-lefever-investors-come-clean/.

[64] *Id.*

[65] *Id.*

[66] *Id.*

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1    Market and Deli.  The caller alleged that the intruders were Mattson and his wife Stacy.[67]

2    Mattson had sold the property to a third party, Chris Fanini, the previous month.[68]

3        121.   The *Press Democrat* further reported that Fanini purchased twelve properties

4    from KS Mattson Partners, including the Sonoma Cheese Factory, in May 2024.[69]

5        122.   In a June 27, 2024 communication to investors (attached in its entirety hereto as

6    Exhibit B), LeFever confirmed LeFever Mattson was in the process of selling properties and

7    paying proceeds to investors (emphasis added):

> As Ken Mattson's misdeeds were coming to light, Ken and I agreed
> that it would be best to begin the process of selling the portfolio of
> properties that are held by the partnerships. ***That process of selling
> properties is ongoing***.
>
> The partnerships led by LeFever Mattson have proven to be good
> investments for decades. Monthly distributions have been a
> welcome source of income for each of you, and for those
> partnerships that have sold properties and distributed the proceeds,
> the returns have been attractive. ***But these partnerships are not
> insulated from the realities of the real estate market, the economy
> in general, or the chaos caused by the problems related to Ken
> Mattson.***
>
> As discussed above, LeFever Mattson has a long term goal of
> selling the properties held in these partnerships and returning
> proceeds to the investors. But here also, many investors want more
> information than I can give at this time. ***We have started selling
> properties and proceeds have been paid to investors. We are
> receiving offers on properties every week. Some of these offers are
> very good, while others are below market value and we are
> continuing to negotiate. For all of these properties, I will bring the
> investors into the process and inform them concerning a property
> sale as soon as it is appropriate.***
>
> ***At LeFever Mattson we are seeking to maximize the proceeds for
> our investors, both in the distributions that will have been paid
> through the life of the investment and the proceeds on sale.*** But
> we are doing much more than that in seeking a remedy for the
> Mattson activities. We know that many of you that are owners of
> record in our partnerships have also invested in Mattson's sales that
> were not authorized or disclosed to LeFever Mattson, or were part

---

[67] Phil Barber, *Ken Mattson, wife implicated in attempt to remove property from Sonoma
business they sold*, The Press Democrat (Jun. 20, 2024),
https://www.pressdemocrat.com/article/news/mattson-sonomas-best-break-in/.

[68] *Id.*

[69] *Id.*

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

of his separate businesses often carried out under his partnership, KS Mattson Partners, LP. I am grateful to our staff that blew the whistle on Ken's schemes and continue to be engaged in the investigation. I am also grateful to so many of you that have come forward to tell your story. Please do not stop doing that. Your information is vital as we continue to investigate. Please direct any information that might be helpful to Mattsoninquiries@lefma.com.

123.    LeFever's statement that properties had been sold and "proceeds paid to investors," without identifying which properties were sold and which LPs received the proceeds from those sales, further suggests that Defendants continue to commingle investors' funds. LeFever does not state whether the "proceeds paid to investors" were made in the form of distributions or as a liquidation of the original capital investment.  Plaintiffs themselves have not received any information about the sale of properties held by their LPs, and are informed and believe and hereon allege that no investor has received such information.  LeFever's assertion that LeFever Mattson will "***bring the investors into the process and inform them concerning a property sale as soon as it is appropriate***" further suggests that no investor has received information reflecting that money received from sale proceeds reflects the profit of the particular property they invested in.  To the contrary, the appropriate inference from LeFever's statement is that Defendants were engaged in improperly commingling proceeds from sales to make distributions rather than return the original capital investment (adjusted to accommodate for the sale proceeds) to investors.

## I.    Potential Dissipation of Investor Assets

124.    Following Defendant LeFever's June 27, 2024 letter, Plaintiffs and investors have recently learned that LeFever Mattson and KS Mattson Partners' investment properties have either been in default or foreclosure proceedings since March 2024. LeFever Mattson and/or KS Mattson Partners have also sold some of these properties to outside buyers without informing Plaintiffs and investors about the status of the properties or the foreclosure sales.

125.    On March 22, 2024, 1200 Apple Tree Court, a Beach Pine LP property, received a Notice of Default from the County of Sonoma. Beach Pine LP originally acquired the property from KS Mattson Partners LP on June 20, 2023, for $760,000. On August 19, 2024,

Beach Pine LP sold the 1200 Apple Tree Court to I Heart Sonoma LLC for $1.4 Million. I Heart Sonoma is a business entity owned by Chris Fanini – founder of Weebly and a known associate of Defendant Mattson. The Walker Plaintiffs own a 4.155% share in Beach Pine LP and were not notified of the sale of the property. There are additional Beach Pine LP investors in the same position

126.   On March 22, 2024, 1190 E Napa Street, a KS Mattson Partners LP property, received a Notice of Default from the County of Sonoma. On May 16, 2024, KS Mattson Partners LP sold 1190 E Napa Street to 1190 E Napa LLC for $3.9 Million.

127.   On March 21, 2024, 72 Moon Mountain Road and 74 Moon Mountain Road, a KS Mattson Partner LP property, received a Notice of Default from the County of Sonoma. On May 6, 2024, KS Mattson Partners sold 72 Moon Mountain Road and 74 Moon Mountain Road to I Heart Sonoma LLC for $3 Million as a multi-property sale. I Heart Sonoma is a business entity owned by Chris Fanini – founder of Weebly and a known associate of Defendant Mattson.

128.   On March 11, 2024, 1221 Apple Tree Court, a KS Mattson Partner LP property, received a Notice of Default from the County of Sonoma. KS Mattson Partners LP originally acquired the property from Dorothie Marsden F/TR on June 7, 2019, for $1.4 Million. On May 6, 2024, KS Mattson Partners sold the 1221 Apple Tree Court to I Heart Sonoma LLC for $1.4 Million. I Heart Sonoma is a business entity owned by Chris Fanini – founder of Weebly and a known associate of Defendant Mattson.

129.   On August 29, 2014, 280 Yosemite Boulevard in Stanislaus County was acquired by LeFever Mattson. Additionally on August 29, 2014, LeFever Mattson sold 280 Yosemite Boulevard for an unknown amount to Hagar Properties LP, a LeFever Mattson entity of which defendant Timothy LeFever is the registered agent. On May 3, 2024, Hagar Properties LP sold 280 Yosemite Boulevard to an external LeFever Mattson entity, Redwoods Modesto CA LLC for $35.3 Million. Some investors in Hagar Properties LP were not initially notified of the sale

and only received a fraction of the proceeds in comparison to their percentage share when the property was sold for $35.3 Million.

130.   On June 6, 2007, 724 Cottonwood Street in Yolo County was acquired by LeFever Mattson. On April 3, 2019, LeFever Mattson sold the 724 Cottonwood Street property for an unknown amount to Nut Pine LP, a LeFever Mattson entity of which Timothy LeFever is the registered agent. On June 25, 2020, Nut Pine LP sold 724 Cottonwood Street to another LeFever Mattson business entity, Woodland Oaks Investments LLC for $4,571,000. Timothy LeFever is also the registered agent for Woodland Oaks Investments LLC. On October 26, 2023, Woodland Oaks Investments sold 724 Cottonwood Street to an external LeFever Mattson entity, MT Baldy Woodland LLC for $13.3 Million.

131.   On September 28, 2007, 333 East Enos Drive in Santa Barbara County was acquired by LeFever Mattson. On September 9, 2016, LeFever Mattson sold the 333 East Enos Drive property for an unknown amount to River Tree Partners LP, a LeFever Mattson entity of which Timothy LeFever is the registered agent. Simultaneously on September 9, 2016, River Tree Partners LP sold 333 East Enos Drive to an external LeFever Mattson entity, 333 East Enos Drive Owner LLC for $37 Million.

### J.     LeFever Mattson Entities File for Bankruptcy

132.   On August 6, 2024, Windscape Apartments, LLC, an entity directly or indirectly controlled by LeFever Mattson, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of California (Santa Rosa Division).

133.   On September 12, 2024, LeFever Mattson and fifty-seven affiliated entities, limited partnerships, and limited liability companies also filed for Chapter 11 bankruptcy.  On September 20, 2024, the bankruptcy court entered an order directing the joint administration for procedural purposes of the LeFever Mattson affiliate Chapter 11 cases.[70] These cases are now consolidated jointly administered under the case titled *In re LeFever Mattson, a California*

---

[70] Case No. 24-10545, ECF No. 45.

*corporation, et al.*, Lead Case No. 24-10545 (Bankr. N.D. Cal.) (the "LeFever Mattson Bankruptcy Action"), pending before Judge Charles Novack.[71]

134.   On October 2, 2024, two additional LeFever Mattson limited partnerships (Pinewood Condominiums, LP and Ponderosa Pines, LP) filed voluntary petitions for Chapter 11 bankruptcy; those proceedings have yet to be consolidated into the LeFever Mattson Bankruptcy Action.

135.   On October 9, 2024, pursuant to 11 U.S.C. § 1102(a), the United States Trustee appointed a seven-member Official Committee of Unsecured Creditors ("OCC"), several of whom appear to be putative Class members.[72] The OCC retained Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel. The first meeting of creditors in the LeFever Mattson Bankruptcy Action will occur on October 21, 2024.[73]

136.   In July 2024, LeFever Mattson hired Bradley D. Sharp as a financial advisor. Mr. Sharp is the President and Chief Executive Officer of Development Specialists, Inc., a leading provider of management consulting and financial advisory services, including turnaround consulting, fiduciary roles, and financial restructuring services.  As of the September 12 filings, Mr. Sharp was appointed the Chief Restricting Officer of the LeFever Mattson debtors. Additionally, as of the September 12 filings, both Defendants LeFever and Mattson have resigned from any director or officer position with any LeFever Mattson debtor entity.

## PLAINTIFFS' EXPERIENCES WITH THE INVESTMENT SCHEME

### A.   Claridge and Winser Plaintiffs

137.   Capri Winser ("Winser") and her husband Richard Claridge ("Claridge") are sixty-eight- and fifty-eight-year-old Virginia residents who first invested with LeFever-Mattson entities in September 2016. Winser initially heard about Defendant Ken Mattson from her

---

[71] *See* ECF No. 58.  LeFever Mattson Bankruptcy Action, ECF No. 45.

[72] *See* LeFever Mattson Bankruptcy Action, ECF No. 135.

[73] *See* LeFever Mattson Bankruptcy Action, ECF No. 128.

brother in 2016 when she and her brother decided to sell a house they had inherited. Defendant Mattson represented himself as someone who could put together a 1031 exchange for commercial property and would pay a fixed rate of return monthly. Winser's brother had heard about Defendant Mattson from Richard Lull who also had invested with Defendant Mattson. Richard Lull's sister, Elizabeth Lull Walker, was a high school classmate of Winser's and had also invested with Defendant Mattson. Eventually, more than half of the Claridge and Winser Plaintiffs' life savings would be committed to Mattson's portfolios, which, as income-generating assets, were expected to provide over half their living income. The Claridge and Winser Plaintiffs purchased what they believed to be interests in real property and several limited partnerships associated with such property from KS Mattson Partners LP, LeFever Mattson, Inc., or entities associated with Ken Mattson on behalf of their Joint Revocable Trust of Richard Allen Claridge, Jr. and Capri Lynn Winser ("Claridge-Winser Trust").

138.    In September 2016, the Claridge-Winser Trust bought what it understood to be a 12.282 percent interest in real property known as 4950, 4960, 4970 Allison Parkway, Vacaville, California from KS Mattson Partners LP for a total purchase price of $665,000.  The Purchase Agreement is signed by Defendant Mattson as the Seller on behalf of KS Mattson Partners, LP. The Purchase Agreement is also signed by Defendant LeFever on behalf of California Investment Properties, the Real Estate Broker (Listing Firm) for the Vacaville property. California Investment Properties is one of several LeFever Mattson Entities currently undergoing Bankruptcy proceedings.

139.    The Claridge-Winser Trust investment was subsequently transferred to Golden Tree LP via quitclaim deed on March 18, 2020, and recorded as a 12.282 percent share of Golden Tree LP with a beginning capital account of $493,566, according to the Claridge-Winser Trust's 2021 IRS Schedule K-1 issued by Golden Tree LP. However, the sale amount recorded for Plaintiffs' Winser and Claridge totaled $660,000, a $166,434 discrepancy. LeFever Mattson, Inc. was at relevant times the general partner of Golden Tree LP, and upon the Claridge-Winser Trust's property transfer to Golden Tree LP, Defendant Ken Mattson

signed the partnership agreement as President of LeFever Mattson, Inc.  KS Mattson Partners LP was another signatory.  Defendant LeFever is listed as the agent for service of process of the Partnership at paragraph 2.4 of the Golden Tree LP Agreement. The ending capital account on this share totaled $453,914 according to the Claridge-Winser Trust's 2023 IRS Schedule K-1 issued by Golden Tree LP.

140.   Similarly, in September 2016 the Claridge-Winser Trust bought what it understood to be a 7.348 percent interest in real property known as 103, 105 Commerce Court, Fairfield, California from KS Mattson Partners LP for a total purchase price of $594,000. The Purchase Agreement is signed by Defendant Mattson as the Seller on behalf of KS Mattson Partners, LP.  The Purchase Agreement is also signed by Defendant LeFever on behalf of California Investment Properties, the Real Estate Broker (Listing Firm) for the Fairfield property.  The Claridge-Winser Trust investment was subsequently transferred to Treehouse Investments LP in June 2020 and recorded a 7.348 percent share of Treehouse Investments LP with a beginning capital account of $568,753 according to the Claridge-Winser Trust's 2021 IRS Schedule K-1 issued by Treehouse Investments LP.  Defendant Ken Mattson signed the partnership agreement on behalf of LeFever Mattson, Inc. as general partner of Treehouse Investments LP. KS Mattson Partners LP was another signatory. Defendant LeFever is listed as the agent for service of process on the Partnership at paragraph 2.4 of the Treehouse Agreement. Exhibit "A" of the Treehouse Partnership Agreement lists the percentage ownership for each investor. The ownership interests total 103%.

141.   As of December 2023, the capital account on the Claridge-Winser Trust's 7.348 percent share totaled $516,876 according to the Claridge-Winser Trust's 2023 IRS Schedule K-1 issued by Treehouse Investments LP.

142.   In September 2016, the Claridge-Winser Trust bought what it understood to be a 6.081 percent interest in real property known as 7456 Foothills Boulevard, Roseville, California from KS Mattson Partners LP for a total purchase price of $577,000. The Purchase Agreement is signed by Defendant Mattson as the Seller on behalf of KS Mattson Partners, LP.

The Purchase Agreement is also signed by Defendant LeFever on behalf of California Investment Properties, the Real Estate Broker (Listing Firm) for the Roseville property. The Claridge-Winser Trust investment was subsequently transferred to Windtree LP by 2018 and recorded a 6.081 percent share of Windtree LP with a beginning 2019 capital account of $529,780, according to the Claridge-Winser Trust's 2019 IRS Schedule K-1 issued by Windtree LP. Defendant LeFever signed the Windtree LP Agreement on behalf of General Partner LeFever Mattson in his capacity as Vice President. Defendant Mattson signed the Windtree LP Agreement on behalf of Limited Partner KS Mattson Partners, LP in his capacity as Manager.  LeFever Mattson, Inc. was at relevant times general partner of Windtree LP, and KS Mattson Partners LP was a limited partner. Exhibit "A" of the Windtree Partnership Agreement lists the percentage ownership for each investor. The ownership interests total 101.45%. Exhibit B of the Windtree Partnership Agreement provides a copy of the LeFever Mattson Property Management Agreement for a property located at 333, 343, 351, 371, 391, 393, and 411 Wilkerson Ave, Perris California. The Property Management Agreement is dated April 6, 2018, and is signed by Defendant LeFever in his capacity as Secretary for LeFever Mattson. Defendant LeFever also signed the Property Management Agreement on behalf of LeFever Mattson for Windtree, LP, its General Partner.

143.   As of December 2023, the capital account on the Claridge-Winser Trust's share totaled $350,886 according to the Claridge-Winser Trust's 2023 IRS Schedule K-1 issued by Windtree LP.

144.   Between November 2016 and July 2018, Claridge and Winser received regular monthly distributions through all three investments in the amount of $2,187.50 each.  In July 2018, the Foothills/Windtree, LP investment increased to monthly distributions in the amount of $2,843.75 but the monthly distributions through the other two investments in the amount of $2,187.50 remained the same. In November 2016, the Claridge Winser Plaintiffs received an initial distribution check for the Allison Parkway property from LeFever Mattson. The Bank account associated with this check was Bank of the West #9078/1211. The memo line for the

checks received for the Allison Parkway property read "ALLI0916excg/Owner WD" where "ALLI" means Allison Parkway; "0916" means September 2016; "exch" means 1031 Exchange and; "Owner WD" means Owner Withdrawal. The memo line on the checks did not change throughout the duration of the distributions even though Solano County records show the Allison Parkway Property was sold to Beach Pine for $6,500,000 recorded with the County on August 19, 2020, with an additional transaction for $2,500,000 recorded with the County on June 16, 2021. Beach Pine then sold the property to Windscape Apartments LLC for $2,700,000, recorded with the County on July 06, 2023. Defendants never informed Plaintiff Winser and/or Claridge that the property had been sold. On the contrary, Defendant Mattson always implied that Plaintiffs were still invested in this property.

145. In November 2016, the Claridge Winser Plaintiffs also received an initial distribution check for the Commerce Court property from KS Mattson Partners LP. The Bank account associated with this check was Bank of the West #9078/1211. The memo line for the checks received from the Commerce Court property read "COMM0916excg/ Owner WD" where "comm" means Commerce Court; "0916" means September 2016; "exch" means 1031 Exchange and; "Owner WD" means Owner Withdrawal. The memo line on the checks did not change throughout the duration of the distributions even though Solano County records show Treehouse Investments LP sold the Commerce Court property to LeFever Mattson for $2,500,000 on August 20, 2020, and recorded with Solano County on June 16, 2021. That same day, on August 20, 2020, LeFever Mattson sold the Commerce Court property to Nut Pine LP for $2,500,000 also recorded with Solano County on June 16, 2021.  Defendants never informed Plaintiff Winser and/or Claridge that the property had been sold. On the contrary, Defendant Mattson always implied that Plaintiffs were still invested in this property.

146. The Claridge Winser Plaintiffs received a distribution check dated March 2, 2024, from KS Mattson Partners, LP for the Alison Parkway property according to the Memo line. The bank account associated with this check changed to BMO Harris Bank N.A. #2-2566/710. Similarly, the Claridge Winser Plaintiffs received a distribution check dated April 5,

2024, from KS Mattson Partners, LP for the Commerce Court property according to the Memo line. The bank account associated with this check changed to BMO Harris Bank N.A. #2-2566/710.

147.   Distributions owed, however, are now in default, and, upon their contacting LeFever Mattson, Inc., they were informed that neither Claridge nor Winser's names nor their partnerships were in LeFever Mattson, Inc.'s current ownership database.

148.   The Claridge and Winser Plaintiffs have not received all the investment materials owed to them based on their investments.

**B.     Michero Plaintiffs**

149.   Plaintiffs Todd and Lori Michero are both sixty-five years old and as of September 2024 reside in Oklahoma.  They previously resided in Alaska, since 2013, and prior to that they resided in California.  The Micheros have made a total of three investments in the Investment Scheme.

150.   In approximately 2008, at the invitation of Defendant Mattson, Mr. Michero invested his retirement funds in what he believed to be Divi Divi Tree through an IRA account. That IRA account is now held with Madison Trust.  Since that time, Mr. Michero has received very limited information about the investment, which did not pay monthly distributions.  Mr. Michero has repeatedly asked for a current valuation of that investment, but Defendant Mattson has not provided it to Mr. Michero.  A Madison Trust Company document from 2023 reflects $83,534.81 in the account. Under the terms of the IRA investment, Defendant Mattson was responsible for informing Madison Trust of the valuation of Mr. Michero's IRA account, but has not done so in 2024.

151.   In December 2013, at Mr. Mattson's invitation, the Michero Plaintiffs invested $14,000 in what Mattson represented was Folsom Village Partners, another LeFever Mattson LP.  The limited partnership agreement Mattson drafted and provided the Micheros reflected that KS Mattson Partners LP was the "Seller". The $14,000 check for the Folsom Village investment from Plaintiff Lori Michero was made out to LeFever Mattson. The limited

Law Offices
Cotchett, Pitre &
McCarthy, LLP

partnership agreement references a "General Partner" but does not identify that entity or person by name. In exchange for the $14,000 investment, Mattson and KS Mattson Partners LP purported to transfer 0.366% interest in the partnership to the Micheros. Mattson did not provide the Micheros with any financial documentation showing that a $14,000 investment reflected a 0.366% interest in Folsom Village Partners. The partnership agreement was signed by Mattson, "Manager" of KS Mattson Partners, LP as the Seller. The partnership agreement did not list other limited partners in Folsom Village Partners or their interests.

152.    The Michero Plaintiffs' Folsom Village Partners investment was liquidated in October 2023.  The Michero Plaintiffs received $26,880.50, which Mattson represented to them was the current value of their ownership interest in Folsom Village Partners LP as of October 2023 when they liquidated.  Mattson did not provide any independent documentation supporting that ownership valuation.  Instead, Mattson provided the Michero Plaintiffs a summary of the Folsom Village Partners investment from LeFever Mattson, Inc. reflecting conclusory information about monthly "distributions" and "remaining ownership" value. The documentation Mattson provided was incomplete: it reflected monthly distribution amounts through December 2021, then annual distribution amounts as of December 2022 and September 30, 2023. But the Michero Plaintiffs did not receive distributions through this investment.

153.    The Michero Plaintiffs asked Mattson for, but never received, further information reflecting the investment value in Folsom Village Partners.  The Michero Plaintiffs did not sign any documentation respecting the sale of their purported ownership interest in Folsom Village Partners, despite asking Mattson to provide such documentation.

154.    In January 2023, Mattson solicited the Michero Plaintiffs to invest $178,500 in Divi Divi Tree, L.P.  Defendant Mattson provided the Micheros with a purported limited partnership agreement, which stated their investment was 0.469 percent of Divi Divi Tree LP. The partnership agreement Mattson gave the Micheros reflected that the "seller" and "general partner" was "LeFever Mattson, Inc." and the partnership agreement was signed by Defendant

Mattson in his role as "President" of "LeFever Mattson Inc."  The Michero Plaintiffs received distribution checks, beginning in April 2023, from the Bank of the West Account ending -1059 held by "LeFever Mattson Inc." The distribution checks were signed by Defendant Mattson.

155.   The distribution checks ceased after February 2024. In early July 2024, the Michero Plaintiffs received three more distribution checks. The three checks received in July 2024 came from the BMO Account, account number ending -1380,  by "KS Mattson Partners, L.P." The checks were signed by Defendant Mattson. This summer, the same BMO Bank account was used by Defendant Mattson and KS Mattson Partners to pay distributions to investors from other limited partnerships besides Divi Divi. The Micheros have not received any further distribution checks since July 2024.

156.   In October 2023, the Michero Plaintiffs withdrew $43,119.50 of their investment in Divi Divi Tree LP.  The following month, November 2023, the Michero Plaintiffs received an email from Defendant Mattson stating that "[t]he balance was liquidated from the remaining investment principal leaving a balance of $135,380.50. The distribution is being adjusted and will continue." Defendant Mattson did not provide information to substantiate that investment balance, or adjustments to the distributions going forward.

157.   The Michero Plaintiffs currently have approximately $218,000 invested with Defendants and the Chapter 11 Entities which has not been returned to them.  However, given the Investment Scheme, the Michero Plaintiffs do not know precisely which Defendant or Chapter 11 Entity holds their money or the precise amount of their investment, which they have previously relied on Defendant Mattson to provide them. In May 2024, following revelations of the Investment Scheme, the Michero Plaintiffs contacted LeFever Mattson to inquire about their investments.  The Michero Plaintiffs were informed by someone speaking on behalf of LeFever Mattson that LeFever Mattson had no record of the Micheros' investment, and that the Micheros would need to prove their investment had been in connection with LeFever and LeFever Mattson, not just Mattson.  The Michero Plaintiffs provided LeFever's employee with such information, including a loan document signed by LeFever.  Neither LeFever nor LeFever

Mattson has responded to the Michero Plaintiffs. The Michero Plaintiffs are informed and believe and thereon allege that some combination of Mattson, LeFever, KS Mattson Partners, and/or LeFever Mattson control and are improperly withholding the Micheros' investment.

158.   The Michero Plaintiffs have not received all investment materials owed to them based on their investments.

### C.   <u>Walker Plaintiffs</u>

159.   The Walker Plaintiffs, who are sixty-nine and sixty-eight-years-old, have resided in Colorado since June 2020.  Prior to that, the Walker Plaintiffs resided in California, where they first invested with LeFever Mattson entities in 2007 through the Walker Family Living Trust ("Walker Family Trust"). Their portfolio represents essentially all their investments.

160.   The Walker Plaintiffs have known Defendants Mattson and LeFever for decades. In the mid-1990's, Elizabeth Walker and Defendant LeFever's mother-in-law were part of a stock club group that met monthly. In 1996, LeFever's mother-in-law invited Defendant Mattson to speak at one of the meetings. Starting in the year 2000, LeFever Mattson started managing a rental house the Walker Plaintiffs owned in Fairfield, CA.

161.   In 2006, after the Walker Plaintiffs were left an inheritance, the Walker Plaintiffs contacted Defendant LeFever's mother-in-law to ask who she used as an investment advisor. The Walker Plaintiffs were again given Defendant Mattson's name and contacted him soon thereafter.

162.   Over the years, the Walker Plaintiffs would also often socialize with Defendants Mattson and LeFever by attending fundraisers and social events with one or both on numerous occasions.

163.   Beginning in 2007, LeFever Mattson Property Management, a subsidiary of LeFever Mattson, facilitated several direct investments (and provided property management services at them) for the Walker Family Trust, including tenancies in common. These include $200,000 invested January 2007 toward what the Walker Plaintiffs understood to be a 13.333 percent interest as tenants in common in Carmichael Apartments at 5800 Engle Road,

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

Carmichael, California subsequently deeded to Buckeye Tree LP in which Walker Plaintiffs maintain a what they understood to be 14.440 percent interest, and for which LeFever Mattson, Inc. served at relevant times as general partner. Defendant LeFever sent the Walker Plaintiffs a correspondence confirming the original purchase.

164.    In April 2007, the Walker Plaintiffs invested $100,000 for what they understood to be a 3.912 percent ownership as tenants in common in real property known as Water's Edge Apartments at 5959 Riverside Boulevard, Sacramento, California that was ostensibly refinanced in 2018 to Beach Pine LP in which the Walker Family Trust holds a 4.155 percent interest. Defendant LeFever sent the Walker Plaintiffs a correspondence confirming the original purchase.

165.    In September 2007, the Walker Plaintiffs invested $150,000 for what they understood to be a 1.056 percent interest as tenants in common in Country Oaks Apartments at 333 East Enos Drive, Santa Maria, California subsequently deeded to River Tree Partners LP in August 2016 for purposes of selling Country Oaks Apartments and purchasing commercial real estate; and a separate $211,700 investment received through inheritance in River Tree Partners LP for a 1.43 percent interest. Again, Defendant LeFever sent the Walker Plaintiffs a correspondence confirming the original purchase in September 2007.

166.    Walker Family Trust's portfolio acquired through or from LeFever Mattson includes $250,000 paid December 2006  for what the Walker Plaintiffs understood to be a 10 percent share of Butcher Road Partners with development in Vacaville, California by transfer agreement signed by Defendant Mattson on behalf of LeFever Mattson, the seller and general partner of Butcher Road Partners; $500,000 invested January 2011 for what the Walker Plaintiffs understood to be a 1.87 percent interest in Divi Divi Tree LP by transfer agreement signed by Defendant Mattson on behalf of LeFever Mattson, the seller and general partner of Divi Divi Tree LP; $100,000 invested early 2016 in the fund BTLOP0516; $350,000 invested December 2017 for what the Walker Plaintiffs understood to be a 7.122 percent interest in Firetree I LP which ostensibly owns Napa warehouses, by transfer agreement signed by

Defendant Mattson on behalf of LeFever Mattson, the seller; $300,000 invested April 2018 to purchase what the Walker Plaintiffs understood to be an 8.333 percent interest in real property known as 2280 Bates Avenue, Concord, California by transfer agreement signed by Defendant Mattson on behalf of LeFever Mattson, the seller; $350,000 invested January 2021 for what the Walker Plaintiffs understood to be an 8.333 percent interest in Watertree I LP pursuant to a partnership agreement signed by Timothy LeFever on behalf of LeFever Mattson, the general partner of Watertree I LP; and $300,000 invested April 2022 for what the Walker Plaintiffs understood to be a 3.588 percent interest in Valley Oak Investments LP by transfer agreement to be signed by LeFever Mattson, the seller and general partner of Valley Oak Investments LP.

167.   The Walker Trust's investments acquired through or from KS Mattson Partners LP include $500,000 invested January 2011 for what the Walker Plaintiffs understood to be a 7.5 percent interest in Ringmasters Square, LLC, now a suspended LLC, by transfer agreement signed by KS Mattson Partners LP, the seller and general partner; $500,000 invested January 2011 for what the Walker Plaintiffs understood to be an 8.25 percent interest in Perris Freeway Plaza, LLC by transfer agreement signed by KS Mattson Partners LP, the seller and general partner; $200,000 invested February 2012 in what the Walker Plaintiffs understood to be Fulton Square; $150,000 invested January 2012 in what the Walker Plaintiffs understood to be Comstock Building Partners, LLC, for which at relevant times Defendant LeFever was agent for service of process, with an additional $200,000 invested during Fall 2023 in the same; $100,000 invested March 2013 for what the Walker Plaintiffs understood to be a 2.633 percent share of Greenhaven Partners by transfer agreement to be signed by KS Mattson Partners LP, the seller; and $100,000 invested January 2014 for what the Walker Plaintiffs understood to be a 2.858 percent interest in Folsom Village Partners by transfer agreement signed by Defendant Mattson on behalf of KS Mattson Partners LP, the seller.

168.   The Walker Trust's investments acquired through or from KS Mattson Partners LP also include $900,000 invested in July 2018 for what the Walker Plaintiffs understood to be a 35 percent share in 4321 1st Street, Pleasanton, California. However, public records reflect

the sale date on this property as August 16, 2018, and the deed was not recorded with the County until September 18, 2018.  Additionally, according to public records, the Walkers' investment/sale amount was recorded as $1,300,000—a $400,000 discrepancy. On July 16, 2020, public records show that the Walker Plaintiffs sold their investment back to KS Mattson Partners LP for $1,050,000. Notably, the Walker Plaintiffs were unaware of this transaction and did not receive any of the funds.

169.   According to Commercial Property Purchase Agreement and Joint Escrow Instructions, additional investments acquired by the Walker Trust through or from KS Mattson Partners LP include $450,000 invested in or about April 2021 for what the Walker Plaintiffs understood to be a half-interest in 450 First Street E, Suite G, Sonoma, California by transfer agreement signed by Defendant Mattson on behalf of KS Mattson Partners LP, the seller, for which they received two monthly distributions—one from LeFever Mattson and the other from KS Mattson Partners LP; at least $500,000 invested September 2023 for what the Walker Plaintiffs understood to be a 20 percent interest in real property known as 19357 Sonoma Highway, Sonoma, California by transfer agreement signed by Defendant Mattson on behalf of KS Mattson Partners LP, the seller, though there are no public records, including records from the Sonoma County Recorder's Office, evidencing documentation of this investment; and $250,000 invested September 2023 for what the Walker Plaintiffs understood to be a 14 percent share of real property known as 22666 Broadway, Sonoma, California by transfer agreement signed by Defendant Mattson on behalf of KS Mattson Partners LP, the seller, though there are also no public records, including records from the Sonoma County Recorder's Office, evidencing documentation of this investment. .

170.   The Walker Family Trust's $500,000 investments in June 2010 in each of, what the Walker Plaintiffs understood to be, Divi Divi Tree LP, Ringmasters Square, LLC, and Perris Freeway Plaza, LLC were in exchange for Defendant Mattson's ostensible purchase of a 50 percent share of Walker family's interest in the beach house that had been in the family for five generations. Defendant Mattson subsequently asked Walker Plaintiffs to allow a personal

interest-only loan against the house. After taking the loan, Defendant Mattson neglected to pay the interest and sent the house into foreclosure. Its lender was Socotra Capital Inc. In a last-minute effort to escape foreclosure sale, Walker Plaintiffs authorized the sale of the house for $2 million under market value.

171.   After years of establishing trust with Defendant Mattson, the Walker Plaintiffs also trusted Defendant Mattson to take over Scott Walker's invested IRAs (SEP IRA and Beneficial IRA). Both were invested in what the Walker Plaintiffs understood to be Specialty Properties Partners, LLC (which LLC was since converted out) and are currently worth, or should be worth, at least $641,800 and $261,000 respectively. The traditional IRA held with Madison Trust Company invests in Divi Divi Tree LP and is or should currently be worth at least $739,800.

172.   In or around late August 2024, Scott Walker received a letter from Pacific Premier Trust dated August 23, 2024 providing the following information regarding Scott Walkers IRA:

> Your relationship is very important to us and we strive to keep you informed of any information that may affect your investments.
>
> Pacific Premier Trust has been made aware that the above investment or an affiliate of the investment was involved in a litigation action. The case was filed in the United States District Court Northern District of California, case number 24-cv-04093.
>
> Due to the current situation, the last known value of the asset has been called into question. **As a result of the undetermined value, we the [sic] value of the referenced asset as $0.00**. This reporting indicates that the last reported value received from the asset sponsor or receiving agent is unreliable (emphasis added).

173.   Defendant LeFever was, until July 2024, the agent for service of process of Specialty Properties Partners, LLC.

174.   Since 2007, the Walker Plaintiffs invested in excess of $8 million dollars with LeFever Mattson and/or KS Mattson Partners, LP.  Due to the Investment Scheme, the Walker Plaintiffs cannot determine which Defendants or Chapter 11 Entities hold those funds, but believe it to be some combination of LeFever Mattson, KS Mattson Partners, LeFever, or

Mattson.  These investments represent almost 100 percent of the Walker Plaintiffs' investment portfolios. These properties and investments are income-generating, but many are in default on obligations owed to the Walker Plaintiffs and the Walker Family Trust.

175.   On June 12, 2024, the Walker Plaintiffs formally submitted an online request with Madison Trust, to withdraw $100,000 in managed funds.  The Walker Plaintiffs subsequently contacted Defendant Mattson via text on at least three occasions, informing him that they have not received their requested withdrawal. On August 9, 2024, the Walker Plaintiffs contacted Madison Trust to inquire about the status of their requested withdrawal. A Madison Trust representative told them that Defendant Mattson would have to authorize a change in some of the Walker Plaintiffs' investments, from real estate to cash, so that the requested withdrawal could be completed. To date, these funds have not been  received.

176.   Walker Plaintiffs have not received all investment materials owed to them based on their investments.

## CLASS ACTION ALLEGATIONS

177.   Plaintiffs reallege all of the foregoing allegations and incorporate them by reference as if fully set forth in this section and in their following Claims for Relief.

178.   Plaintiffs bring this case on behalf of themselves and as a class action under Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4), on behalf of all members of the following Class and Subclass:

### The Class

All persons who made one or more investments, from January 1, 2000 through the date when the Class is certified by the Court (the "Class Period") with or through Timothy J. LeFever, Kenneth W. Mattson, KS Mattson Partners, LP, Specialty Properties Partners, LP, LeFever Mattson, Inc., LeFever Mattson I, LLC, Home Tax Service of America, Inc. (d/b/a LeFever Mattson Property Management), and/or Divi Divi Tree, LP, and who have not received back all of their capital investment(s) in addition to interest paid and/or accrued.  The Class includes one subclass:

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**The Elder Subclass**

> All members of the Class who made one or more investments with
> Timothy J. LeFever, Kenneth W. Mattson, KS Mattson Partners,
> LP, Specialty Properties Partners, LP, LeFever Mattson, Inc.,
> LeFever Mattson I, LLC, Home Tax Service of America, Inc. (d/b/a
> LeFever Mattson Property Management), and/or Divi Divi Tree, LP
> after reaching the age of 65 years.

179.   Plaintiffs reserve the right to amend or modify the Class definition with respect to greater specificity, further designation of subclasses, or limitation to particular issues.

180.   **Impracticability of Joinder (Numerosity)**. The potential members of the Class and Subclass as defined above are so numerous that joinder of all members is not practicable. While the precise number of Class Members has not been determined at this time, it is readily knowable pursuant to disclosures or discovery from Defendants.  Plaintiffs are informed and believe there are hundreds of investors who invested with Defendants during the Class Period. The identities and current addresses of all Class Members are or should be ascertainable from the Defendants' books and records, because until approximately April 2024 all Class members were receiving regular payments represented by Defendants to constitute interest or profits from the management or sale of their investment interests.

181.   **Commonality and Predominance**. All Class and Subclass members' investments in the Investment Scheme now appear, contrary to representations by Defendants, to have been subject to a common scheme and to have suffered a common fate.  There are thus important questions of law and fact common to the Class, and the Elder Subclass, that predominate over any questions affecting only Individual Class Members, making class certification appropriate under Rule 23(b)(3).  Any of the following or other common questions of law and fact are also appropriate for issue class certification and trial under Rule 23(c)(4). These significant common questions of law and fact include, without limitation:

a.   The degree and nature of Defendants' knowledge, intent, and conduct in creating, promoting, and implementing the Investment Scheme described in this Complaint, and in misrepresenting and concealing its true nature and operations from investors.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

b.    Whether Defendants' conduct as alleged in this Complaint was intentional, grossly negligent, reckless, and/or a breach of Defendants' legal and equitable duties to investors.

c.    Whether Defendants' conduct included the commingling, misuse, or misappropriation of investors' funds.

d.    Whether other persons or entities, not presently named as Defendants, colluded with, aided and abetted, or otherwise participated or assisted so as to share liability for the harms suffered by investors resulting from the conduct alleged in this Complaint

182.    **Typicality**. The claims of the named Plaintiffs are typical to the claims of the Class because all Class Members' investments were subjected to the undisclosed machinations of the Investment Scheme, and all have sustained damages arising out of and caused by Defendants' unlawful conduct.

183.    **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and Subclass.  Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and Subclass Members and have the financial resources to do so.  None of the Plaintiffs or their counsel have any interest adverse to those of the other Class or Subclass Members.

184.    **Superiority of Class Action**. A class action is superior to other available methods for their fair, consistent, and efficient adjudication of this controversy.  The adjudication of this controversy in this Court through a class action will avoid the possibility of inconsistent, inequitable, and potentially conflicting adjudication of the claims asserted herein and/or varying outcomes that would establish incompatible standards of conduct.  A class action provides a superior vehicle for resolving the common issues for all similarly affected and situated.  Moreover, based upon the expense of litigation, completion of individual cases is not financially feasible for most Class Members, especially considering the substantial losses they have already incurred.  There will be no greater difficulty in the management of this action

as a class action than there would be in any other proceeding attempting to adjudicate the claims of the Investment Scheme victims, and the class mechanism best promotes the principles of fairness, economy, and efficiency articulated in Federal Rule of Civil Procedure 1 to govern all civil claims.

185.   **Conduct Generally Applicable to the Class; Preservation and Equitable Distribution of a Limited Fund**.  Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class Members, requiring the Court's imposition of uniform relief, including injunctive and other equitable relief, which make class certification under Rule 23(b)(1) and/or 23(b)(2) appropriate. Such certification will ensure compatible standards of conduct toward the Class, and the protection and equitable treatment of all Class Members, especially in the event that Defendants' assets and properties are determined to constitute a limited fund inadequate to fully compensate all Class Members.

186.   **Notice to the Class**.  The members of the Class, the Elder Subclass, and any other designated subclasses can be identified and given direct notice of this action and their rights and options.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Fraud)
(Against All Defendants)

187.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

188.   Defendants misrepresented and intentionally concealed and failed to disclose material facts to Plaintiffs in connection with their investments. Those misrepresentations included, *inter alia*, (1) that money invested with LeFever Mattson, KS Mattson Partners, Mattson,  LeFever, Specialty Properties Partners or any of the affiliated LeFever Mattson LPs and LLCs, would be applied to the acquisition of a specific real property owned by the partnership; (2) that the percentage of the purported partnership an investor received for a particular investment was based on the value of the property; (3) that the partnership would

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 4:24-cv-04093-JST)**   60

maintain a separate bank account in the name of the partnership into which the proceeds would be deposited; and (4) that payments to investors would come from the partnership's proceeds through the management and sale of those properties, consistent with their purported partnership interest.

189.   Plaintiffs' funds would not be and were not actually invested in specific real estate partnerships; the purported percentage of the partnership interest was not related to the property's value or the amount of their capital investment; their investments were not kept in separate bank accounts in the name of the partnership; and returns on their investments would not come exclusively from the management and sale of the real properties purported to relate to such partnerships, consistent with their purported partnership interests.  These and other facts relating to the actual operation of the partnerships, and of the Investment Scheme, were material in that reasonable investors would consider them important in deciding whether to invest, whether to make additional investments, whether to withdraw their investments, and whether to recommend investment to others.

190.   Plaintiffs did not know and were not informed by LeFever Mattson, KS Mattson Partners, Mattson, or LeFever of these misrepresented and/or concealed material facts.

191.   LeFever Mattson, KS Mattson Partners, Mattson, and LeFever intended to deceive Plaintiffs by misrepresenting and/or concealing these facts, and actively continued to fraudulently conceal these facts from Plaintiffs and the Class and the Elder Subclass, throughout the Class Period.

192.   Had such material information been represented accurately, and not concealed, Plaintiffs, the Class, and the Elder Subclass reasonably would have been able to take action to protect and recover their existing investments, and to avoid making additional investments.

193.   LeFever Mattson, KS Mattson Partners, Mattson, and LeFevers' misrepresentations, omissions, and concealments were substantial factors in causing harm to Plaintiffs, the Class, and the Elder Subclass.

194.   LeFever Mattson, KS Mattson Partners, Mattson, and LeFevers' conduct was malicious, oppressive, fraudulent and/or in reckless disregard of Plaintiffs', the Class's, and the Elder Subclass's rights and interests.

<div align="center">

**SECOND CLAIM FOR RELIEF**
(Breach of Fiduciary Duty)
(Against All Defendants)

</div>

195.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

196.   Based upon the facts described in this Complaint, the relationship of trust reposed in LeFever Mattson, KS Mattson Partners, Mattson, and LeFever, and LeFever Mattson, KS Mattson Partners, Mattson, and LeFever's superior knowledge of the investments at issue, Defendants owed a fiduciary duty to Plaintiffs, the Class, and the Elder Subclass. For the avoidance of doubt, this claim is not derivative in nature.

197.   LeFever Mattson, and Defendants KS Mattson Partners, Mattson, and LeFever breached these fiduciary duties through the conduct described in this Complaint and similar conduct as yet unknown, given Defendants' failure to fulfill their duties as General Partners, and otherwise, with respect to the responsible management and care of investors' funds.

198.   As a proximate result of these breaches, Plaintiffs, the Class, and the Elder Subclass have sustained damages and will continue to sustain damage and loss to their investments.

199.   Defendants' harmful conduct was malicious, oppressive, fraudulent and/or in reckless disregard of Plaintiffs', the Class's, and the Elder Subclass's rights.

<div align="center">

**THIRD CLAIM FOR RELIEF**
(Conversion)
(Against All Defendants)

</div>

200.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

201.   Plaintiffs, the Class, and the Elder Subclass had a right to possession of their personal property; namely, the money they invested in the Investment Scheme. The specific amount of Plaintiffs', the Class's, and the Elder Subclass's financial investment in purported LPs and LLCs that Defendants have taken possession of, misused, and refuse to return is not knowable to Plaintiffs, given the Investment Scheme. Plaintiffs allege on information and belief that LeFever Mattson, and Defendants KS Mattson Partners, Mattson,  LeFever and/or Specialty Properties Partners have taken possession of the financial investments made with those Defendants as set forth in this Complaint.

202.   Defendants substantially interfered with investors' property by knowingly or intentionally taking possession of it, diverting, spending it, and otherwise misusing it, and refusing to return it.

203.   Defendants' conduct was a substantial factor in causing Plaintiffs', the Class's and the Elder Subclass's harm.

204.   Defendants' harmful conduct was malicious, oppressive, fraudulent and/or in reckless disregard of Plaintiffs', the Class's and the Elder Subclass's rights.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
(Constructive Trust)
(Against All Defendants)

</div>

205.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

206.   Based upon the allegations above, Plaintiffs, the Class, and the Elder Subclass contend that they are the owners of valid investments in the limited partnerships, other investment vehicles, and the real properties that were purportedly purchased, operated, and sold by and through Defendants, and the proceeds thereof.

207.   Defendants contend that Plaintiffs, the Class, and the Elder Subclass are not the owner of valid investments in the limited partnership entities and the properties purportedly related to them, and that Defendants or third parties are the owners of record of these entities,

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1    instead of the investors, whose funds were used and/or diverted to obtain these entities and

2    properties.

3          208.   LeFever Mattson contends that in some instances it may not have Plaintiffs', the

4    Class's, and the Elder Subclass's property and investments, and that Mattson is in sole

5    possession of the investments.  Due to the Investment Scheme, Plaintiffs, the Class, and the

6    Elder Subclass are not aware of which Defendant or other entity possesses their investments.

7          209.   Defendants have held the foregoing ownership interests in constructive trust for

8    the benefit of the investors, and the Court should order the distribution of the ownership

9    interests (and/or the fair market value of the ownership interests) to Plaintiffs, the Class, and its

10   Elder Subclass as a matter of equity. To prevent dissipation of the investors' ownership interest

11   in these entities while this litigation is pending, the Court should enjoin Defendants from

12   selling and/or transferring ownership interests in these entities to any other person or entity.

**FIFTH CLAIM FOR RELIEF**
(Aiding and Abetting Fraud)
(Against Defendant LeFever)

15
16         210.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this

17   Complaint, as though set forth fully herein.

18         211.   LeFever Mattson, and Defendants KS Mattson Partners, and Mattson and

19   Specialty Properties Partners committed fraud resulting in injury to Plaintiffs and the Class and

20   Elder Subclass, as alleged herein.  Defendant LeFever's conduct alleged herein enabled,

21   substantially assisted, encouraged, and was a substantial factor in, the commission of such

22   fraud.

23         212.   Defendant LeFever knew that LeFever Mattson, KS Mattson Partners, Mattson

24   and/or Specialty Properties Partners did not properly value the properties for investors, and that

25   investors' contribution of money to the purchase of real properties was not accurately reflected

26   in the assigned partnership interests.

27         213.   Defendant LeFever knew that LeFever Mattson, KS Mattson Partners, Mattson

28   and/or Specialty Properties Partners did not provide accurate and complete financial statements

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

for the LPs and LLCs reflecting the profits and losses of the real properties owned by the LPs and LLCs.

214. Defendant LeFever knew that the distribution payments made to investors did not reflect the profits and losses of the real properties owned by the LPs and LLCs.

215. Defendant LeFever knew that LeFever Mattson, KS Mattson Partners, and/or Mattson were soliciting investments from investors, and that some investors were not reflected on the LeFever Mattson books and records. In some instances, Defendant LeFever signed LP agreements or other documentation reflecting those investments, which was provided to investors.

216. Defendant LeFever knew that LeFever Mattson, KS Mattson Partners and Mattson maintained the Bank of the West Account in the name of LeFever Mattson, and that that bank account was used to make distribution payments and otherwise conduct business for LeFever Mattson. Defendant LeFever has admitted in a declaration filed with the Court that, at Mattson's direction, LeFever signed checks from that Bank of the West ccount on behalf of LeFever Mattson.

217. Defendant LeFever had actual knowledge of the truth and had access to more than sufficient information to understand that LeFever Mattson, KS Mattson Partners, and Mattson were engaged in the Investment Scheme.

218. Before and during the commission of the fraud, LeFever intended to aid and abet, and did substantially assist, LeFever Mattson, KS Mattson Partners, and Mattson in fraud perpetrated on Plaintiffs and the Class and Elder Subclass, by operating as co-owner of LeFever Mattson, signing checks on behalf of LeFever Mattson, and operating LeFever Mattson and the associated LPs and LLCs.

219. Defendant LeFever's conduct herein was knowing and intentional, and was carried out by LeFever to benefit himself. LeFever received the benefit of investor money raised through the Investment Scheme.

**SIXTH CLAIM FOR RELIEF**
(Violation of Cal. Welf. and Inst. Code § 15610.30 for Financial Abuse of Elders)
(Against All Defendants)

220.   Elder Plaintiffs Scott A. Walker, and Elizabeth L. Walker, on behalf of themselves and the Elder Subclass, incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

221.   Defendants obtained the Elder Plaintiffs' and Elder Subclass members' property through fraudulent, deceptive, unfair, and abusive conduct.

222.   The Elder Plaintiffs and Elder Subclass members were sixty-five years of age or older at the time they made one or more of their investments, during the Class Period, and while the conduct alleged in this Complaint was ongoing.

223.   Defendants obtained these Elder Plaintiffs' and Elder Subclass's property for wrongful use and/or with the intent to defraud and/or by undue influence.

224.   The Elder Plaintiffs and Elder Subclass were harmed, including by losing the value of the funds invested and by sustaining emotional distress.

225.   Defendants' conduct was a substantial factor in causing the Elder Plaintiffs and Elder Subclass harm.

226.   Defendants' harmful conduct was malicious, oppressive, and fraudulent and/or in reckless disregard of the Elder Plaintiffs' and Elder Subclass's rights.

**SEVENTH CLAIM FOR RELIEF**
(Unjust Enrichment)
(Against All Defendants)

227.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

228.   Defendants received substantial benefits, in the form of the investments made by Plaintiffs, the Class, and the Elder Subclass in the Investment Scheme, at these investors' expense.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

229.   Defendants have used these investments for the benefit of themselves, and to maintain a deceptive scheme, and it would be unfair and inequitable for Defendants to retain any interest in the investors' funds, or Defendants' resulting acquisitions of real and personal property.

230.   Plaintiffs, the Class, and the Elder Subclass are entitled to Defendants' disgorgement and restitution of their investments.

**EIGHTH CLAIM FOR RELIEF**
(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*)
(Against All Defendants)

231.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

232.   Defendants have violated Cal. Business and Professions Code § 17200 *et seq.* by engaging in an ongoing course of fraudulent, unlawful or unfair business acts and practices with respect to the Investment Scheme at Plaintiffs', the Class's, and the Elder Subclass's expense.

233.   Defendants had exclusive and superior knowledge regarding the material information they concealed from Plaintiffs, the Class, and the Elder Subclass.

234.   Plaintiffs, the Class, and the Elder Subclass reasonably relied upon Defendants' misrepresentations and on their omissions, to their detriment.

235.   The unfair and unlawful acts and practices described in this Complaint and comprising or exemplifying the Investment Scheme were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members. The harm these practices caused to Plaintiffs and Class members outweighed their utility, if any.

236.   As a direct and proximate result of Defendants' unfair and unlawful practices and acts, including the Investment Scheme, Plaintiffs and Class members have suffered a loss of money or property, real or personal, as described above, and will continue to suffer monetary and economic harms.

237.   Plaintiffs have an inadequate remedy at law and are therefore entitled to additional relief.

238.   Plaintiffs, the Class, and the Elder Subclass are entitled to injunctive and equitable relief, including Defendants' disgorgement and restitution of their investments.

### NINTH CLAIM FOR RELIEF
#### (Appointment of a Receiver and Provision of an Accounting)
#### (Against All Defendants)

239.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this Complaint, as though set forth fully herein.

240.   Defendants are indebted to Plaintiffs, the Class, and the Elder Subclass for a significant sum and there is imminent danger of damage and loss to Plaintiffs, the Class, and the Elder Subclass.

241.   Other legal remedies available to Plaintiffs, the Class, and the Elder Subclass are not adequate to protect their interests.

242.   A receiver will protect the interests of Plaintiffs, the Class, and the Elder Subclass.

243.   Appointment of a receiver is appropriate and necessary to preserve, manage, and dispose of the real properties and other assets Defendants acquired through the Investment Scheme in order to honor and enforce the partnership agreements and other representations made to investors about the use and management of their investments, to preserve the and protect the value of these properties and assets for the benefit of the investors, and to prevent waste.

244.   Plaintiffs, the Class, and the Elder Subclass are entitled to appointment of a receiver to take charge of and maintain these properties and assets, and to provide an accounting to the Court and the Class and the Elder Subclass.

1
2

**TENTH CLAIM FOR RELIEF**
(Negligent Misrepresentation)
(Against All Defendants)

3
4

245.   Plaintiffs incorporate by reference the allegations of all the Paragraphs of this

Complaint as though set forth fully herein.

5
6

246.   Plaintiffs bring this claim on behalf of themselves and the Class and Elder

Subclass against Defendants and as appropriate bring this claim in the alternative to their

7

claims alleging affirmative misrepresentations.

8
9

247.   Defendants each made false statements of fact and provided false information to

Plaintiffs and the Class and Elder Subclass, *inter alia*, (1) that money invested with LeFever

10

Mattson, KS Mattson Partners, Mattson, or LeFever, or any of the affiliated LPs and LLCs,

11
12

would be applied to the acquisition of a specific real property owned by the partnership; (2)

that the percentage of the purported partnership an investor received for a particular investment

13
14

was based on the value of the property; (3) that the partnership would maintain a separate bank

account in the name of the partnership into which the proceeds would be deposited; and (4) that

15
16

payments to investors would come from the partnership's proceeds through the management

and sale of those properties, consistent with their purported partnership interest.

17
18

248.   Defendants knew that Plaintiffs, the Class and the Elder Subclass would rely on

these false statements and false information, and intended for them to do so. Defendants failed

19
20

to exercise reasonable care in obtaining and communicating the false statements and false

information.

21
22

249.   At all relevant times, Defendants had a duty to disclose all facts material to

Plaintiffs and the Class and Elder Subclass's investments in the Investment Scheme.

23
24

250.   Defendants knew, or in the exercise of reasonable diligence should have known,

that their express representations regarding the Investment Scheme were false and misleading.

25
26

Defendants made such statements without reasonable grounds for believing them to be true.

27

251.   The misrepresentations made by Defendants were pervasive.

28

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1      252.  The misrepresentations made by Defendants were likely to deceive and had a

2 tendency to deceive reasonable investors, and have deceived Plaintiffs and the Class and Elder

3 Subclass. The facts misrepresented by Defendants would be material to a reasonable investor.

4      253.  Plaintiffs and the Class and Elder Subclass were reasonable justified in relying on

5 Defendants' false statements and false information, in deciding to invest with Defendants in the

6 Investment Scheme.

7      254.  As a result of Defendants' conduct, Plaintiffs and the Class and Elder Subclass

8 were harmed and have suffered actual damages.

9 <div align="center">**PRAYER FOR RELIEF**</div>

10      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

11 follows:

12      A.    For certification, at an early practicable time, of the Class and the Elder Subclass,

13 and any additional subclasses, and the appointment of Plaintiffs' counsel as Class Counsel and

14 the designation of Class and Subclass representatives, under the applicable provisions of

15 Federal Rule of Civil Procedure 23;

16      B.    For the award of damages in favor of Plaintiffs and the Class and the Elder

17 Subclass against all Defendants, jointly and severally, for all damages sustained as a result of

18 Defendants' violations of law, including general damages, punitive damages, and treble

19 damages, and prejudgment interest thereon as permitted by law;

20      C.    For the award of rescission or a rescissory measure of damages;

21      D.    For the award to Plaintiffs, the Class and the Elder Subclass of reasonable

22 attorneys' fees, costs and expenses as permitted by law;

23      E.    For an Order confirming that Defendants held all Plaintiffs' and Class and

24 Subclass members' investments, and the properties these investments were used to purchase, in

25 constructive trust for all investors' benefit, and ordering the allocation and distribution of these

26 ownership interests (and/or their fair market value) to Plaintiffs, the Class, and the Elder

27 Subclass as a matter of equity;

28

F.     For a temporary restraining order, preliminary injunction, and permanent injunction against Defendants from selling and/or transferring Plaintiffs' ownership interest in the above-described properties to any other person or entity;

G.     For a judicial declaration confirming that Plaintiffs, the Class, and the Elder Subclass are the owners of valid investments, and that Defendants have an obligation to return their investments;

H.     For the appointment of a Receiver;

I.     For an Accounting; and

J.     For such other and further legal and equitable relief as the Court may deem proper.

<u>**DEMAND FOR A JURY TRIAL**</u>

Plaintiffs, the Class, and the Elder Subclass demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated:  October 17, 2024          **COTCHETT, PITRE & McCARTHY, LLP**

By:     */s/ Blair V. Kittle*
          BLAIR V. KITTLE
          JOSEPH W. COTCHETT
          VASTI S. MONTIEL
          DAVID G. HOLLENBERG

Dated:  October 17, 2024          **CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD LLP**

By:     */s/ Gayle M. Blatt*
          GAYLE M. BLATT
          DAVID S. CASEY, JR.
          FREDERICK SCHENK
          P. CAMILLE GUERRA
          MICHAEL J. BENKE

/ / /

/ / /

/ / /

1    Dated:  October 17, 2024               **LIEFF, CABRASER, HEIMANN &**
                                            **BERNSTEIN, LLP**

2                                           By:    */s/ Katherine Lubin Benson*
                                                   ELIZABETH J. CABRASER
3                                                  RICHARD M. HEIMANN
                                                   KATHERINE LUBIN BENSON
4                                                  MICHAEL K. SHEEN

5                                           *Attorneys for Plaintiffs and the Proposed Class and*
                                            *Subclass*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1

## **ATTORNEY ATTESTATION**

2        I, Blair V. Kittle, am the ECF User whose ID and password are being used to file the

3   Class Action Complaint.  In compliance with Civil Local Rule 5-l(h)(3), I hereby attest that

4   concurrence in the filing of this document has been obtained from each signatory.

5

6    Dated:  October 17, 2024                    By:    _/s/ Blair V. Kittle_____

7                                                        Blair V. Kittle

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# TIMOTHY LEFEVER AND KENNETH MATTSON
# BUSINESS ENTITIES

| Timothy LeFever – Business Entities (Timothy LeFever is the Registered Agent for these Entities) | | | | |
|---|---|---|---|---|
| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
| Autumn Wood I, LLC - 200319510021 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201130400003 CA - Autumn Wood 1, LP | July 14, 2003 | October 28, 2011 |
| Autumn Wood I, LP - 201130400003 | LP | Active | July 14, 2003 | |
| Bay Tree, LP | LP | Active | March 29, 2016 | |
| Beach Pine, LP | LP | Active | November 8, 2018 | |
| Bishop Pine, LP | LP | Active | November 8, 2018 | |
| Black Walnut, LP | LP | Active | November 7, 2014 | |
| Buck Avenue Apartments, LLC - 200301310019 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201226300011 CA - Buck Avenue Apartments LP | January 9, 2003 | September 19, 2012 |
| Buck Avenue Apartments, LP - 201226300011 | LP | Active | January 9, 2003 | |
| Buckeye Tree, LP | LP | Active | May 26, 2022 | |
| Bur Oak, LP | LP | Active | January 6, 2022 | |
| Butcher Road Partners, LLC | LLC | Suspended - FTB | April 2, 2010 | April 1, 2015 |
| California Investment Builders, Inc. | Stock Corporation - General | Terminated | October 25, 2006 | March 24, 2014 |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| California Investment Properties (SOI Due 12/31/2022) | Stock Corporation - General | Active | December 2, 2004 | |
| Cambria Pine, LP | LP | Active | November 8, 2018 | |
| Chestnut Oak, LP | LP | Active | January 6, 2022 | |
| Country Oaks, LLC - 200725010242 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700001 CA - Country Oaks I, LP | September 5, 2007 | December 19, 2012 |
| Country Oaks I, LP - 201300700001 | LP | Active | September 5, 2007 | |
| Divi Divi Tree, LP | LP | Active | December 5, 2002 | |
| Douglas Fir Investments D, LLC | LLC - Out of State (Delaware) | Terminated | August 21, 2015 | August 31, 2018 |
| Douglas Fir Investments, LP | LP | Active | April 14, 2015 | |
| Firetree I, LP | LP | Active | November 15, 2017 | |
| Firetree II, LP | LP | Active | November 15, 2017 | |
| Firetree III, LP | LP | Active | November 15, 2017 | |
| Foothill Pine, LP | LP | Active | October 1, 2019 | |
| Foxtail Pine, LP | LP | Active | November 8, 2018 | |
| Ginko Tree, LP | LP | Active | June 6, 2022 | |
| Golden Tree, LP | LP | Active | November 3, 2015 | |
| Hagar Properties LLC - 200201810039 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700009 CA - Hagar Properties LP | January 11, 2002 | December 19, 2012 |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| Hagar Properties LP - 201300700009 | LP | Active | January 11, 2002 | |
| Hagar Properties, LP | LP | Active | January 11, 2002 | |
| Harrow Cellars | Stock Corporation - General | Active | April 17, 2020 | |
| Heacock Park Apartments, LP | LP | Active | August 23, 2013 | |
| Home Tax Service of America, Inc. | Stock Corporation - General | Active | December 27, 1991 | |
| Jack Harouni, LLC | LLC | Suspended - FTB/SOS | September 5, 2007 | March 7, 2017 |
| Lefever Mattson | Stock Corporation - General | Active | August 17, 1989 | |
| Lefever Mattson I, LLC | LLC | Suspended - FTB | December 19, 2002 | September 3, 2019 |
| Live Oak Investments, LP | LP | Active | March 24, 2015 | |
| Monterey Pine, LP | LP | Active | October 31, 2018 | |
| Napa Elm I, LLC - 200301310014 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700011 CA - Napa Elm LP | January 9, 2003 | December 19, 2012 |
| Napa Elm, LP - 201300700011 | LP | Active | January 9, 2003 | |
| Nut Pine, LP | LP | Active | November 8, 2018 | |
| Perris Freeway Plaza D, LLC | LLC - Out of State (Delaware) | Terminated | August 21, 2015 | August 31, 2018 |
| Perris Freeway Plaza, LP | LP | Active | September 18, 2001 | |
| Perris Investors II, LLC | LLC | Suspended - FTB/SOS | September 5, 2007 | March 7, 2017 |
| Pineapple Bear | Stock Corporation - General | Active | January 17, 2019 | |
| Pinecone, LP | LP | Active | November 30, 2018 | |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| Pinewood Condominiums, LLC - 200301310021 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700010 CA - Pinewood Condominiums LP | January 9, 2003 | December 19, 2012 |
| Pinewood Condominiums, LLC - 200301310021 (Converted Out) | LLP | Non-Active - Converted To Limited Partnership 201300700010 CA - Pinewood Condominiums, LP | January 9, 2003 | December 19, 2012 |
| Pinewood Condominiums, LP - 201300700010 | LP | Active | January 9, 2003 | |
| Ponderosa Pines, LP | LP | Active | March 11, 2015 | |
| Red Cedar Tree, LP | LP | Active | July 29, 2022 | |
| Red Hickory Tree, LP | LP | Active | March 10, 2020 | |
| Red Mulberry Tree, LP | LP | Active | July 29, 2022 | |
| Red Oak Tree, LP | LP | Active | November 7, 2022 | |
| Red Oak, LP | LP | Active | January 6, 2022 | |
| Red Spruce Tree, LP | LP | Active | October 4, 2022 | |
| Redbud Tree, LP | LP | Active | May 26, 2022 | |
| River Birch, LP | LP | Active | March 27, 2020 | |
| River Tree Partners, LP | LP | Active | August 3, 2016 | |
| River View Shopping Center 2, LLC | LLC - Out of State (Delaware) | Forfeited - FTB | June 3, 2015 | January 4, 2021 |
| River View Shopping Center I, LLC (SOI Due 06/30/2023) | LLC - Out of State (Delaware) | Active | June 3, 2015 | |
| RT Capitol Mall, LP | LP | Active | August 19, 2016 | |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| RT Golden Hills, LP | LP | Active | August 19, 2016 | |
| Scotch Pine, LP | LP | Active | March 10, 2020 | |
| Sequoia Investment Properties, LLC - 200431410020 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201226300010 CA - Sequoia Investment Properties, LP | November 5, 2004 | September 19, 2012 |
| Sequoia Investment Properties, LP - 201226300010 | LP | Active | November 5, 2004 | |
| Sienna Pointe, LLC (SOI Due 08/31/2023) | LLC - Out of State (Delaware) | Active | August 27, 2015 | |
| Specialty Properties Partners, LLC - 201102810033 | LLC | Non-Active – Converted to Limited Partnership 201401000002 CA – Specialty Properties Partners, LP | January 27, 2011 | December 27, 2013 |
| Specialty Properties Partners, LP - 201401000002 | LP | Active | January 27, 2011 | |
| Spruce Pine, LP | LP | Active | May 30, 2019 | |
| The Laurel Wreath Foundation, Inc. - 3112993 (EIN: 27-1212315) | Non-profit Corporation - Public Benefit | Active | October 21, 2009 | |
| Tradewinds Apartments, LLC  - 200301310016 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700003 CA - Tradewinds Apartments LP | January 9, 2003 | December 19, 2012 |
| Tradewinds Apartments, LP - 201300700003 | LP | Active | January 9, 2003 | |
| Treakle Properties, LLC | LLC | Terminated | September 5, 2007 | January 9, 2020 |
| Treehouse Investments, LP | LP | Active | October 20, 2014 | |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| Vaca Villa Apartments - 200301310022 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700002 CA - Vaca Villa Apartments, LP | January 9, 2003 | December 19, 2012 |
| Vaca Villa Apartments, LP - 201300700002 | LP | Active | January 9, 2003 | |
| Valles Properties, LLC | LLC | Terminated | September 5, 2007 | February 26, 2016 |
| Valley Oak Investments, LP | LP | Active | January 15, 2015 | |
| Waters Edge Riverside Properties, LLC (SOI Due: 03/31/2022) | LLC | Active | March 30, 2020 | |
| Watertree I, LP | LP | Active | November 15, 2017 | |
| Willow Oak, LP | LP | Active | January 10, 2022 | |
| Windscape Apartments, LLC - 201823410420 | LLC - Out of State (Delaware) | Active | August 22, 2018 | |
| Windscape Apartments I D, LLC - 201523710234 | LLC - Out of State (Delaware) | Terminated | August 21, 2015 | August 31, 2018 |
| Windscape Apartments II D, LLC - 201523710419 | LLC - Out of State (Delaware) | Terminated | August 21, 2015 | August 31, 2018 |
| Windscape Apartments I, LLC - 200725010245 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700004 CA - Windscape Apartments I, LP | September 5, 2007 | December 19, 2012 |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| Windscape Apartments I, LP - 201300700004 (Converted Out) | LP | Non-Active - Converted To Limited Liability Company 201302410183 CA - Windscape Apartments I LP | September 5, 2007 | January 22, 2013 |
| Windscape Apartments I, LLC - 201302410183 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201525200007 CA - Windscape Apartments I, LP | December 19, 2012 | September 3, 2015 |
| Windscape Apartments I, LP - 201525200007 | LP | Active | January 22, 2013 | |
| Windscape Apartments II, LLC - 200725110060 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201300700005 CA - Windscape Apartments II, LP | September 5, 2007 | December 19, 2012 |
| Windscape Apartments II, LP - 201300700005 (Converted Out) | LP | Non-Active - Converted To Limited Liability Company 201302410185 CA - Windscape Apartments II, LLC | September 5, 2007 | January 22, 2013 |
| Windscape Apartments II, LLC - 201302410185 (Converted Out) | LLC | Non-Active - Converted To Limited Partnership 201525200011 CA - Windscape Apartments II, Lp | December 19, 2012 | September 3, 2015 |
| Windscape Apartments II, LP - 201525200011 | LP | Active | January 22, 2013 | |
| Windscape Holdings, LLC - 201822210426 (SOI Due 08/31/2022) | LLC | Active | August 8, 2018 | |

| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
|---|---|---|---|---|
| Windtree, LP | LP | Active | February 23, 2018 | |
| Woodland Oaks Investments, LLC (SOI Due 03/31/2022) | LLC | Active | March 30, 2020 | |
| Yellow Poplar, LP | LP | Active | March 27, 2020 | |

| Kenneth Mattson – Business Entities (Kenneth Mattson is the Registered Agent for these Entities) | | | | |
|---|---|---|---|---|
| Business Name | Business Type | Active/Non-Active | Initial Filing Date | Inactive Date |
| Food Pavillion I, LTD., A California Limited Partnership | LP | Active | August 16, 1989 | |
| KS Mattson Company, LLC | LLC | Active | August 16, 1999 | |
| KS Mattson Partners, LP | LP | Active | August 16, 1999 | |
| Apan Partners, LLC | LLC | Suspended - FTB | May 16, 2002 | February 3, 2014 |
| McKinley Partners, LLC | LLC | Suspended - FTB | July 2, 2002 | February 3, 2014 |
| Lassen Partners, LLC | LLC | Suspended - FTB | August 8, 2002 | January 2, 2014 |
| Ringmaster's Square, LLC | LLC | Suspended -FTB | June 22, 2004 | April 1, 2021 |
| Specialty Sales Classics, Inc. | Stock Corporation | Active | January 14, 2011 | |
| Specialty Sales Global, Inc. | Stock Corporation | Suspended - FTB/SOS | January 18, 2011 | December 4, 2013 |

# Exhibit B

From: **Mattson Inquiries** <Mattsoninquiries@lefma.com>
Date: Thu, Jun 27, 2024 at 12:38 PM
Subject: Update
To: Mattson Inquiries <Mattsoninquiries@lefma.com>

In early April, I wrote to this list of investors where LeFever Mattson is the general partner (of a limited partnership) or the managing member (of an LLC).  I informed you that Ken Mattson stepped down from his position as Chief Executive Officer and Chief Financial Officer for LeFever Mattson.  And I stated that distributions would be paused as I moved into the positions vacated by Mattson.  These distributions, according to the partnership agreement, are discretionary and are paid when it is prudent based on available and anticipated cash needs.

If you read the newspapers, you likely know that Ken Mattson was asked to resign because of improper activities by him and various entities he owns and controls.  We continue to investigate these matters and many of you are helping us dig deeper into what Ken has done.

I have spoken with many of you directly, but I have a very long list of people that I have not been able reach out to individually.  Let me try to provide some additional information here about Ken, about LeFever Mattson, about our property portfolio, and about the future.   But please also realize that many considerations, including the current legal situation, limit what I am able to discuss.

Additionally, I do not know the future.  I do not want to over-promise for what we can do.

Decades ago, LeFever Mattson began investing in multi-family properties throughout California.  Many of you considered Ken Mattson to be your financial advisor, and with his help you invested in the LeFever Mattson led partnerships which owned these properties.  Over the last decade, many of these properties were sold and the profits reinvested in other properties.  In other cases, we continue to hold properties that we have owned for a long time.

As Ken Mattson's misdeeds were coming to light, Ken and I agreed that it would be best to begin the process of selling the portfolio of properties that are held by the partnerships.  That process of selling properties is ongoing.

The partnerships led by LeFever Mattson have proven to be good investments for decades.  Monthly distributions have been a welcome source of income for each of you, and for those partnerships that have sold properties and distributed the proceeds, the returns have been attractive.  But these partnerships are not insulated from the realities of the real estate market, the economy in general, or the chaos caused by the problems related to Ken Mattson.

Monthly distributions are not guaranteed in the partnership agreement because there are times when it is better, or even necessary, to not send out checks based on current and anticipated financial demands.  It is tough to hear from investors that believed that checks would always come and want to know when they will get the next one.  It is even harder to hear from those that put so much trust and resources with Ken, and now say that they regret "putting all of their eggs in one basket".  And I know that my inability to give specifics on when to expect the next monthly distribution is painful.

As discussed above, LeFever Mattson has a long term goal of selling the properties held in these partnerships and returning proceeds to the investors.  But here also, many investors want more information than I can give at this time.  We have started selling properties and proceeds have been paid to investors.  We are receiving offers on properties every week.  Some of these offers are very good, while others are below market value and we are continuing to

negotiate. For all of these properties, I will bring the investors into the process and inform them concerning a property sale as soon as it is appropriate.

At LeFever Mattson we are seeking to maximize the proceeds for our investors, both in the distributions that will have been paid through the life of the investment and the proceeds on sale.  But we are doing much more than that in seeking a remedy for the Mattson activities.  We know that many of you that are owners of record in our partnerships have also invested in Mattson's sales that were not authorized or disclosed to LeFever Mattson, or were part of his separate businesses often carried out under his partnership, KS Mattson Partners, LP.  I am grateful to our staff that blew the whistle on Ken's schemes and continue to be engaged in the investigation.  I am also grateful to so many of you that have come forward to tell your story.  Please do not stop doing that.  Your information is vital as we continue to investigate.  Please direct any information that might be helpful to Mattsoninquiries@lefma.com .

At LeFever Mattson, our approach in seeking a just conclusion to the Mattson situation breaks into three phases:  First we took the results of our investigation to the authorities.  Then we filed a civil action seeking to address his wrongs.  And now we are in a phase of direct appeal to Ken Mattson to simply do the right thing, save his victims from further losses in costly court battles, and enter into some arrangement that allows for the sale of his assets to pay those that have been hurt.  I remain optimistic that this approach will bring tangible results.

Tim LeFever
CEO
LeFever Mattson

# Exhibit C

1
2
3
4
5
6

HANSON BRIDGETT LLP
JOHN T. CU, SBN 207402
jcu@hansonbridgett.com
LAWRENCE M. CIRELLI, SBN 114710
lcirelli@hansonbridgett.com
ANTHONY J. DUTRA, SBN 277706
adutra@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:      (415) 541-9366

ELECTRONICALLY FILED
Superior Court of California
County of Sonoma
6/6/2024 4:36 PM
By: Kristin Breeden, Deputy Clerk

7
8

Attorneys for Plaintiffs
Timothy LeFever, LeFever Mattson, Divi Divi
Tree, L.P., and Windscape Apartments, LLC

9

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10

**COUNTY OF SONOMA**

11

12
13

TIMOTHY LEFEVER, LEFEVER
MATTSON, DIVI DIVI TREE, L.P., AND
WINDSCAPE APARTMENTS, LLC,

14

Plaintiffs,

15

v.

16
17

KENNETH W. MATTSON AND KS
MATTSON PARTNERS L.P.,

Defendants.

Case No.   24CV03485

**COMPLAINT FOR:**

**(1)   BREACH OF CONTRACT;**

**(2)   BREACH OF FIDUCIARY DUTY;**

**(3)   BREACH OF DUTY OF GOOD
        FAITH AND FAIR DEALING;**

**(4)   CONVERSION;**

**(5)   CONSTRUCTIVE FRAUD;**

**(6)   FRAUDULENT CONCEALMENT;**

**(7)   RECEIVING STOLEN PROPERTY
        IN VIOLATION OF CAL. PEN.
        CODE § 496;**

**(8)   DECLARATORY RELIEF; AND**

**(9)   REMOVAL OF DIRECTOR
        PURSUANT TO CALIFORNIA
        CORPORATIONS CODE § 304**

18
19
20
21
22
23
24
25
26
27
28

20861705.8

COMPLAINT

1    Plaintiffs Timothy LeFever ("LeFever"), LeFever Mattson ("LM"), Divi Divi Tree, L.P.

2    ("Divi"), and Windscape Apartments, LLC ("Windscape," and together with LeFever, LM, and

3    Divi, the "Plaintiffs") hereby allege as follows:

4                        **SUMMARY OF THE DISPUTE**

5        1.      LeFever and Defendant Kenneth W. Mattson ("Mattson") have been close personal

6    friends for over five decades. They met in elementary school when they were eight years old; they

7    attended the same middle school, high school, and university; and each was the best man in the

8    other's wedding. LeFever considered Mattson his best friend.

9        2.      In 1990, LeFever and Mattson became not merely good friends, but also business

10   partners, when LeFever acquired a 50% interest in what is now LM. At all times since then,

11   LeFever and Mattson have each owned 50% of LM's shares.

12       3.      By all accounts, Mattson is a very wealthy man.  He owns multiple homes. One

13   home located in Piedmont takes up the front of a block.  Another home located in Sonoma was

14   featured in the Wall Street Journal before Mattson bought it, fully furnished.  He has vacation

15   homes located in Del Mar that touch the sand.  He drives luxury cars.  He has owned Bentleys and

16   at least one Rolls Royce.  He even owns an exotic car company, although it was recently shut

17   down by the DMV.  In 2021, Mattson claimed a net worth in excess of $250 million.

18       4.      Mattson is also a thief.  He stole money directly from LM, the company that bears

19   his name.  He stole money from the retirement accounts of senior citizens when he promised but

20   did not actually give them an ownership interest in numerous LM-managed real estate

21   partnerships.  And he stole the identity and reputation of LM when he used the company's name

22   without its knowledge or consent in conjunction with his fraud.

23       5.      Mattson is also a liar.  He lied to the purported investors he swindled, and when the

24   fraudulent scheme he perpetrated for more than a decade was disclosed, he lied to the public,

25   falsely claiming, among other things that "Any transfer of an interest in Divi Divi over the years

26   by LeFever-Mattson to [the purported Divi investors] was documented and approved by me. All

27   proceeds from such sales were deposited with and used by LeFever-Mattson, not me."  Intended as

28   a boast, Mattson's statement was also an admission.  Prior to 2015, Mattson would have needed

the written authorization of not only an LM affiliate, LeFever Mattson I, LLC, but also an unaffiliated nonprofit that served as Divi's Managing General Partner, and Mattson did not have the consent of that nonprofit.  Mattson lacked the authority to provide consent on behalf of LM or any of its affiliates.  Mattson was also self-dealing in violation of his fiduciary duties.  And his documentation was nothing more than a second set of books that he used to convince IRA custodians that his activities were legitimate.

6.     Mattson also lied to the putative Divi investors he conned and to the public by falsely stating that Divi had been making distributions to those putative investors and that Plaintiffs were responsible for stopping those distributions. To the contrary, Divi had never made any distributions to these putative investors because they were never limited partners of record. Plaintiffs are informed and believe and, on that basis, allege that Mattson was secretly making payments to or for the benefit of these putative investors from an account he alone controlled. Plaintiffs are further informed and believe and, on that basis, allege that the payments Mattson made to these putative investors was from funds that Mattson received from other putative investors he swindled and that these payments bore no relation to the amount or timing of distributions Divi had made to its limited partners of record.

7.     Mattson studied economics and was, for 25 years, a stockbroker.  But he also found time to have multiple side businesses, including  K. W. M. Enterprises, Inc. ("KWM"), a real estate investment company that would change its name to LeFever Mattson when LeFever, Mattson's childhood friend, became half owner of the business in 1990.  As LM and its real estate portfolio grew, LeFever, an attorney and real estate broker, built and operated the related property management company, LeFever Mattson Property Management ("LMPM"), and the real estate brokerage company, California Investment Properties.  Mattson continued to run LM as CEO and CFO and offered real estate investments to a growing group of investors drawn largely from his stock brokerage client list.

8.     Mattson also has a family partnership, KS Mattson Partners L.P. ("KSMP," and with Mattson, "Defendants"), through which Mattson also buys and sells real estate.  Mattson sometimes abused his authority to sell KSMP's properties to limited partnerships and limited

2
COMPLAINT

liability companies that LM managed (each such partnership or limited liability company, an "LM Investment"), with Mattson signing for both the LM Investment as buyer and KSMP as seller, and many times with a significant profit to KSMP.

9.      In the past, Mattson was regarded by many as a financial genius.  This reputation was at least partially based on Mattson's real estate and investment portfolio.  But it was also based on his uncanny ability to predict the economic future.  Despite that reputation, Mattson's fondness for other people's money apparently caused him to do economically risky things, like finance much of his real estate portfolio with seller carry back loans that have huge annual balloon payments and with "hard money," high interest loans.  Unfortunately, many of those risky loans have become the responsibility of others when Mattson abused his power by making the unauthorized property sales from KSMP to various LM Investments.  Often the loans and the terms were not fully disclosed upon transfer, and many of those loans are now in default as Mattson has missed payments.

10.      Because Mattson has a degree in economics and had been working at a financial services firm when LeFever and Mattson began running LM together, LeFever trusted Mattson to oversee LM's finances and investor relations.

11.      But Mattson abused LeFever's trust and Mattson's control over LM.

12.      Mattson created and operated what amounted to a secret division of LM for his own exclusive benefit by, among other things, committing numerous acts of self-dealing, secretly funneling at least $75 million to himself and KSMP, his wholly owned company, to the detriment of LeFever, LM, Divi, Windscape, and other LM Investments.

13.      Mattson purported to cause LM and/or other LM affiliates to enter into numerous poorly crafted agreements without LeFever's knowledge or consent and without LM's knowledge or consent.

14.      Mattson secretly caused LM, Divi, and/or other LM Investments to purchase real estate from KSMP at inflated prices so that Mattson could obtain secret profits from LM, Divi, and/or other LM Investments.

3
COMPLAINT

15.     Through his fraudulent scheme, Mattson duped more than one hundred putative investors into giving him tens of millions of dollars – most of which came from their Individual Retirement Accounts or from other funds they had saved for retirement – for what they believed were interests in various LM Investments.  But those putative investors received nothing in exchange: Mattson did not own the limited partnership interests or membership interests he purportedly sold them, did not have authority to sell those limited partnership interests or membership interests, and/or those limited partnership interests or membership interests may not have even existed.  Mattson took tens of millions of dollars from hundreds of people in exchange for nothing.

16.     Despite having legal and contractual obligations to disclose in advance all of these transactions to Plaintiffs, Mattson did not disclose any.  Instead, he actively concealed them from Plaintiffs to hide his misconduct and prevent Plaintiffs from stopping Mattson's fraudulent scheme and self-dealing. Mattson's concealment in many instances lasted longer than a dozen years.

17.     When Plaintiffs recently started to uncover Defendants' misconduct, Plaintiffs immediately confronted Mattson and began investigating and then reported Mattson's fraudulent conduct to the authorities. Mattson gradually admitted to much of Defendants' misconduct but provided an ever-changing story in an attempt to justify his actions. Mattson nonetheless entered into an agreement (the "Indemnity Agreement") under which he admitted to his wrongdoing and agreed that Defendants would indemnify and hold Plaintiffs harmless from the damage Defendants have already caused them and from the harm and expenses Plaintiffs will suffer in the future because of Defendants' wrongdoing.

18.     Plaintiffs entered into the Indemnity Agreement, among other reasons, to help minimize the harm Defendants caused to the dozens – if not hundreds – of investors that Defendants swindled out of their retirement savings through Defendants' misconduct and to hold Defendants accountable for the harm they caused.

19.     Plaintiffs have demanded that Defendants indemnify Plaintiffs as promised and that Defendants compensate Plaintiffs in full for the harm Defendants caused, but Defendants have refused to do so.

4
COMPLAINT

20.     Plaintiffs have therefore been forced to bring this action to stop Defendants from committing further acts of fraud, self-dealing, breaches of fiduciary duty, and breaches of contract; to hold Defendants accountable for the harm they have caused Plaintiffs and their investors; and to ensure that Defendants abide by their obligations to indemnify and hold Plaintiffs harmless from any further harm they might suffer on account of Defendants' misconduct.  It is only through this action that Plaintiffs can address and remedy the harm Mattson's conduct has caused by deceiving putative investors into paying him for what they believed were partnership interests in Divi and the other LM Investments.

21.     Plaintiffs' investigation into Defendants' wrongdoing is still ongoing. Plaintiffs anticipate that their investigation will uncover additional wrongful acts by Defendants that have harmed Plaintiffs and their investors and putative investors.

## THE PARTIES

22.     LeFever is and, at all relevant times mentioned herein, was an individual domiciled and residing in Solano County, California.

23.     LM is and, at all relevant times mentioned herein, was a corporation incorporated under the laws of the State of California. LM's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

24.     Divi is and, at all relevant times mentioned herein, was a limited partnership organized under the laws of the State of California. Divi's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

25.     Windscape is and, at all relevant times mentioned herein, was a limited liability company organized under the laws of the State of California. Windscape's headquarters and principal place of business is and, at all relevant times mentioned herein, was in Sacramento County, California.

26.     Plaintiffs are informed and believe and, on that basis, allege that Mattson is an individual domiciled and residing in Sonoma County, California.

27.     Plaintiffs are informed and believe and, on that basis, allege that KSMP is and, at all relevant times mentioned herein, was a limited partnership organized under the laws of the

1   State of California.  Plaintiffs are informed and believe and, on that basis, allege that KSMP's

2   headquarters and principal place of business is in Sonoma County, California.

3                             **JURISDICTION AND VENUE**

4          28.     The Superior Court for the County of Sonoma has subject matter jurisdiction over

5   this dispute pursuant to Article VI, Section 10 of the California Constitution and California Civil

6   Procedure Code Section 410.10 because the subject matter of this dispute falls within the general

7   jurisdiction of the Superior Courts of the State of California.

8          29.     The Superior Court for the County of Sonoma has personal jurisdiction over

9   Mattson and KSMP pursuant to Article VI, Section 10 of the California Constitution, Amendment

10  XIV of the United States Constitution, and California Civil Procedure Code Section 410.10

11  because Mattson and KSMP are each domiciled in the State of California and because Plaintiffs'

12  claims against Mattson and KSMP relate to and/or arise out of Mattson's and KSMP's respective

13  significant contacts with the State of California.

14         30.     The Superior Court for the County of Sonoma is the proper venue for this dispute

15  pursuant to California Civil Procedure Code Sections 395 and 395.5 because (a) Mattson resides

16  in the County of Sonoma; (b) KSMP's liability under the Agreement of  Limited Partnership of

17  Divi Divi Tree, L.P. (the "Original Divi LP Agreement") and the Amended and Restated

18  Agreement of Limited Partnership of Divi Divi Tree, L.P. (the "Amended Divi LP Agreement,"

19  and together with the Original Divi LP Agreement, the "Divi LP Agreements") arose in whole or

20  in part in the County of Sonoma; (c) one or more of KSMP's breaches of the Divi LP Agreement

21  occurred in the County of Sonoma; and (d) Mattson entered into the Indemnity Agreement with

22  LM and LeFever that is a subject of this action in the County of Sonoma and/or agreed to perform

23  under the Indemnity Agreement in the County of Sonoma.

24                             **GENERAL ALLEGATIONS**

25  **A.      LeFever and Mattson Become Close Personal Friends.**

26         31.     LeFever and Mattson both grew up in or around Rancho Cordova, California.  They

27  first met in elementary school when they were 8 years old, and although they attended different

28  elementary schools, they attended middle school and high school together.  After graduating from

Cordova High School, LeFever and Mattson each attended U.C. Berkeley.  LeFever graduated with a degree in political science.  Mattson graduated with a degree in economics.

32.     After graduating from Berkeley, LeFever obtained a juris doctorate from what is now U.C. Law San Francisco.

33.     Mattson, meanwhile, became a securities broker.  Plaintiffs are informed and believe and, on that basis, allege that Mattson began working as a securities broker at what is now Principal Securities, Inc. in late 1983, that he worked as a securities broker for Dean Witter Reynolds Inc. between October of 1984 and March of 1990, and that he then joined Prudential Securities Incorporated.  Mattson continued working as a securities broker at Prudential, and then at Sutro & Company, Inc. and what is now RBC Capital Markets Corp. where Mattson remained until at least 2009.

34.     LeFever considered Mattson his best friend from early in his youth and afterward. Mattson introduced LeFever to the woman LeFever would eventually marry, and Mattson and LeFever were each the best man at the other's wedding.

**B.      LeFever and Mattson Form LM.**

35.     Plaintiffs are informed and believe and, on that basis, allege that Mattson formed KWM as Mattson's wholly owned corporation in or around August 1989.

36.     At or around that time, LeFever began discussing the idea of forming a real estate company with Mattson.

37.     This idea came into fruition in 1990 when LeFever acquired a 50% interest in KWM from Mattson.  LeFever and Mattson then changed the name of the company to LM.  At all times since then, LeFever and Mattson have each owned 50% of LM's shares.

38.     Mattson was still working as a securities broker at the time, and he told LeFever that his employer did not want him doing hands-on real estate work.  Consequently, LeFever obtained a real estate brokers license for LM.

39.     Mattson had nearly seven years of experience as a securities broker when LeFever and Mattson began running LM together.  As a result, Mattson had established financial and investor relationships at the time, but LeFever had not.  Because of his economics and finance

background, his many years' experience as a securities broker, and his established financial and investor relationships, Mattson naturally took primary responsibility for managing LM's finances and investor relations.  Because of their close personal friendship, LeFever completely and implicitly trusted Mattson handling virtually all financial and investor related matters for LM.

40.     LeFever, who was a licensed attorney by the time he and Mattson formed LM, focused on real estate acquisitions, property management, and lender relations for LM.

41.     In 1991, LeFever and Mattson formed another company, LMPM, to provide property management services.  LM currently owns a majority interest in LMPM, with a third individual, Mark Bennett owning the remaining shares.

42.     Separately, Mattson owns several other companies including KSMP, which is also a real estate investment company.  Plaintiffs are informed and believe and, on that basis, allege that KSMP is directly or indirectly wholly owned by Mattson and is controlled solely by Mattson.

**C.     LeFever and Mattson Grow LM's Real Estate Portfolio.**

43.      LM has grown substantially as a real estate investment company since 1990. Today, LM manages a portfolio of real estate valued at over $400 million.

44.     Beginning in the late 1990s, LM began to offer certain real estate opportunities to outside investors by acquiring the real estate in a co-tenancy with the investors.

45.     Eventually, LM's business model shifted so that it typically did not acquire real estate in its own name.  Instead, LM's business model is to create the LM Investments – limited partnerships and limited liability companies that each purchase one or more commercial properties.  Divi and Windscape are two of these LM Investments.

46.     This structure allowed LM to pool more capital by selling limited partnership or LLC membership interests in the LM Investments to a small number of accredited investors while typically reserving an ownership interest in the LM Investments for itself as general partner or managing member, sometimes as limited partners or members as well.  Most of these outside investors were Mattson's former clients or other contacts Mattson developed while he was working as a securities broker.

47.     Because of this structure, each of the LM Investments has either a limited partnership agreement or an operating agreement (each such partnership or operating agreement, an "LM Investment Agreement") that provides LM and the investors a clear understanding about such things as how the LM Investment will be managed, under what circumstances investors might receive a distribution, and under what conditions the investors can sell or transfer their interest in the LM Investment.

48.     LM manages each of the LM Investments by serving as its managing or general partner (if the LM Investment is a limited partnership) or as its manager (otherwise).  LeFever's and Mattson's other company, LMPM, typically serves as property manager for the commercial properties that the LM Investments own and provides various back-office functions for LM and the LM Investments.

49.     If the LM Investment generates operating profits (*e.g.*, from rent collected from the tenants of one of the LM Investment's properties) the LM Investment typically distributes a portion of that income to its respective investors.  Historically, when an LM Investment sold a property, the LM Investment would usually use the sale proceeds to purchase another property through an exchange under Section 1031 of the Internal Revenue Code, rather than distributing the sale proceeds to investors.

**D.     LM Forms Divi to Purchase the Sienna Pointe Apartments in Moreno Valley.**

50.     In or around late 2002, LM identified the Sienna Pointe apartment complex in Moreno Valley, California as a potentially lucrative real estate investment property.

51.     The purchase of Sienna Pointe included the assumption of a loan that required the involvement of a nonprofit entity.

52.     To facilitate the purchase of Sienna Pointe, LM formed Divi as a limited partnership between a Sacramento-based religious nonprofit corporation (the "Nonprofit") and LeFever Mattson I, LLC, one of LM's subsidiaries.  The Nonprofit was named Divi's Managing General Partner.

53.     Divi acquired the Sienna Pointe property in or around 2003.

9

54.     In or around September 2015, Divi refinanced the loan it assumed, on acquisition of the Sienna Pointe property in 2003, and the Nonprofit and LeFever Mattson I, LLC, both withdrew and resigned as Divi's Managing General Partner and Co-General Partner respectively. Concurrently therewith, Divi's remaining partners executed the Amended Divi LP Agreement, naming LM as Divi's general partner.

55.     Divi eventually sold the Sienna Pointe property in 2021 and reinvested the sale proceeds into approximately 20 other properties through 1031 exchanges.

**E.     Mattson Orchestrates a Fraudulent Scheme to Unjustly Enrich Himself.**

56.     The Original Divi LP Agreement required the investors to obtain written consent of both the Nonprofit and LeFever Mattson I, LLC before selling or otherwise transferring their interests in Divi.  The Amended Divi LP Agreement and the other LM Investment Agreements require the investors to obtain LM's written approval before selling or otherwise transferring their interest in the LM Investment.

57.     Over time, some investors wanted to sell their interest in one or more of the LM Investments.  Mattson oftentimes would buy those investors out by having KSMP acquire the investors' LM Investment interests. Eventually, LeFever also bought out some investors and acquired a portion of LM's Divi limited partnership interest so that he too acquired an individual interest in some of the LM Investments.  Plaintiffs are informed and believe and, on that basis, allege that all of these purchases by KSMP and LeFever were properly reported to and approved by LM or its predecessors in accordance with the Divi LP Agreements.

58.     A number of such transactions have been properly effected with respect to Divi since 2015.  Up until this time, Divi had a total of 19 limited partners, but LeFever, Mattson, and KSMP were not Divi limited partners.  Over time since 2015, KSMP bought out most of these Divi limited partners and LeFever bought a portion of LM's limited partnership interest, so that Divi's current investors of record are: LM (16.473%); LeFever and his wife, Amy LeFever (19.458%); Treakle Revocable Trust (14.442%); and KSMP (49.626%).  The Treakle Revocable Trust and LM are the only remaining original investors in Divi.

59.     In addition to these known and approved acquisitions, Mattson was also secretly selling purported interests in LM Investments without LeFever's knowledge or LM's consent. Neither LeFever nor LM was informed of these sales at any time before or after their occurrence.

60.     LeFever and LM have now learned that, for more than a decade, Mattson surreptitiously sold purported Divi partnership interests to numerous putative investors and intentionally concealed these transactions from LeFever and LM.  Some of these purported sales of Divi partnership interests occurred under the Original Divi LP Agreement.  Mattson intentionally concealed these transactions from the Nonprofit as well.

61.     According to Mattson, some of the Divi partnership interests he purportedly sold were KSMP's.  But Mattson has also acknowledged that some of his sales took place before KSMP owned any interest in Divi, and that he was therefore purporting to sell Divi partnership interest belonging to LM.  However, Mattson did not have the authority to sell any of LM's Divi partnership interests based on his approval or action alone.  Moreover, despite allegedly selling some of LM's interest in Divi, Mattson kept all of the money for himself and did not provide LeFever or LM any portion of the proceeds from these secret transactions.

62.     Plaintiffs are informed and believe and, on that basis, allege that Defendants purported to sell Divi interests to at least 177 different putative investors (the "Putative Divi Sales"), and received $55 million or more in connection with the Putative Divi Sales, which far exceeds the entire valuation for Divi, much less KSMP's 49.626% interest in Divi.

63.     Based on the prior transactions in which Mattson caused KSMP to acquire nearly half of the Divi partnership interests and in which Mattson provided approval of LeFever's acquisition of Divi limited partnership interests, Mattson not only knew how to, but also knew that he was required to: (a) use a purchase agreement to document the sale of Divi limited partnership interests and what exactly was being sold; (b) notify and obtain LM's advance written approval of the transaction by presenting the proposed transaction to LeFever, LM's only disinterested shareholder and director; and (c) record the transactions in Divi's books and records so that, among other things, Divi can properly accord to the new partner and all others (e.g., make

11
COMPLAINT

1  distributions to the correct investors and in the correct amounts, issue accurate K-1 statements to

2  the limited partners, etc.).

3        64.    Plaintiffs are informed and believe and, on that basis, allege that Defendants did not

4  execute purchase agreements or even specify the percentage interest sold for the overwhelming

5  majority of the Putative Divi Sales and that Defendants intentionally did this so that LeFever and

6  LM would not know about the Putative Divi Sales.  Plaintiffs are also informed and believe and,

7  on that basis, allege that Mattson likely did not even intend to sell the putative investors Divi

8  limited partnership interests and instead merely intended to dupe them into falsely believing they

9  had purchased Divi limited partnership interests while providing them nothing in return for the

10 money they gave him.

11       65.    Plaintiffs are also informed and believe that Mattson falsified certain

12 documentation to further his fraudulent scheme.  For example, Plaintiffs are informed and believe

13 and, on that basis, allege that Mattson documented certain Putative Divi Sales by having the

14 purported investor execute a signature page from the Original Divi LP Agreement even if the

15 transaction occurred after Divi adopted the Amended Divi LP Agreement and that Mattson

16 intentionally doctored the signature page so that it indicated LM was the Managing General

17 Partner even though only the Nonprofit ever held that title.  Mattson has also admitted to creating

18 fake K-1 forms for certain purported investors, and Plaintiffs are informed and believe and, on that

19 basis, allege that Mattson provided fake K-1 forms to Divi investors to maintain the false

20 impression that they were actually Divi limited partners.  Plaintiffs are informed and believe and,

21 on that basis, allege that Mattson fabricated these fraudulent K-1 forms, among other reasons, so

22 that the putative Divi investors would not realize Defendants had duped them and to minimize the

23 risk that Plaintiffs would learn of Defendants' fraudulent scheme from a putative investor asking

24 Plaintiffs to provide a K-1 form that the putative investor otherwise would have expected to

25 receive.

26       66.    To conceal their wrongdoing, Defendants also intentionally failed to present any of

27 the Putative Divi Sales to LeFever, LM's only disinterested shareholder and director, failed to

28 obtain LM's written approval of the Putative Divi Sales, failed to obtain the Nonprofit's written

approval of the Putative Divi Sales under the Original Divi LP Agreement, and intentionally omitted any record of the Putative Divi Sales from Divi's books and records and from LM's books and records.  As a result, neither LeFever nor LM knew anything about the Putative Divi Sales until Mattson's fraudulent schemes finally began to come to light in March of this year.

67.     Mattson took additional steps to hide the Putative Divi Sales from LeFever and LM.  For example, Mattson opened a bank account for LM (the "Covert Account") with Bank of the West (which was subsequently acquired by Bank of Montreal) that Mattson ensured he alone could access, allowing Mattson to execute and manage the Putative Divi Sales and other self-dealing transactions without leaving a paper trail of bank records that LeFever or LM could find.

68.     Plaintiffs are informed and believe and, on that basis, allege that Mattson had the putative Divi investors transfer their purchase money for the Putative Divi Sales to the Covert Account, falsely representing to them that it was a Divi bank account, and that Mattson also used the Covert Account for other unauthorized transactions.  Plaintiffs are informed and believe and, on that basis, allege that all money deposited in the Covert Account – including the $55 million or more that Defendants received in the Putative Divi Sales and an additional $20 million in estimated funds Defendants received from the purported sale of interests in the other LM Investments – was ultimately transferred to and spent by Mattson for his own personal benefit.

69.     Plaintiffs are also informed and believe and, on that basis, allege that when conducting the Putative Divi Sales, Mattson did not use LM's address, but instead used a post office box he had obtained for his own use and for KSMP's use and represented to the putative Divi investors, that it was LM's post office box.  Plaintiffs are informed and believe and, on that basis, allege that Mattson alone had access to this post office box, and that he intentionally used this post office box address for the Putative Divi Sales to actively conceal the Putative Divi Sales form Plaintiffs by ensuring that any correspondence regarding the Putative Divi Sales would be diverted away from LM and instead be routed directly to him.

70.     Because Defendants had concealed the existence of the Putative Divi Sales from Plaintiffs, Divi never made any distributions to the putative Divi investors.  Plaintiffs are informed and believe and, on that basis, allege that to further hide the Putative Divi Sales from Plaintiffs and

to maintain the false impression he had given the putative Divi investors, Mattson would cause KSMP to pay distributions to or for the benefit of certain of the putative Divi investors so that they would falsely believe that Divi was instead making partnership distributions to them.  Plaintiffs are informed and believe and, on that basis allege, however, that the distributions paid by KSMP to or for the benefit of the putative Divi investors bore no relation (both in terms of timing and amount) to the distributions paid by Divi to KSMP and that Mattson instead caused KSMP to pay whatever was necessary to maintain the front that the putative Divi investors were investors in Divi.

71.     After Mattson's wrongdoing came to light, Divi stopped making distributions to Mattson and all other investors of record.  Plaintiffs are informed and believe and, on that basis, allege that Mattson thereafter stopped making payments to many of the putative Divi investors and then, to maintain his deception, falsely blamed Plaintiffs for terminating the payments to the putative Divi investors and continued to mislead the public about Defendants' fraudulent conduct. Plaintiffs are informed and believe and, on that basis allege, that Mattson has in some instances continued to cause KSMP or other entities controlled by Mattson to make distributions to putative Divi investors as though they are from Divi, telling the putative Divi investors not to be alarmed and that their "investments" in Divi are safe.

72.     Mattson's self-dealing was not limited to these secret Putative Divi Sales.  Mattson has also surreptitiously caused LM to pay millions of dollars for properties that Mattson titled in his own name or in KSMP's name.  For example, Mattson secretly used more than $6 million of LM's money to purchase a lavish home for himself in Sonoma, which he now uses as his primary residence.  Mattson hid from LeFever the fact that Mattson had used LM's money to purchase these properties by, among other things, using the Covert Account to wire LM's funds into the escrow account for real estate purchases that exclusively benefitted Mattson.

73.     Mattson also used KSMP to facilitate numerous other self-dealing transactions by diverting corporate opportunities away from LM and LM Investments to KSMP, Mattson's wholly owned company.  For example, Plaintiffs are informed and believe and, on that basis, allege that in September 2022, Mattson caused KSMP to purchase real estate in Sonoma for $6.5 million.  Five

weeks later, Mattson caused KSMP to sell that same property without any change to Windscape for $7.5 million, netting Defendants $1,000,000 in the process and causing Windscape to pay $1,000,000 more for the property than it should have.

74. Mattson has also caused LM Investments to purchase underperforming, heavily encumbered commercial properties from KSMP without LeFever's knowledge or approval so that the LM Investments would be stuck with these indebted and underperforming assets rather than KSMP, his wholly owned company.

75. Plaintiffs are informed and believe and, on that basis, allege that KSMP finances both its real estate purchases and Mattson's distributions to his putative investors using high interest, hard money loans and loans requiring large balloon payments. Upon obtaining such debt proceeds, Mattson has thereafter caused LM Investments to purchase many of those properties from KSMP without LeFever's knowledge or approval. These acquisitions by the LM Investments were completed subject to the aforementioned loans without LeFever's knowledge or approval with the result that these LM Investments were saddled with unknown debt obligating LM to make balloon payments soon after acquisition. In many instances, these are the non-performing or under-developed properties that LM finds itself left with, described immediately above.

76. At least three of the properties that KSMP recently sold to the LM Investments are currently in default and at least two more have significant balloon payments due, meaning that the LM Investments and their investors are at risk of suffering significant financial losses. KSMP, meanwhile, took the money and ran.

**F.      Mattson Enters Into the Indemnity Agreement and Admits Wrongdoing.**

77. After LeFever and LM confronted Mattson regarding his unauthorized Divi transactions and other misconduct, Mattson entered into the Indemnity Agreement with LeFever and LM.

78. Mattson made several key admissions in the Indemnity Agreement including acknowledging that:

- "none of the [Putative Divi Sales] were presented to the Board or shareholders of Lefever Mattson prior to the date that the [Putative Divi Sales] were entered into";

- "none of the [Putative Divi Sales] were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the [Putative Divi Sales] were entered into";

- "neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the [Putative Divi Sales]"; and

- "neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the [Putative Divi Sales]."

79.     Mattson agreed in the Indemnity Agreement that he and KSMP would indemnify and hold harmless LeFever, LM, and the LM Investments from any expenses they might incur, including attorney's fees, or claims they might face in connection with Mattson's or KSMP's misconduct.

80.     Mattson also agreed in the Indemnity Agreement to assist LM and LeFever by providing them information they might request about Mattson's actions.  Thus far, however, Mattson has refused to provide LM and LeFever the information they have requested and LM and LeFever believe there may be hundreds of unauthorized sales by Mattson in other LM Investments that have yet to be accounted for.  Mattson also has not reimbursed LM and LeFever fully for the expenses they have already incurred and will shortly further incur in connection with investigating and addressing the impact of Mattson's actions.

## FIRST CAUSE OF ACTION

### (Breach of Contract – LeFever, LM, and Divi against All Defendants)

81.     Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 80.

82.     KSMP and LeFever are each limited partners in Divi.

83.     LM is Divi's general partner.

84.     Mattson, KSMP, LeFever, LM, and Divi have each entered into and agreed to be bound by the terms of the Divi LP Agreements.

16

85.     The Original Divi LP Agreement prohibits limited partners from transferring Divi limited partnership interests without both the Nonprofit's written approval and LM's written approval. The Amended Divi LP Agreement prohibits limited partners from transferring Divi limited partnership interests without LM's written approval.

86.     In order to obtain LM's approval, there must be a consent vote from a majority of LM's board of directors; in the case of LM, in all relevant times, only LeFever and Mattson served as board of directors of LM and thus both LeFever and Mattson had to approve any transfer of limited partnership interests.

87.     The Nonprofit has fully performed all of its obligations under the Original Divi LP Agreement by, among other things, acting as Divi's Managing General Partner.  LM has fully performed all of its obligations under the Divi LP Agreements by, among other things, acting as Divi's general partner.  LeFever has fully performed all of his obligations under the Divi LP Agreements by, among other things, obtaining LM's written approval and, if needed, the Nonprofit's written approval for any transfer of any Divi limited partnership interests to him or from him.  Divi has fully performed all of its obligations under the Divi LP Agreements by, among other things, paying or reimbursing all direct expenses incurred in connection with the administration and operation of Divi.

88.     Defendants contend that KSMP has transferred Divi limited partnership interests to numerous parties through the Putative Divi Sales.

89.     KSMP did not at any time obtain LM's written approval for any of the Putative Divi Sales and did not at any time obtain the Nonprofit's written approval for any of the Putative Divi Sales that occurred prior to the adoption of the Amended Divi LP Agreement.

90.     Plaintiffs contend that Divi limited partnership interests are only transferred under the Original Divi LP Agreement if the transfer is authorized in writing in advance by both the Nonprofit and LM and only transferred under the Amended Divi LP Agreement if the transfer is authorized in writing in advance by LM.  Plaintiffs further contend that because the Putative Divi Sales were not authorized in writing in advance by LM and/or the Nonprofit, no Divi limited partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead

in the alternative that if KSMP transferred Divi limited partnership interests to numerous third parties through the Putative Divi Sales, KSMP breached the applicable Divi LP Agreement by making the Putative Divi Sales without obtaining LM's and, if applicable, the Nonprofit's prior written approval.

91.     The amount (by value) of Divi limited partnership interests that KSMP purportedly sold likely exceeded the amount (by value) of Divi limited partnership interests that KSMP and LM together owned, and indeed may have exceed the total amount (by value) of Divi limited partnership interests that Divi issued.

92.     Thus, to the extent that KSMP transferred more Divi limited partnership interests in percentage terms than 100%, LeFever, LM and Divi have each been harmed by KSMP's transfer of additional Divi limited partnership interests in violation of the Divi LP Agreements through the Putative Divi Sales because any such transfer diluted the respective ownership interests of all owners of record in Divi.

93.     LeFever and LM have also been harmed by KSMP's transfer of Divi limited partnership interests in violation of the Divi LP Agreements through the Putative Divi Sales because Defendants contend that certain of the Putative Divi Sales involved KSMP selling Divi limited partnership interests that belonged to LM and neither LeFever nor LM received anything in return for these unauthorized sales of LM's Divi limited partnership interests.

94.     Each of Divi, LeFever, and LM has also been harmed by KSMP's transfer of Divi limited partnership interests in violation of the Divi LP Agreements through the Putative Divi Sales because Divi, LeFever, and LM have each incurred significant expenses in connection with the investigation into the Putative Divi Sales and responding to related issues concerning the unauthorized Putative Divi Sales.  Divi, LeFever, and LM would not have incurred these expenses if KSMP had not transferred Divi limited partnership interests in violation of the Divi LP Agreement.

95.     As a result of KSMP's breaches of the Divi LP Agreements, as alleged, Divi, LeFever, and LM have suffered and continue to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

96.     After Defendants' wrongful conduct finally came to light, LeFever, LM, and Mattson entered into the Indemnity Agreement under which Mattson agreed that Defendants would indemnify and hold Plaintiffs harmless from the damage Defendants have already caused Plaintiffs and from the harm Plaintiffs will suffer in the future because of Defendants' wrongdoing. Mattson also agreed to assist LM and LeFever by providing them information they might request about Mattson's actions so that LM and LeFever could help identify the putative investors that Defendants had swindled and help ensure that Defendants remedied the harm they caused to these putative investors.

97.     Plaintiffs have fully performed under the Indemnity Agreement by, among other things, tendering to Mattson indemnification demands for expenses covered by the Indemnity Agreement and tendering to Mattson demands that Mattson advance funds for indemnifiable expenses that Plaintiffs expected to incur.

98.     Mattson has breached the Indemnity Agreement by, among other things failing to pay for indemnifiable expenses that Divi, LeFever, and LM have tendered to Mattson and failing to advance funds for indemnifiable expenses that Divi, LeFever, and LM expect to incur.  Mattson has also breached the Indemnity Agreement by failing to provide Plaintiffs information regarding Defendants' misconduct that Plaintiffs requested from him.

99.     Divi, LeFever, and LM have been harmed as a result of Mattson's breaches of the Indemnity Agreement because Divi, LeFever, and LM have each incurred expenses that Mattson is required to pay for or reimburse Divi, LeFever, and LM for but has not.  Divi, LeFever, and LM have also been harmed by Mattson's breaches of the Indemnity Agreement because they have each incurred additional expenses to obtain information that Mattson was required to provide but did not.

100.     Plaintiffs are informed and believe and, on that basis, allege that there is a unity of interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such that

1    Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal

2    equivalent of an empty shell corporation.

3         101.    It would be inequitable to recognize KSMP's separate existence as a partnership

4    because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he

5    can escape liability for his wrongdoing and be unable to satisfy creditors.

6         102.    KSMP is therefore equally liable for Mattson's breaches of the Indemnity

7    Agreement under a reverse veil piercing theory.

8         103.    Mattson, LM, and LeFever agreed in the Indemnity Agreement that the prevailing

9    party in any action arising out of the Indemnity Agreement is entitled to recover their attorneys'

10   fees from the opposing party.  Mattson and LM are therefore entitled to recover from Defendants

11   any attorneys' fees that Mattson and LM incur in connection with this cause of action.

12   <div align="center">**SECOND CAUSE OF ACTION**</div>

13   <div align="center">**(Breach of Fiduciary duty – LM and LeFever against All Defendants)**</div>

14        104.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth

15   in full, the allegations contained in Paragraphs 1 through 103.

16        105.    At all times relevant herein, Mattson served as one of LM's officers and one of its

17   directors.  In this capacity, Mattson owed LM and LeFever fiduciary duties, including the duty of

18   care, duty of loyalty, and the duty to disclose all material information to LM and LeFever.

19        106.    Mattson breached the fiduciary duties he owed LM and LeFever by, among other

20   things, engaging in self-dealing transactions such as (1) causing LM to pay for real estate that

21   Mattson acquired in his own name and/or KSMP's name and not LM's including, but not limited

22   to, a lavish mansion in Sonoma that Mattson purchased for himself and which he now uses as his

23   primary residence, (2) misappropriating LM's corporate opportunities for KSMP, his wholly

24   owned company, (3) selling Divi partnership interests without authorization to do so, and retaining

25   the proceeds from the sales of LM's Divi partnership interests and any new or additional Divi

26   partnership interests solely for himself, (4) selling property owned by LM to a buyer who partially

27   funded the purchase by issuing a $4 million promissory note and causing the promissory note to

28

1  be in favor of one of Mattson's wholly-owned entities instead of LM, (5) failing to disclose the

2  secret Divi transactions; and (6) concealing his illicit transactions with the Covert Account.

3      107.    Mattson's breaches of his fiduciary duties, as alleged, directly and proximately

4  harmed LM and LeFever by, among other things, causing LM to pay millions of dollars for

5  property at inflated prices that exclusively benefitted Mattson and/or KSMP, causing LM to sell

6  millions of dollars of valuable property and receiving nothing in return, diluting LM's and

7  LeFever's ownership interests in Divi, clouding title of LM's and LeFever's ownership interests in

8  Divi, and causing LM and LeFever to incur significant sums of money to investigate and

9  remediate the harm Mattson's conduct caused the third parties who believed they purchased Divi

10  partnership interests.  Again and again, Mattson has placed his own personal interests above those

11  of LeFever and LM, benefiting himself to LeFever's and LM's detriment and in breach of the

12  fiduciary duties Mattson owed.

13      108.    As a result of Mattson's conduct, as alleged, LM and LeFever have suffered and

14  continue to suffer damages, all in an amount to be determined according to proof at trial, but

15  which Plaintiffs estimate to be at least $100 million.

16      109.    Plaintiffs are informed and believe and, on that basis, allege that there is a unity of

17  interest between Mattson and KSMP because Mattson wholly owns and controls KSMP, Mattson

18  has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has

19  failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such

20  that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal

21  equivalent of an empty shell corporation.

22      110.    It would be inequitable to recognize KSMP's separate existence as a partnership

23  because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he

24  can escape liability for his wrongdoing and be unable to satisfy creditors.

25      111.    KSMP is therefore equally liable for Mattson's breaches of fiduciary duty under a

26  reverse veil piercing theory.

27      112.    Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP,

28  Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and

LeFever fiduciary duties and that Mattson's conduct would violate the fiduciary duties Mattson owed LM and LeFever.

113.   To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's breaches of the fiduciary duties Mattson owed LM and LeFever by, among other things pursuing corporate opportunities Mattson diverted away from LM, purchasing property that Mattson paid for using LM's funds, transferring said property to LM Investments at inflated prices and only after, in many instances, heavily encumbering such property with debt subject to extremely deleterious terms, and selling Divi limited partnership interests in transactions KSMP knew were not authorized by LM.

114.   KSMP's conduct was a substantial factor in causing LM's and LeFever's harm because, among other things, Mattson could not have misappropriated LM's corporate opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name if KSMP did not acquire those properties, and Mattson could not have sold KSMP's Divi interests without proper authorization unless KSMP agreed to sell those Divi limited partnership interests.

115.   To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's wrongful conduct individually for its own individual advantage.

116.   As a result, and as an alternative to liability under a reverse veil piercing theory, KSMP is jointly and severally liable for Mattson's breaches of his fiduciary duties because KSMP aided and abetted those breaches.

117.   Defendants' conduct, as alleged, was done with an intentional and conscious disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary damages assessed against Defendants in a sum according to proof at trial, as a means of deterring Defendants from committing similar acts and omissions in the future and punishing them for their wrongful conduct.

## THIRD CAUSE OF ACTION

### (Breach of Duty of Good Faith and Fair Dealing – All Plaintiffs against KSMP)

118.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 117.

119.    As one of Divi's limited partners and one of Windscape's members, KSMP owed Divi, Windscape, LM, and LeFever statutory duties of good faith and fair dealing.

120.    KSMP breached the duties of good faith and fair dealing by, among other things, misappropriating corporate opportunities from Divi and Windscape for its own benefit and to the detriment of Plaintiffs.

121.    For example, Plaintiffs are informed and believe and, on that basis, allege that in September 2022, Mattson caused KSMP to purchase real estate in Sonoma for $6.5 million. Five weeks later, Mattson caused KSMP to sell that property to Windscape for $7.5 million, netting Defendants $1,000,000 in the process and causing Windscape to pay $1,000,000 more for the property than it should have.

122.    KSMP also breached its duties of good faith and fair dealing by selling the LM Investments properties which KSMP used as security for high interest, hard money loans or loans with large balloon payments in the future and then making the LM Investments' acquisition of those properties subject to those loans notwithstanding that in many instances substantial portions of the principal of these loans was paid to KSMP (each such sale subject to a hard money loan or a loan with a large balloon payment, a "Hard Money/Balloon Payment Loan Sale").  KSMP knew that Mattson concealed these Hard Money/Balloon Payment Loan Sale transactions from Plaintiffs and that Mattson did not have authority to cause the LM Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions, but KSMP nonetheless consummated the Hard Money Loan Sale transactions so that KSMP could obtain a secret profit from the LM Investments and saddle them with high interest, hard money loans and loans with large balloon payments without Plaintiffs' knowledge or consent.

123.    KSMP also breached its duties of good faith and fair dealing through the secret Putative Divi Sales.

124.    KSMP knew that it was required to disclose to LM and seek advance written approval from LM to transfer any Divi limited partnership interests, but KSMP secretly conducted the Putative Divi Sales without ever obtaining LM's written approval for any of the Putative Divi Sales or ever even notifying LM that they had purportedly taken place.

125.    Plaintiffs contend that Divi limited partnership interests are only transferred if the transfer is authorized in writing by LM and/or the Nonprofit and that because the Putative Divi Sales were not authorized in writing by LM or the Nonprofit (as applicable), no Divi limited partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead in the alternative that if KSMP did, in fact, transfer Divi limited partnership interests to numerous parties through the Putative Divi Sales without obtaining LM's written approval, then LeFever and LM have each been harmed by KSMP's transfer of Divi limited partnership interests through the Putative Divi Sales because any such transfer diluted LeFever's and LM's respective ownership interests in Divi.

126.    LM has also been harmed by KSMP's transfer of Divi limited partnership interests in the Putative Divi Sales because Defendants contend that certain of the Putative Divi Sales involved KSMP selling Divi limited partnership interests that belonged to LM and LM did not receive anything in return for these unauthorized sales of LM's Divi limited partnership interests.

127.    Each of Divi, LeFever, and LM has also been harmed by KSMP's transfer of Divi limited partnership interests through the Putative Divi Sales because Divi, LeFever, and LM have each incurred significant expenses in connection with the investigation into the Putative Divi Sales and responding to related issues concerning the unauthorized Putative Divi Sales. Divi, LeFever, and LM would not have incurred these expenses if KSMP had not transferred Divi limited partnership interests in violation of the Divi LP Agreements.

128.    Plaintiffs have also been harmed by the Hard Money/Balloon Payment Loan Sale transactions because they have been forced to pay KSMP above-market rates for the respective properties while at the same time being saddled with high interest, hard money loans, many of which are already in default and face potential foreclosure and/or loans with large future balloon payments.  All principal of these loans paid or received by KSMP constitutes additional theft in

1   that the LM Investments are reduced in value on a dollar-for-dollar basis by the amount of

2   principal paid or received by KSMP.

3        129.    As a result of KSMP's breaches of its duties of good faith and fair dealing, as

4   alleged, Divi, Windscape, LeFever, and LM have suffered and continue to suffer damages, all in

5   an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least

6   $100 million.

7        130.    Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP,

8   Mattson has knowledge of all facts that KSMP knows and Mattson therefore knew that KSMP

9   owed Divi, Windscape, LM, and LeFever statutory duties of good faith and fair dealing and that

10  KSMP's conduct would violate the duties of good faith and fair dealing that KSMP owed Divi,

11  Windscape, LM and LeFever.

12       131.    To the extent that KSMP is not the alter-ego of Mattson, Mattson substantially

13  assisted KSMP's breaches of the duties of good faith and fair dealing that KSMP owed Divi,

14  Windscape, LM and LeFever by, among other things diverting Divi's and Windscape's corporate

15  opportunities to KSMP and causing KSMP to sell Divi limited partnership interests in transactions

16  KSMP and Mattson knew were not authorized by LM.

17       132.    Mattson's conduct was a substantial factor in causing Divi's, Windscape's, LM's

18  and LeFever's harm because, among other things, KSMP could not have misappropriated Divi's

19  and Windscape's corporate opportunities if Mattson did not divert them to KSMP and KSMP

20  could not have sold its Divi interests without proper authorization unless Mattson concealed those

21  sales from LM, LeFever, and Divi.

22       133.    To the extent that KSMP is not the alter-ego of Mattson, Mattson substantially

23  assisted KSMP's wrongful conduct individually for his own individual advantage and not merely

24  by acting on KSMP's behalf.

25       134.    As a result, Mattson is jointly and severally liable with KSMP for KSMP's

26  breaches of its statutory duty of good faith and fair dealing because Mattson aided and abetted

27  those breaches.

28

135.     Defendants' conduct, as alleged, was done with an intentional and conscious disregard of Plaintiffs' rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling Plaintiffs to an award of punitive and exemplary damages assessed against each of the Defendants in a sum according to proof at trial, as a means of deterring the Defendants from committing similar acts and omissions in the future and punishing the Defendants for their wrongful conduct.

## FOURTH CAUSE OF ACTION

### (Conversion – LM against All Defendants)

136.     Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 135.

137.     LM had an ownership interest in, among other things, real property on Butcher Road in Vacaville, California (the "Butcher Road Property").

138.     Defendants substantially interfered with LM's ownership interest in the Butcher Road Property by, among other things, selling the Butcher Road Property.

139.     The sales proceeds from the sale of the Butcher Road Property included a $4 million promissory note (the "Note"). Because of LM's ownership interest in the Butcher Road Property, LM likewise had an ownership interest in the proceeds from any sale of that property, including the Note. Plaintiff is informed and believes and, on that basis alleges, that Defendants substantially interfered with LM's interest in the Note without LM's authorization by causing the Note to be exclusively in favor of KSMP and not in LM's favor.

140.     Defendants contend that some of the Divi limited partnership interests they sold in the Putative Divi Sales were owned by LM.

141.     Plaintiffs contend that Divi limited partnership interests are only transferred if the transfer is authorized in writing by LM and/or the Nonprofit and that because the Putative Divi Sales were not authorized in writing by LM or the Nonprofit (as applicable), no Divi limited partnership interests were actually transferred through the Putative Divi Sales, but Plaintiffs plead in the alternative that if KSMP did, in fact, transfer Divi limited partnership interests to numerous third parties through the Putative Divi Sales without obtaining LM's written approval, then

Defendants substantially interfered with LM's Divi limited partnership interests by purportedly selling them in the Putative Divi Sales without LM's authorization.

142.     Plaintiffs are informed and believe and, on that basis allege, that Mattson transferred more than $6 million of LM's money (the "Escrowed Funds") into an escrow account. The Escrowed Funds are a specific and identifiable sum that LM owned. Defendants substantially interfered with LM's ownership interest in the Escrowed Funds without LM's authorization by causing the escrow agent to pay the Escrowed Funds for Mattson's palatial home in Sonoma that that Defendants titled exclusively in Mattson's or KSMP's name.

143.     Defendants' interference with LM's ownership interest in the Note, the Escrowed Funds, and LM's Divi limited partnership interests (collectively, the "Converted Property) and disposition of the Converted Property, as alleged, was not authorized by LM and was wrongful.

144.     Defendants' wrongful conversion directly and proximately caused LM significant harm because LM no longer has access to or possession of the Converted Property.

145.     As a result of Defendants' conversion, as alleged, LM has suffered and continues to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $10 million.

146.     Defendants' conduct, as alleged, was done with an intentional and conscious disregard of LM's rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling LM to an award of punitive and exemplary damages assessed against each of the Defendants in a sum according to proof at trial, as a means of deterring them from committing similar acts and omissions in the future and punishing them for their wrongful conduct.

## FIFTH CAUSE OF ACTION

### (Constructive Fraud – LM and LeFever against All Defendants)

147.     Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 146.

148.    At all times relevant herein, Mattson has served as one or more of LM's officers and one of its directors. In this capacity, Mattson owed LM and LeFever fiduciary duties, including a duty to disclose all material information to LM.

149.    Mattson breached his fiduciary duty to disclose all material information to LM and LeFever by, among other things, failing to disclose the Putative Divi Sales, failing to disclose the corporate opportunities that he diverted to KSMP and allowed KSMP to misappropriate, and failing to disclose that he was causing LM and the LM Investments to pay inflated prices for heavily indebted real estate that Mattson was purchasing in his own name and/or in KSMP's name keeping for himself the more desirable properties (including, but not limited to, the lavish Sonoma home Mattson bought himself using LM's funds) and unloading the undesirable and/or unprofitable ones on LM and the LM investments.

150.    LM and LeFever would have taken steps to prevent Mattson's aforementioned wrongful conduct on their own behalf and on behalf of the LM Investments as their respective general partners and/or managing members if Mattson had complied with his fiduciary duties and disclosed these facts to LM and LeFever before Mattson completed his wrongful misconduct.

151.    LM and LeFever were harmed by Mattson wrongful suppression of the aforementioned facts and constructive fraud because LM and LeFever have each incurred significant expenses in connection with the investigation of the Putative Divi Sales and, to the extent the Putative Divi Sales involved actual sales of Divi limited partnership interests that had not been previously issued, because the Putative Divi Sales diluted LM's and LeFever's ownership interest in Divi.

152.    LM was also harmed by Mattson's wrongful suppression of the aforementioned facts and constructive fraud because LM paid more than $6 million for the lavish Sonoma home that Mattson titled in his own name and/or in KSMP's name and because LM did not obtain the profit or financial benefit it would have received from the corporate opportunities that Mattson wrongfully diverted to KSMP.

153.    LM has also been harmed by Mattson's wrongful suppression of the aforementioned facts and constructive fraud because LM and the LM Investments unwittingly

took title to properties subject to the Hard Money/Balloon Payment Loan Sale transactions and thereby have been forced to pay KSMP above-market prices for the respective properties while at the same time being saddled with high interest, hard money loans and/or loans with large future balloon payments, many of which are already in default and face foreclosure.

154.     As a result of Mattson constructive fraud, as alleged, LeFever and LM have suffered and continue to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

155.     Plaintiffs are informed and believe and, on that basis, allege that there is a unity of interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal equivalent of an empty shell corporation.

156.     It would be inequitable to recognize KSMP's separate existence as a partnership because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he can escape liability for his wrongdoing and be unable to satisfy creditors.

157.     KSMP is therefore equally liable for Mattson's breaches of fiduciary duty under a reverse veil piercing theory.

158.     Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP, Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and LeFever fiduciary duties and that Mattson's concealment of material facts would violate the fiduciary duties Mattson owed LM and LeFever and be constructively fraudulent conduct.

159.     To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's constructive fraud by, among other things pursuing corporate opportunities Mattson concealed from and diverted away from LM and LeFever, purchasing property that Mattson paid for using LM's funds knowing that Mattson concealed the transactions from LM and LeFever, completing the Hard Money/Balloon Payment Loan Sale transactions knowing that Mattson had concealed the transactions from LM, LeFever, and the LM Investments, and selling

29

COMPLAINT

Divi limited partnership interests in transactions KSMP knew Mattson had not disclosed to LM and LeFever and that were not authorized by LM.

160.    KSMP's conduct was a substantial factor in causing LM's and LeFever's harm because, among other things, Mattson could not have misappropriated LM's corporate opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name if KSMP did not acquire those properties, Mattson could not have caused LM and the LM Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions if KSMP was not the willing counterparty to those transactions, and Mattson could not have sold KSMP's Divi interests without proper authorization unless KSMP agreed to sell those Divi limited partnership interests.

161.    To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's wrongful conduct individually for its own individual advantage.

162.    As a result, and as an alternative to liability under a reverse veil piercing theory, KSMP is jointly and severally liable for Mattson's constructive fraud because KSMP aided and abetted those breaches.

163.    Defendants' conduct, as alleged, was done with an intentional and conscious disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary damages assessed against each of the Defendants in a sum according to proof at trial, as a means of deterring them from committing similar acts and omissions in the future and punishing them for their wrongful conduct.

### SIXTH CAUSE OF ACTION

### (Fraudulent Concealment – LM and LeFever against All Defendants)

164.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 163.

165.    At all times relevant herein, Mattson has served as one or more of LM's officers and one of its directors. In this capacity, Mattson owed LM and LeFever fiduciary duties, including a duty to disclose all material information to LM.

166.    Despite having a duty to disclose all relevant information to LM and LeFever, Mattson actively concealed and failed to disclose to LM and LeFever, among other things, the Putative Divi Sales, the Hard Money/Balloon Payment Loan Sales, the corporate opportunities that he diverted to KSMP and allowed KSMP to misappropriate, and that he was causing LM to pay for real estate that Mattson was purchasing in his own name and/or in KSMP's name including, but not limited to, the lavish Sonoma home Mattson bought himself using LM's funds.

167.    Mattson's fraudulent concealment was not limited to mere nondisclosure of facts he was legally obligated to disclose to LM and LeFever: Mattson actively concealed the above facts by, among other things, using the Covert Account to hide the transactions from LM and LeFever, using his own post office box and not LM's address so that that any correspondence regarding the Putative Divi Sales would be diverted away from LM and instead be routed directly to him, failing to report to LM any of the activities and transactions effected utilizing the Covert Account, prohibiting any LM employees or anyone else to access the Covert Account, failing to document the Putative Divi Sales with purchase agreements and other records Mattson knew he was supposed to use to document the transactions so that there was no paper trail documenting his wrongful conduct, maintain a separate email account independent of LM servers and using this email account exclusively for all business dealings, maintaining all of his records on a personal laptop and sharing none of those records with LM, and by instructing his assistant not to disclose to LM and LeFever the existence of and facts concerning Mattson's wrongful conduct and illicit transactions.

168.    Mattson intentionally concealed these facts from LM and LeFever so that they would not discover or ever be in a position to take steps to prevent Mattson's aforementioned wrongful misconduct.

169.    LM and LeFever relied on the nonexistence of the facts Mattson concealed from them because LM and LeFever would have taken steps on their own behalf and on behalf of the

LM Investments as their respective general partners and/or managing members to prevent Mattson's aforementioned wrongful conduct if Mattson had not actively concealed the facts and instead disclosed these facts to LM and LeFever before Mattson completed his wrongful misconduct.

170.     LM and LeFever's reliance on the nonexistence of the facts Mattson concealed from them was reasonable because Mattson was LeFever's close personal friend, LeFever trusted Mattson completely and would therefore have no reason to believe that Mattson was concealing information from him or trying to harm him, and because Mattson was an officer and director of LM and was under a legal obligation to disclose material facts to LM and LeFever.

171.     LM and LeFever were harmed by Mattson's wrongful suppression of the aforementioned facts and fraudulent concealment because LM and LeFever have each incurred significant expenses in connection with the investigation of the Putative Divi Sales and, to the extent the Putative Divi Sales involved actual sales of Divi limited partnership interests (which Plaintiffs contend did not occur because LM and/or the Nonprofit did not approve the sales) and to the extent that such limited partnership interests had not been previously issued, LM and LeFever were harmed because the Putative Divi Sales diluted LM's and LeFever's ownership interest in Divi.

172.     LM was also harmed by Mattson's wrongful suppression of the aforementioned facts and fraudulent concealment because LM paid more than $6 million for lavish Sonoma home that Mattson titled in his own name and/or in KSMP's name and because LM did not obtain the profit or financial benefit it would have received from the corporate opportunities that Mattson wrongfully diverted to KSMP.

173.     LM has also been harmed by Mattson's wrongful suppression of the aforementioned facts and fraudulent concealment because LM and the LM Investments unwittingly entered into the Hard Money/Balloon Payment Loan Sale transactions and thereby have been forced to pay KSMP above-market rates for the respective properties while at the same time being saddled with high interest, hard money loans and/or loans with large balloon payments, many of which are already in default and face foreclosure.

174.     As a result of Mattson fraudulent concealment, as alleged, LeFever and LM have suffered and continue to suffer damages, all in an amount to be determined according to proof at trial, but which Plaintiffs estimate to be at least $100 million.

175.     Plaintiffs are informed and believe and, on that basis, allege that there is a unity of interest between Mattson and KSMP because Mattson wholly owns KSMP, Mattson has used KSMP's assets as his own and has commingled his assets with KSMP's, KSMP has failed to observe partnership formalities, Mattson has transferred significant assets to KSMP such that Mattson lacks sufficient capital, is unable to satisfy his personal liabilities, and is the personal equivalent of an empty shell corporation.

176.     It would be inequitable to recognize KSMP's separate existence as a partnership because Mattson has purposefully caused the majority of his assets to be held by KSMP so that he can escape liability for his wrongdoing and be unable to satisfy creditors.

177.     KSMP is therefore equally liable for Mattson's fraudulent concealment under a reverse veil piercing theory.

178.     Because KSMP is wholly owned by Mattson and Mattson alone manages KSMP, Mattson's knowledge is imputed to KSMP, and KSMP therefore knew that Mattson owed LM and LeFever fiduciary duties, that Mattson was under a duty to disclose all material facts to LM and LeFever, and that Mattson's concealment of material facts would violate the fiduciary duties Mattson owed LM and LeFever and be constructively fraudulent conduct.

179.     To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's fraudulent concealment by, among other things pursuing corporate opportunities Mattson concealed from and diverted away from LM, purchasing property that Mattson paid for using LM's funds knowing that Mattson concealed the transactions from LM, completing the Hard Money/Balloon Payment Loan Sale transactions knowing that Mattson concealed the transactions from LM, LeFever, and the LM Investments, and selling Divi limited partnership interests in transactions KSMP knew Mattson had not disclosed to LM and that were not authorized by LM.

33

COMPLAINT

180.     KSMP's conduct was a substantial factor in causing LM's and LeFever's harm because, among other things, Mattson could not have misappropriated LM's corporate opportunities if KSMP did not pursue the opportunities that Mattson wrongfully diverted away from LM, Mattson could not have caused LM to pay for property that was titled in KSMP's name if KSMP did not acquire those properties, Mattson could not have sold KSMP's Divi interests without proper authorization unless KSMP agreed to sell those Divi limited partnership interests, LM and LeFever would not have had to incur costs investigating the secret Putative Divi Sales unless KSMP agreed to sell the respective Divi limited partnership interests, and Mattson could not have caused LM and the LM Investments to enter into the Hard Money/Balloon Payment Loan Sale transactions if KSMP was not the willing counterparty to those transactions.

181.     To the extent that KSMP is not the alter-ego of Mattson, KSMP substantially assisted Mattson's wrongful conduct individually for its own individual advantage.

182.     As a result, and as an alternative to liability under a reverse veil piercing theory, KSMP is jointly and severally liable for Mattson's fraudulent concealment because KSMP aided and abetted those breaches.

183.     Defendants' conduct, as alleged, was done with an intentional and conscious disregard of LM's and LeFever's rights and with oppression, fraud, and malice as defined under Civil Code Section 3294, entitling LM and LeFever to an award of punitive and exemplary damages assessed against each of the Defendants in a sum according to proof at trial, as a means of deterring them from committing similar acts and omissions in the future and punishing them for their wrongful conduct.

## SEVENTH CAUSE OF ACTION

**(Receiving Stolen Property in Violation of Cal. Pen. Code § 496 – LM against All Defendants)**

184.     Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 183.

185.     Defendants obtained the Converted Property from LM through theft by false pretenses.

186.     Defendants each had actual or constructive possession of the Converted Property after they stole it from LM, concealed the Converted Property from LM, and/or withheld the Converted Property from LM, knowing that the Converted Property was stolen from LM.

187.     Pursuant to California Penal Code Section 496(c), LM is entitled to recover from Defendants three times the amount of damages LM suffered in connection with Defendants' violation of California Penal Code Section 496 and recover from Defendants the attorneys' fees LM incurs in connection with this civil action.

## EIGHTH CAUSE OF ACTION

### (Declaratory Relief – All Plaintiffs against All Defendants)

188.     Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 187.

189.     An actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendants, on the other, concerning the following issues:

A.     Whether the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales.  Plaintiffs contend that the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales.  Plaintiffs are informed and believe and, on that basis, allege that Defendants contend that the Indemnity Agreement does not obligate Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales.

B.     Whether the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales.  Plaintiffs contend that the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs

1   concerning the Putative Divi Sales.  Plaintiffs are informed and believe and, on that basis, allege

2   that Defendants contend that the Indemnity Agreement does not obligate Mattson to advance to

3   Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any

4   claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning

5   the Putative Divi Sales.

6           C.      Whether the Indemnity Agreement obligates Mattson to reimburse Plaintiffs

7   for any payments they make in satisfaction of any claims asserted against Plaintiffs by putative

8   investors to whom Defendants purportedly sold partnership interests or membership interests in

9   other LM Investments without obtaining LM's prior written authorization.  Plaintiffs contend that

10  the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in

11  satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants

12  purportedly sold partnership interests or membership interests in other LM Investments without

13  obtaining LM's prior written authorization.  Plaintiffs are informed and believe and, on that basis,

14  allege that Defendants contend that the Indemnity Agreement does not obligate Mattson to

15  reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against

16  Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or

17  membership interests in other LM Investments without obtaining LM's prior written authorization.

18          D.      Whether the Indemnity Agreement obligates Mattson to advance to

19  Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any

20  claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold

21  partnership interests or membership interests in other LM Investments without obtaining LM's

22  prior written authorization.  Plaintiffs contend that the Indemnity Agreement obligates Mattson to

23  advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction

24  of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly

25  sold partnership interests or membership interests in other LM Investments without obtaining

26  LM's prior written authorization.  Plaintiffs are informed and believe and, on that basis, allege that

27  Defendants contend that the Indemnity Agreement does not obligate Mattson to advance to

28  Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any

claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization.

E.     Whether Divi is permitted to offset any payments Divi might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive or be entitled to.  Plaintiffs contend that Divi is permitted to offset any payments Divi might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive or be entitled to.  Plaintiffs are informed and believe and, on that basis, allege that Defendants contend that Divi is not permitted to offset any payments Divi might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive or be entitled to.

F.     Whether the other LM Investments are permitted to offset any payments they might make in satisfaction of claims asserted against them by putative investors to whom Defendants purportedly sold partnership interests or membership interests in such LM Investments without obtaining LM's prior written authorization against the LM Investments' distributions that Defendants might otherwise receive or be entitled to.  Plaintiffs contend that the other LM Investments are permitted to offset any payments they might make in satisfaction of claims asserted against them by putative investors to whom Defendants purportedly sold partnership interests or membership interests in such LM Investments without obtaining LM's prior written authorization against the LM Investments' distributions that Defendants might otherwise receive or be entitled to.  Plaintiffs are informed and believe and, on that basis, allege that Defendants contend that the other LM Investments are not permitted to offset any payments they might make in satisfaction of claims asserted against them by putative investors to whom Defendants purportedly sold partnership interests or membership interests in such LM Investments without obtaining LM's prior written authorization against the LM Investments' distributions that Defendants might otherwise receive or be entitled to.

G.      Whether LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.  Plaintiffs contend that LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.  Plaintiffs are informed and believe and, on that basis, allege that Defendants contend that LM is not permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.

190.    Plaintiffs desire a judicial determination of the parties' respective rights and interest as to the foregoing matters, and a judicial declaration that (a) the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales; (b) the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales; (c) the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization; (d) the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might

make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization; (e) Divi is permitted to offset any payments Divi might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions Defendants might otherwise receive or be entitled to; (f) the other LM Investments are permitted to offset any payments they might make in satisfaction of claims asserted against them by putative investors to whom Defendants purportedly sold partnership interests or membership interests in such LM Investments without obtaining LM's prior written authorization against the LM Investments' distributions that Defendants might otherwise receive or be entitled to; and (g) LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.

191.    A judicial declaration is necessary and appropriate at this time to avoid continuing disputes and future litigation between the parties and the uncertainty such disputes have created and will create in the future.

## NINTH CAUSE OF ACTION

**(Removal of Director Pursuant to California Corporations Code § 304 – LM & LeFever against Mattson)**

192.    Plaintiffs replead, reallege, and incorporate herein by reference, as though set forth in full, the allegations contained in Paragraphs 1 through 191.

193.    Because LeFever owns 50% of the outstanding shares of LM's stock, California Corporations Code Section 304 authorizes the Court to remove Mattson as a director and to bar him from reelection to LM's board of directors.

194.    Mattson has grossly abused his authority and/or discretion through his self-dealing, conversion, violations of the fiduciary duties he owes LM, his fraudulent concealment and constructive fraud, all as alleged above.

195.    As a result of Mattson's gross abuse of authority and/or gross abuse of discretion, this Court should remove Mattson from his position as one of LM's directors and should bar him from serving as one of LM's directors in the future.

196.    Mattson has committed fraudulent and dishonest acts against LM through his self-dealing, conversion, violations of the fiduciary duties he owes LM, his fraudulent concealment and constructive fraud, all as alleged above.

197.    As a result of Mattson's fraudulent and dishonest acts, this Court should remove Mattson from his position as one of LM's directors and should bar him from serving as one of LM's directors in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

### On the First Cause of Action

1.    For compensatory damages as the proof at trial may show;

2.    For disgorgement of Defendants' ill-gotten gains; and

3.    For recovery of LM's and LeFever's attorneys' fees.

### On the Second Cause of Action

1.    For compensatory damages as the proof at trial may show;

2.    For disgorgement of Defendants' ill-gotten gains; and

3.    For punitive and exemplary damages as alleged and as the proof at trial may show.

### On the Third Cause of Action

1.    For compensatory damages as the proof at trial may show;

2.    For rescission of the Hard Money/Balloon Payment Loan Sale transactions;

3.    For disgorgement of Defendants' ill-gotten gains; and

4.    For punitive and exemplary damages as alleged and as the proof at trial may show.

**On the Fourth Cause of Action**

1.    For compensatory damages as the proof at trial may show;

2.    For disgorgement of Defendants' ill-gotten gains; and

3.    For punitive and exemplary damages as alleged and as the proof at trial may show.

**On the Fifth Cause of Action**

1.    For compensatory damages as the proof at trial may show;

2.    For rescission of the Hard Money/Balloon Payment Loan Sale transactions;

3.    For disgorgement of Defendants' ill-gotten gains; and

4.    For punitive and exemplary damages as alleged and as the proof at trial may show.

**On the Sixth Cause of Action**

1.    For compensatory damages as the proof at trial may show;

2.    For rescission of the Hard Money/Balloon Payment Loan Sale transactions;

3.    For disgorgement of Defendants' ill-gotten gains; and

4.    For punitive and exemplary damages as alleged and as the proof at trial may show.

**On the Seventh Cause of Action**

1.    For compensatory damages as the proof at trial may show;

2.    For recovery from Mattson and KSMP of three times LM's damages as the proof at trial may show; and

3.    For recovery of LM's attorneys' fees.

**On the Eighth Cause of Action**

1.    For a judicial declaration that the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales;

2.    For a judicial declaration that the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Plaintiffs concerning the Putative Divi Sales;

3.  For a judicial declaration that the Indemnity Agreement obligates Mattson to reimburse Plaintiffs for any payments they make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization;

4.  For a judicial declaration that the Indemnity Agreement obligates Mattson to advance to Plaintiffs funds sufficient to cover any payments Plaintiffs might make in satisfaction of any claims asserted against Plaintiffs by putative investors to whom Defendants purportedly sold partnership interests or membership interests in other LM Investments without obtaining LM's prior written authorization;

5.  For a judicial declaration that Divi is permitted to offset any payments Divi might make in satisfaction of any claims that the putative investors from the Putative Divi Sales assert against Divi concerning the Putative Divi Sales against distributions of capital or income that Defendants might otherwise receive or be entitled to; and

6.  For a judicial declaration that the other LM Investments are permitted to offset any payments they might make in satisfaction of claims asserted against them by putative investors to whom Defendants purportedly sold partnership interests or membership interests in such LM Investments without obtaining LM's prior written authorization against the LM Investments' distributions of capital or income that Defendants might otherwise receive or be entitled to.

7.  For a judicial declaration that LM is permitted to offset any payments it might make in satisfaction of claims asserted against LM by putative investors to whom Defendants purportedly sold partnership interests or membership interests in Divi or the LM Investments without obtaining LM's prior written authorization against any dividends LM might declare and/or any other amounts that Defendants might otherwise receive or be entitled to from LM.

**On the Ninth Cause of Action**

1.  For an order removing Mattson as one of LM's directors; and

2.  For an injunction barring Mattson as one of LM's directors in the future.

**On All Causes of Action**

1.  For costs of suit herein; and

42

2.      For such other and further relief as the Court deems just and proper.

DATED:  June 6, 2024                           HANSON BRIDGETT LLP


By: _____
JOHN T. CU
LAWRENCE M. CIRELLI
ANTHONY J. DUTRA
Attorneys for Timothy LeFever, LeFever Mattson,
Divi Divi Tree, L.P., and Windscape Apartments,
LLC

# Exhibit D

Filed
Superior Court of California,
Sacramento
06/06/2024
larsonh
By _____, Deputy
24CV011305

1  Micheline N. Fairbank, Bar No. 226038
   Daniel Rapaport, Bar No. 67217
2  Kurt Franklin, Bar No. 172715
   Thiele R. Dunaway, Bar No. 130953
3  **FENNEMORE WENDEL**
   1111 Broadway, 24th Floor
4  Oakland, CA 94607
   Tel: (510) 834-6600 / Fax: (510) 834-1928
5  Email: mfairbank@fennemorelaw.com
            drapaport@fennemorelaw.com
6            kfranklin@fennemorelaw.com
            rdunaway@fennemorelaw.com
7
   Attorneys for Plaintiff
8  KENNETH W. MATTSON

9

10                SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                          COUNTY OF SACRAMENTO

12

13  KENNETH W. MATTSON,                         Case No. _____

14          Plaintiff,                          **COMPLAINT FOR DECLARATORY
                                                RELIEF, RECISSION, UNFAIR**
15  vs.                                         **COMPETITION, DERIVATIVE ACTION,
                                                IMPROPER REMOVAL OF DIRECTOR**
16  TIMOTHY LeFEVER, an individual; LeFEVER     **AND ILLEGAL DENIAL OF ACCESS TO**
    MATTSON, a California Corporation, and      **CORPORATE DOCUMENTS**
17  DOES 1-10, inclusive.
                                                Action Filed: June 6, 2024
18          Defendants.

19

20      Plaintiff KENNETH W. MATTSON hereby alleges as follows:

21                              **THE PARTIES**

22      1.      Plaintiff Kenneth W. Mattson ("Plaintiff" or "Mattson") is an individual residing

23  in the State of California.  Plaintiff is one of the two founders of Defendant LeFever Mattson, a

24  duly organized California corporation formerly known as K.W.M. Enterprises and incorporated in

25  1989 ("LeFever Mattson").  Defendant LeFever Mattson is incorporated in the State of California

26  and its principal place of business is in the City of Citrus Heights, County of Sacramento, State of

27  California.  Until late 2023, Mattson was the Chief Executive Officer of LeFever Mattson, and

28  Mattson owns and controls one-half of the outstanding shares of LeFever Mattson.

---

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

BY FAX

1  2.      Defendant Timothy LeFever ("LeFever") is the other shareholder in LeFever

2  Mattson and also owns one-half of its outstanding shares.  Defendant LeFever resides in the

3  County of Solano.  LeFever is an attorney at law, who is currently licensed to practice law in the

4  State of California and was admitted to the State Bar of California in December 1986.

5  3.      Plaintiff is informed and believes, and thereon alleges, that the acts described

6  below were in part committed by, aided by, and abetted by certain individuals and/or entities

7  whose true names, capacities, and/or precise roles are not known at the present time.  Such

8  individuals and/or entities have thus been sued herein as fictitiously named "DOE" defendants,

9  DOES 1-10, inclusive.  Those fictitiously named defendants (the "DOES") will be identified

10  during the discovery process, at which point this Complaint will be promptly amended to disclose

11  their identities and relationship to Plaintiff's claims.

12  4.      Plaintiff is informed and believes, and thereon alleges, that at all times mentioned

13  herein, each of the Defendants was the agent and/or representative and/or employee of each of the

14  remaining defendants and in doing things herein mentioned was acting within the scope of such

15  agency and/or representation and/or employment.

16  **VENUE AND JURISDICTION**

17  5.      Sacramento County is the proper venue for this dispute because it is the principal

18  place of business of Defendant LeFever Mattson and many of the acts complained of occurred in

19  this County.  This is an unlimited civil action in which Declaratory Relief and other remedies are

20  requested, and the amount in controversy exceeds $25,000.

21  **GENERAL ALLEGATIONS**

22  6.      LeFever Mattson is in the business of  owning and managing real estate properties

23  in the State of California.  It invests its own funds in various residential and commercial projects.

24  It often works with individual investors on specific projects.  It also forms limited partnerships

25  and transfers limited partnership interests in a single asset entity, which is used as the

26  development vehicle.  Historically, it sometimes acquired real property with investors who

27  became tenants in common as to a particular parcel or parcels of real property.

28  - 2 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

49339112.4/069731.0001

7.     LeFever and Mattson agreed that they had equal ownership and control over LeFever Mattson, but Mattson would primarily interact with investors.  Until recently, they were the only Directors.  LeFever also delegated significant operational decisions to Mattson.  However, LeFever always had access to all company documents, was privy to all material decisions and called Mattson, at least daily, to discuss operations.

8.     Each entity, which owned a parcel, or parcels of real property developed by LeFever Mattson, had a separate, though sometimes overlapping, group of investors, or was owned solely by LeFever Mattson.  While there was no fixed obligation to make distributions to investors, it was Mattson's practice to do so, whenever possible.  Real estate investments rise and fall depending on numerous market factors.  When the U.S. economy has faltered, there is less competition for real estate and values decline.  As was the case for many, LeFever Mattson experienced extreme hardship during the COVID-19 pandemic due to tenant defaults, decreased demand and consequential loss of income.  In fact, during times of crisis in the real estate world, Mattson advanced personal funds to entities to allow their investors to receive money to assist their individual situations.  LeFever refused to make contributions to help investors, although he, unlike Mattson, always demanded and received an annual salary of between $500,000 and $1,000,000.  If Mattson made personal advances, he was only repaid such advances, without interest or fees, and then only when an entity had generated a surplus, allowing for reimbursement.

9.     A dispute arose in 2023 between LeFever and Mattson in connection with a Limited Partnership named Divi Divi Tree LP ("Divi"), in which LeFever Mattson was a general partner.  Divi originally owned a 400-unit apartment building located in Riverside, California.  At one time, LeFever Mattson owned a significant interest in Divi.  However, over the years, LeFever Mattson sold its interests to new investors and deposited investment proceeds in a separate operational account for the benefit of LeFever Mattson.  These sales were documented through Purchase and Sales Agreements, although Defendants now refuse to provide copies to

- 3 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

1    Plaintiff.  LeFever now claims LeFever Mattson did not authorize such sales and claims falsely

2    that Mattson used investment funds for personal purposes (the "Disputed Transactions").

3         10.    In late 2023, LeFever Mattson's legal counsel, Scott Smith ("Smith"), resigned

4    from his law firm, Hanson Bridgett, and was retained by LeFever Mattson, as part-time General

5    Counsel.  Smith, shortly thereafter, accused Mattson of misconduct and threatened unspecified

6    legal actions and that he would notify governmental authorities of Defendants' claims of

7    misconduct by Mattson.  Defendants demanded Mattson enter into an Indemnity Agreement

8    indemnifying LeFever Mattson.   Mattson believed that he had acted appropriately but proposed

9    that if Divi investors were somehow damaged by him, he would bear the expenses associated

10   with resolving any errors.

11        11.    In February 2024, at a Special Board Meeting called by LeFever, without an

12   agenda, Defendants and Smith insisted Mattson resign as CEO, which he did in order to allow

13   him time to clear up these claims.  Defendants and Smith also demanded, and Mattson agreed to

14   amend the Bylaws of LeFever Mattson to allow Smith to become a third director.  Smith and

15   LeFever also presented Mattson with an eight page document, captioned as an Indemnity

16   Agreement, which they demanded he sign on the spot.  Plaintiff is informed and believes, and

17   thereon alleges that, a true and correct copy of that document is attached as **Exhibit A.**

18   Hereinafter, Exhibit A may also be referred to as "the document."  Plaintiff cannot be sure that

19   the document attached as Exhibit A is an authentic copy of the document Plaintiff signed at that

20   Board Meeting, because Defendants never provided him with a copy of the executed document

21   and later refused to provide a copy after Plaintiff's request.  Because of their long standing

22   relationships, Plaintiff trusted LeFever and Smith to have fairly and reasonably crafted the

23   Agreement based upon their prior discussions, Mattson did not closely examine the contents of

24   the agreement, instead relying on LeFever and Smith's representations at the meeting.  However,

25   that document, which Mattson only briefly glanced through, but did not read completely,

26   provided egregious terms far in excess of what had been previously discussed.  It contained

27   Recitals, which were false, and designed to deflect claims against Defendants and to admit

28                                      - 4 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

49339112.4/069731.0001

1  wrongdoing by Mattson.  At all times, Plaintiff understood and believed thereon to his detriment,

2  that Smith was the attorney for LeFever Mattson and was not representing LeFever's personal

3  interests, much less Smith's own interests.  Plaintiff's reliance has proven to be erroneous as the

4  Indemnity Agreement was for the benefit of LeFever and Smith and contained false statements.

5      12.    The agreement, initially discussed conceptually between LeFever, Smith and

6  Mattson, was intended to be limited to indemnifying LeFever Mattson regarding potential claims

7  from potential Divi investors. It was proposed that Plaintiff would bear the expenses associated

8  with resolving any errors. However, the actual Agreement presented at the Board Meeting by

9  LeFever and Smith was far broader in scope, contained unenforceable provisions, offered no

10  consideration to Mattson, and was unconscionable. Plaintiff is informed and believes, and thereon

11  alleges, that Smith prepared the Indemnity Agreement, which provided broad indemnities to both

12  Defendants and Smith personally.  Smith did not disclose that the document required that Mattson

13  indemnify Smith for any actions by Smith, in connection with his acts and omissions related to

14  LeFever Mattson.  Smith did not disclose this conflict of interest, either orally or in writing.

15  While both Smith and LeFever are attorneys at law, neither of them advised Mattson of the

16  Draconian and unfair terms contained in the document, the effect of the document, or that

17  Mattson should seek independent counsel before signing it.  While Plaintiff believes he signed the

18  document, he has not been provided with a fully executed copy.

19      13.    Some, but not all of the unfair, false, unconscionable, and illegal terms of the

20  document are the following:

21      a.    The Recitals contain false statements that LeFever and LeFever Mattson

22  were not aware of the Disputed Transactions, received no benefit from them, and are not

23  obligated to the investors to honor those agreements.

24      b.    The undisclosed scope of Mattson's purported indemnification obligation

25  under Exhibit A was not limited to what was proposed and purportedly seeks indemnity for any

26  event concerning LeFever Mattson that may arise, even criminal actions, which was not agreed to

27  and is against public policy.

- 5 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

1          c.     The document purports to provide Smith with a broad personal indemnity

2 that would cover any civil or criminal damages, which is an improper overreach by corporate

3 counsel and against public policy and was an undisclosed conflict of interest and violated the

4 California Rules of Professional Conduct.

5          d.     The document purports to allow LeFever and Smith to hire any attorneys,

6 regardless of cost, with no oversight by Mattson and require Mattson immediately pay such fees

7 and costs generated and further allows Defendants to settle any claim for any amount and requires

8 Mattson to pay all such expenses without objection, regardless of their fairness or reasonableness.

9          e.     The document purports to provide a guarantee of payment without defense

10 or offset, regardless of negligence, fraud, or misconduct by LeFever or Smith.

11          f.     The document purports to provide LeFever and Smith with exclusive

12 power to decide if they are entitled to corporate indemnity, which is contrary to the California

13 Corporations Code.  It allows them to select "independent" counsel for LeFever Mattson and

14 creates a presumption of entitlement to indemnity, which is unfair, and contrary to California law

15 and purports to bind Mattson as a shareholder.

16          g.     The document purports to shift presumptions under California law

17 regarding indemnification.

18          h.     The document purports to illegally waive Plaintiff's right to a jury trial

19 guaranteed by California law.

20          i.     The document purports to bind third-parties, which were not asked to

21 consent to its terms.

22     14.     The document provides no consideration whatsoever to Plaintiff, except the

23 illusory consideration that LeFever and LeFever Mattson "shall give Indemnitor such information

24 and cooperation in connection with the Proceeding as may be reasonably appropriate; provided

25 that such cooperation is at no cost or Expense to Indemnitee or any Indemnitee Party."

26     15.     Not only, was the "consideration" for Plaintiff illusory, but also, this promise was

27 breached by Defendants.  Immediately, after Plaintiff signed Exhibit A, Defendants began what

28                                          - 6 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

49339112.4/069731.0001

1  Plaintiff is informed and believes, and thereon alleges, was a preplanned scheme to destroy

2  Plaintiff.   LeFever unilaterally stopped making proper limited partnership distributions to

3  investors, causing consternation; however, as Mattson had stepped down as CEO and was not on

4  equal footing, he was precluded from intervening to protect the investors' interests.

5  Simultaneously, Defendants repeatedly contacted LeFever Mattson investors making false factual

6  statements, that the investors' interests were invalid, and that Mattson wrongfully took their

7  money, when in fact, the sales were regular, documented and authorized by the CEO and

8  certainly not hidden from LeFever.  LeFever has even made attempts to encourage lawsuits

9  against Mattson.  Plaintiff is informed and believes, and thereon alleges that, these extra judicial

10  statements could prejudice future adjudication proceedings.

11      16.     On May 14, 2024, Plaintiff, through his counsel, wrote LeFever and requested

12  various documents Plaintiff's counsel would need in connection with a threatened or pending

13  investigation of Mattson and LeFever Mattson by the Department of Justice.  The requested

14  information was necessary and reasonable, and was also sought to document third-party

15  transactions, yet Defendants, through Smith, refused to provide the requested information,

16  without additional and highly unreasonable demands and conditions.  In any event, as a Director,

17  Mattson was entitled to access to all unprivileged corporate documents.  Smith and Defendants

18  knew Mattson had been physically and electronically locked out of access to LeFever Mattson

19  documents.  They knew the so-called cooperation provision required information delivery, but

20  Defendants breached the only covenants of Exhibit A, which gave Plaintiff anything.  See

21  communications attached collectively as **Exhibit B.**

22      17.     Defendants thus repudiated and breached the terms of Exhibit A, which precludes

23  Defendants from any and all of the benefits of Exhibit A, allowing for it to be rescinded and

24  deemed null and void.  Plaintiff has since formally rescinded Exhibit A by written notice of

25  transmittal prior to the filing of this Complaint.

26

27

28

- 7 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

49339112.4/069731.0001

## FIRST CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

18.    Plaintiff realleges and incorporates by reference all the allegations above, as though fully set forth herein.

19.    California Code of Civil Procedure § 1060 allows any person interested under a contract, including a determination of any question of construction or validity arising under the instrument or contract, to seek declaratory relief from the Superior Court.  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties with respect to Exhibit A.  Plaintiff contends that  for the reasons previously alleged, Exhibit A is invalid, was without consideration and was the subject of fraud, and/or was breached by Defendants, making it invalid, not enforceable and that Plaintiff has no obligations to any person based on that document.  Plaintiff is informed and believes, and thereon alleges that, Defendants contend Exhibit A is fully enforceable and that their refusal to provide requested corporate documents is somehow excusable, rather than a breach of their obligations.

20.    The scope of the indemnity on its face applies only to transactions where terms and conditions of sale of interests are not "clearly documented," which is the definition for Third-Party Transactions contained in the Third Recital of Exhibit A.

21.    Proceedings is defined to include investigation of a civil, criminal, administrative or investigative nature in which LeFever Mattson or LeFever  is involved as a party, potential party, or a non-party witness or otherwise.  Exhibit A, Section I.01(h).

22.    The scope of indemnification applies only to Third-Party Transactions or damages incurred in connection with Proceedings relating to Third-Party Transactions.  Exhibit A, Section III.01(b) and that it cannot bind any person or entity who did not sign it.

23.    Should the Court determine Exhibit A is enforceable and was not breached by Defendants, Plaintiff requests the Court narrowly construe and limit all rights of indemnification to circumstances where a transaction was not "clearly documented."  Further, that Exhibit A can only bind a signatory.

- 8 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

49339112.4/069731.0001

1    24.    An actual controversy has arisen and exists between Plaintiff and Defendants as to

2    their respective rights and obligations in regard to the enforceability and scope of indemnity

3    addressed in Exhibit A.

4    25.    Plaintiff desires a judicial determination of these issues and the Parties' respective

5    rights and obligations, and a judicial determination is necessary and appropriate at this time under

6    the circumstances in order that Plaintiff and Defendants may ascertain their respective rights and

7    obligations as set forth above.  A Court order is necessary for future conduct.  Declaratory

8    judgment from the Court will resolve this dispute and relieve Plaintiff from the extraordinary and

9    unconscionable burden Defendants seek to place on Plaintiff.  Plaintiff has no adequate and

10   speedy remedy at law to resolve the Parties' dispute, other than by declaratory judgment from this

11   Court and respectfully requests that the Court resolve this dispute by issuing a judicial declaration

12   as to the Parties' respective rights and liabilities with regard to Exhibit A.

13   WHEREFORE, Plaintiff prays for judgment as set forth below.

14   <center>**SECOND CAUSE OF ACTION**</center>

15   <center>**(Rescission – Against All Defendants)**</center>

16   26.    Plaintiff incorporates all the allegations above as though fully set forth herein.

17   27.    Plaintiff brings this Cause of Action pursuant to California Civil Code §§ 1688

18   and 1689 to extinguish the Indemnity Agreement attached hereto as Exhibit A.

19   28.    Any execution of this document by Plaintiff was given by mistake.  Plaintiff

20   understood the scope of his offer of indemnification was to be limited to potential claims by

21   investors related to any errors by him in sales of interests in the Divi limited partnership.

22   29.    Plaintiff's consent was obtained by duress, fraud, menace, and undue influence

23   undertaken by Defendants and the corporate attorney, Smith, who was jointly interested with

24   Defendants in personal protection.

25   30.    Plaintiff obtained no consideration for the onerous obligations imposed by Exhibit

26   A.  Further, any possible consideration to Plaintiff failed as Defendants refused in writing to

27   provide needed information to Plaintiff, so as to allow him to demonstrate the true facts to the

28   - 9 -

Fennemore Wendel
Attorneys at Law
Oakland

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

49339112.4/069731.0001

1  Department of Justice and investors, so as to avoid or limit claims and reputational damage and

2  otherwise protect his rights.

3       31.    The Indemnity Agreement prepared by Defendants and their agents is in part

4  unlawful and was obtained by attorney Smith, in part for his own benefit, without disclosure of

5  his conflict of interest or who he was representing while knowing Plaintiff was unrepresented.

6       32.    Plaintiff received and accepted no benefits from Exhibit A and has notified

7  Defendants in writing that he has rescinded any express or implied consent to Exhibit A.

8       WHEREFORE, Plaintiff prays for judgment as set forth below.

9  <div align="center">**THIRD CAUSE OF ACTION**</div>

10  <div align="center">**(Unfair Competition – Against All Defendants)**</div>

11       33.    Plaintiff incorporates all the allegations of Paragraphs 1-18 and 26-31 above as

12  though fully set forth herein.

13       34.    Plaintiff, a natural person, brings this Cause of Action based upon California

14  Business and Professions Code § 17200, which precludes any unlawful, unfair, or fraudulent

15  business act or practice.

16       35.    LeFever Mattson is a real estate business continually operating in the State of

17  California since 1989.  One of its business strategies was to acquire, own and manage apartment

18  buildings through limited partnerships in which individuals invested.  One of those limited

19  partnerships was Divi.  As the CEO of LeFever Mattson, which at one time owned a significant

20  interest in Divi, Mattson was authorized to sell and transfer limited partnership interests to

21  investors and did so.  Funds collected by LeFever Mattson were then deposited into a special

22  account and such proceeds were used, as needed, for LeFever Mattson's corporate purposes.  This

23  type of transaction was a longstanding business practice of the corporation.

24       36.    Beginning in November 2023, Defendant LeFever Mattson, aided and abetted by

25  LeFever, implemented a plan to disadvantage and injure Plaintiff and the third-party investors in

26  Divi.  Defendants claimed that the sale and transfer, of limited partnership interests in Divi owned

27  by LeFever Mattson, by its CEO and 50% shareholder, to individual investors was not authorized.

28  <div align="center">- 10 -</div>

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

49339112.4/069731.0001

1  Defendants claimed that therefore, since LeFever Mattson must still own its undivided and

2  undiluted interest in Divi, that the investors owned nothing, and they had been defrauded by

3  Plaintiff.  Defendants also encouraged civil lawsuits and other proceedings be brought against

4  Plaintiff claiming Mattson had stolen investors' money.  Defendants' allegations of wrongful

5  conduct by Plaintiff are false.  Sales of LeFever Mattson's interests in Divi to third-parties was in

6  the regular course of business, documented and within the authority of Plaintiff as CEO of

7  LeFever Mattson.  Proceeds from sales were used for legitimate corporate purposes.  Plaintiff

8  contends the investors own the interests they purchased.

9        37.    Thereafter, Defendants, along with Smith, who failed to disclose the fact he was to

10  personally benefit, through fraud, undue influence, menace, and mistake, presented Plaintiff with

11  an unconscionable and partially illegal agreement to sign, as well as corporate documents,

12  effectively ceding control of LeFever Mattson to Defendant LeFever and to Smith.

13        38.    Plaintiff is informed, believes, and based thereon, alleges that, in furtherance of

14  Defendants' scheme to seize control of LeFever Mattson, Defendants stopped paying normal and

15  regular distributions to the investors and have declared prior transfers to investors void and

16  retained the sales proceeds.  Plaintiff is informed and believes and thereon alleges that Defendants

17  are using these funds for their own purposes.

18        39.    Defendants' unfair business practices have proximately caused significant injury in

19  fact to Plaintiff, as well as the Divi investors.  Such practices are unfair, illegal, and fraudulent.

20        40.    Defendants should be and Plaintiff requests this Court enjoin Defendants from any

21  further actions to transfer any revenue from Divi, except to pay normal business expenses and

22  distributions to third-party investors.  Defendants should be ordered to disgorge all net revenue

23  from operations of Divi to its investors and Plaintiff on a pro rata basis.  Further, LeFever

24  Mattson should be ordered to account for and disgorge all proceeds from sales of limited

25  partnership interests, which sales it now rejects.  Plaintiff contends the sales of LeFever Mattson's

26  limited partnership interests in Divi by LeFever Mattson to the investors should be confirmed.  To

27  the extent the Court determines the sales did not bind LeFever Mattson, LeFever Mattson should

28                                          - 11 -

1 | be required to disgorge all funds taken from and equitably owned by Plaintiff and the Divi

2 | investors, together with interest calculated at an appropriate rate.

3 |       WHEREFORE, Plaintiff prays for judgment as set forth below.

4 | **FOURTH CAUSE OF ACTION**

5 | **(Derivative Claim Against LeFever and Nominally Against LeFever Mattson)**

6 |       41.    Plaintiff incorporates all the allegations above as though fully set forth herein.

7 |       42.    In late 2023, Defendant LeFever assumed the role of CEO of Defendant LeFever

8 | Mattson, which in this Cause of Action, is named only as a nominal defendant.  As such, and as a

9 | Director, LeFever had fiduciary duties of loyalty, good faith, fair dealings, full disclosure, and

10 | due care to LeFever Mattson (sometimes referred to herein as the "Company").

11 |       43.    Plaintiff is informed and believes, and on that basis, alleges, that these fiduciary

12 | duties were and are being breached by Defendant LeFever, who has acted fraudulently,

13 | negligently, and without the care, skill, prudence and diligence that a reasonably prudent person

14 | acting in the capacity, and familiar with such matters, would use, and acting intentionally and

15 | imprudently to refuse to honor sales of limited partnership interests by LeFever Mattson in Divi

16 | to third-party investors, while also retaining investor funds and retaining the benefits of those

17 | funds delivered to the Company for said limited partnership interests in Divi.

18 |       44.    The acts by LeFever include, but are not limited to the following:

19 |       a.    He used fraud, duress, intimidation, and threats to coerce Plaintiff to agree

20 | to change the Bylaws and appoint Smith to the Board of Directors, so as to effectively gain

21 | control of the Company.

22 |       b.    As CEO, he has declared to investors that the interests they lawfully

23 | acquired in Divi were not authorized and the sales are null and void.

24 |       c.    He has ceased all normal monetary distributions to Divi investors.

25 |       d.    He has refused to return investors the funds paid to, deposited with, and

26 | used generally by the Company, in consideration for their limited partnership interests.

27 |

28 | - 12 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

1            e.      He has falsely stated that sales by the Company were made by Plaintiff in

2    his individual capacity, and the proceeds were not received by the Company.

3            f.      He has created, allowed, and encouraged conflicts of interest at the

4    Company.

5          45.    These breaches of fiduciary duties by LeFever have and will result in substantial

6    damages to the Company, including but not limited to lawsuits and reputational damage.  LeFever

7    Mattson should authorize a legal action against LeFever to protect investors but will not do so

8    because LeFever effectively controls the Company.

9          46.    Plaintiff brings this action derivatively for the right and for the benefit of the

10   shareholders of the Company to redress injuries suffered, and to be suffered, as a result of the

11   breaches of fiduciary duty and other violations by Defendant CEO LeFever.  Formal demand on

12   the Directors to bring an action against LeFever would be futile in light of LeFever's control of

13   the Board, and the fact that the Company's remedy is to file an action to remove him as CEO and

14   Director, and remove Smith as a Director and counsel, and to immediately agree to honor the

15   Company's commitments to the investors in Divi.  LeFever and Smith have directly participated

16   in the wrongs complained of herein, which disables them from acting independently, objectively

17   and in good faith to advance the interests of the Company or respond informally to any demand

18   by Plaintiff.  Based on the allegations of the Complaint and the actions by LeFever to date,

19   including the failure and refusal to honor the rights of its investors and the interests of the

20   Company and its shareholders, such demand would be a futile and useless act, and said Company

21   is therefore sued and named as a nominal Defendant in this Cause of Action.

22         47.    By refusing to honor its agreements with investors, or even return the proceeds it

23   received therefrom, LeFever has caused economic harm and damage to the Company, thus

24   breaching his fiduciary duties, causing damage in an amount not presently ascertainable, but in all

25   events in an amount in excess of the jurisdictional threshold of this Court and in an amount to be

26   proven at trial.

27         WHEREFORE, Plaintiff prays for a judgment as set forth below.

28                                        - 13 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

**(Improper Removal of Director and Reinstatement – Against All Defendants)**

48.     Plaintiff incorporates all the allegations of Paragraphs 1-16, 18-24, 26-31, 32-39 and 41-46 above as though fully set forth herein.

49.     On May 14, 2024, Plaintiff, who was a Director of LeFever Mattson, demanded access to specified unprivileged corporate documents from Defendants, which demand was refused.  See Exhibit B.

50.     Plaintiff had an absolute statutory right to these documents pursuant to California Corporations Code § 1602.

51.     On June 1, 2024, LeFever advised Plaintiff that he was calling a Special Meeting of the Board of Directors of LeFever Mattson for June 3, 2024.  No agenda was provided.

52.     Plaintiff is informed and believes, and thereon alleges that, at the Board meeting, as part of LeFever's scheme to further take control of LeFever Mattson, and to preclude Plaintiff from his statutory right of access to corporate documents, LeFever and Smith purported to remove Mattson as a Director.

53.     The Board of Directors is precluded from removing a Director by California Corporations Code §303.  The only way to remove a Director would be by suit in the Superior Court under § 304.  Defendants did not take such action and Plaintiff requests this Court declare that Plaintiff is currently a Director of LeFever Mattson, entitled to all rights such status provides, and for monetary damages caused to Plaintiff by Defendants' wrongful actions in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment as set hereinafter set forth below.

**SIXTH CAUSE OF ACTION**

**(Access to Corporate Documents – Corporations Code §§ 1602 and 1603 Against**

**LeFever Mattson)**

54.     Plaintiff incorporates all the allegations above as though fully set forth herein.

- 14 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

49339112.4/069731.0001

55.     Plaintiff, as Director was illegally locked out of access to corporate documents by Defendants.  On May 14, 2024, a request for a set of specific corporate documents was made in writing.  At the time Plaintiff, as a Director, had a right to inspect and copy these documents pursuant to California Corporations Code § 1602.  That statutory right was violated by Defendants.

56.     Seeking to undermine Plaintiff's access to documents, Plaintiff is informed and believes, and thereon alleges, that on June 3, 2024, Defendants purported to remove Plaintiff as a Director, despite the fact that they had no authority to do so pursuant to California Corporations Code § 303.

57.     Plaintiff brings his Sixth Cause of Action pursuant to California Corporations Code § 1603, which provides that upon refusal of a lawful demand for inspection, this Superior Court, may enforce the right, or in the alternative, may order a third-party inspection.  LeFever Mattson's actions have also caused damage to Plaintiff in an amount to be proven at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below:

## PRAYER FOR RELIEF

Plaintiff requests the relief described below as follows:

## ON THE FIRST CAUSE OF ACTION

1.     For a declaration that the Indemnity Agreement attached as Exhibit A be deemed to be null, void, and unenforceable;

2.     In the alternative, that Defendants breached their obligations under the terms of Exhibit A and based thereon, Plaintiff has no liabilities or obligations to Defendants or others;

3.     In the alternative, that Plaintiff's only indemnity obligations are under circumstances in which that indemnity for the claims, damages, and proceedings is based solely upon transactions in which funds collected were from transactions in which the terms and conditions were not clearly documented;

4.     For a declaration that Exhibit A does not bind any person or entity which did not sign it;

- 15 -

FENNIMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION, IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE DOCUMENTS

49339112.4/069731.0001

1    5.    For a temporary restraining order and preliminary injunction restraining and

2  enjoining Defendants from taking any action based on Exhibit A until this matter has been finally

3  adjudicated;

4    6.    For costs of the suit; and

5    7.    For such other and further relief as the Court deems proper.

6                    **ON THE SECOND CAUSE OF ACTION**

7    1.    For a judgment that the Indemnity Agreement attached as Exhibit A was breached

8  by Defendants or is otherwise unenforceable and was properly rescinded;

9    2.    For costs of suit; and

10   3.    For such other and further relief as the Court deems proper.

11                    **ON THE THIRD CAUSE OF ACTION**

12   1.    For a judgment that sales of Divi limited partnership interests are binding on

13  LeFever Mattson and that attempts to deny their enforceability and retain proceeds from such

14  sales are acts of unfair competition;

15   2.    Judgment requiring Defendants to disgorge net income of Divi to Plaintiff and

16  investors in an amount to be proven at trial;

17   3.    For preliminary and permanent injunctive relief precluding Defendants from

18  transferring any revenue from Divi, except to pay normal business expenses and distributions to

19  third-party investors on a pro rata basis;

20   4.    For costs of the suit; and

21   5.    For such other and further relief as the Court deems proper.

22                    **ON THE FOURTH CAUSE OF ACTION**

23   1.    For a judgment that Defendant LeFever breached his fiduciary duties to the

24  Company by improperly exercising his control over it to refuse to honor sales of limited

25  partnership interests by the Company in Divi to third-party investors, while also retaining investor

26  funds and the benefits of those funds, delivered to the Company;

27   2.    For consequential damages caused to the Company by the conduct described

28                                  - 16 -

COMPLAINT FOR DECLARATORY RELIEF, RECISSION, UNFAIR COMPETITION, DERIVATIVE ACTION,
IMPROPER REMOVAL OF DIRECTOR AND ILLEGAL DENIAL OF ACCESS TO CORPORATE
DOCUMENTS

49339112.4/069731.0001

1    above, in an amount to be proven at trial;

2        3.      For costs of suit; and

3        4.      For such other and further relief as the Court deems proper.

4                      **ON THE FIFTH CAUSE OF ACTION**

5        1.      For a declaration that Plaintiff was improperly removed as a Director of LeFever

6    Mattson and that all actions by the Board on June 3, 2024, and thereafter, are null and void;

7        2.      For the reinstatement of Plaintiff to his position as a Board member of LeFever

8    Mattson;

9        3.      For damages against all Defendants for the improper attempt to remove Plaintiff as

10   a Board member;

11       4.      For costs of the suit; and

12       5.      For such other and further relief as the Court deems proper.

13                     **ON THE SIXTH CAUSE OF ACTION**

14       1.      For an order that Plaintiff is entitled to immediate access to inspect all

15   unprivileged corporate documents and that the documents initially requested be immediately

16   made available for a judgment to that effect;

17       2.      For damages against LeFever Mattson for its denial of access to corporate

18   documents, in an amount to be proven at trial;

19       3.      For costs of the suit, and

20       4.      For such other and further relief as the Court deems proper.

21   Dated: June 6, 2024                              FENNEMORE WENDEL

22

23                                          By: _michuline n faibant_____

24                                              Micheline N. Fairbank
                                                Daniel Rapaport
25                                              Kurt Franklin
                                                Thiele R. Dunaway
26                                              Attorneys for Plaintiff
                                                KENNETH W. MATTSON
27

28                                      - 17 -

FENNEMORE WENDEL
ATTORNEYS AT LAW
OAKLAND

49339112.4/069731.0001

# EXHIBIT A

## INDEMNITY AGREEMENT

THIS INDEMNITY AGREEMENT (this "**Agreement**") entered into effective as of January 1, 2024, is made by Kenneth W. Mattson, an individual (the "**Indemnitor**") in favor, and for the benefit of, Timothy LeFever, an individual ("**LeFever**") and LeFever Mattson, a California corporation ("**LeFever Mattson**", individually and collectively with LeFever, the "**Indemnitee**"; Indemnitor, LeFever and LeFever Mattson are each individually referred to herein as a "**Party**" and collectively as "**Parties**").

### RECITALS

**WHEREAS**, Indemnitor and LeFever are the sole shareholders and sole members of the board directors of LeFever Mattson (the "**Board**");

**WHEREAS**, LeFever Mattson is the owner of various interests in, and the general partner and/or manager of, limited partnerships and limited liability companies that own, develop, manage and operate real estate and other business assets (collectively, the "**Operating Entities**");

**WHEREAS**, Indemnitor has entered into numerous transactions with individuals and/or entities pursuant to which Indemnitor has secured funds on terms and conditions not clearly documented (collectively, the "**Third Party Transactions**");

**WHEREAS**, the Parties acknowledge and agree that: (i) none of the Third Party Transactions were presented to the Board or shareholders of LeFever Mattson prior to the date that the Third Party Transactions were entered into, (ii) none of the Third Party Transactions were authorized or approved by the Board or shareholders of LeFever Mattson at any time prior to or after the date that the Third Party Transactions were entered into, (iii) neither LeFever nor LeFever Mattson is in any way a party to or obligated in connection with any of the Third Party Transactions, and (iv) neither LeFever nor LeFever Mattson received any benefit, directly or indirectly, economic or otherwise, in connection with or as a result of the Third Party Transactions;

**WHEREAS**, Indemnitor has covenanted and agreed to exercise Indemnitor's best efforts to properly document each of the Third Party Transactions as transactions solely between Indemnitor and the relevant third parties, and to obtain a release of Indemnitee insofar as such Third Party Transactions are concerned; and

**WHEREAS**, Indemnitee has agreed to reasonably cooperate with Indemnitor's efforts to document the Third Party Transactions conditioned on Indemnitor's agreement to indemnify Indemnitee and hold Indemnitee harmless from and against the Third Party Transactions, as hereinafter set forth, subject to the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the Recitals, which are incorporated by reference, the representations, covenants, and warranties contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties, intending to be bound legally, agree as follows:

## ARTICLE I

## DEFINITIONS

**Section I.01.  Definitions**. The following terms, as used in this Agreement, have the respective meanings set forth below:

(a)    **"Affiliate"** of any Person means any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, and the term **"Affiliated"** shall have a correlative meaning. The term **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Members of the immediate family (i.e., spouse, parents and children) of any Person, and any family trusts for, and estate planning vehicles of, any Person and such Person's immediate family shall be deemed to be Affiliates of such Person.

(b)    **"Damages"** include any and all liabilities, losses, costs, and/or Expenses (as defined below) incurred by an Indemnitee Party in connection with any Proceeding related to a Third Party Transaction, or arising from any misrepresentation or breach of any representation, warranty or covenant by Indemnitor in this Agreement.

(c)    **"Disinterested Director"** means a member of the Board who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(d)    **"Expenses"** include any and all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedes-bond or other appeal bond or their equivalent, and (ii) Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the LeFever Mattson.

(e)    **"Independent Counsel"** means a law firm, or a partner or member of a law firm, that is (i) experienced in matters of corporation law, (ii) approved by both the Indemnitor and Indemnitee, and (iii) neither presently is, nor in the past five years has been, retained to represent (A) any Party hereto in any matter material to such Party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (B) any other party to a Proceeding giving rise to a claim for indemnification hereunder.

(f)    **"Liabilities"** means (i) all obligations incurred by any Indemnitee Party in connection with any Third Party Transaction; (ii) all Expenses incurred by any Indemnitee Party in the defense of Proceeding related to a Third Party Transaction, (iii) all Expenses incurred by any Indemnitee Party in connection with the protection, preservation, and enforcement by any Indemnitee Party of any rights, or remedies related to a Third Party Transaction, (iv) all Damages incurred by or assessed against any Indemnitee Party; and (iv) all Expenses incurred in the defense, protection, preservation, and enforcement by Indemnitee of any rights, liens, or remedies against Indemnitor or in the defense, protection, preservation, and enforcement of this Agreement and (v) any other liability incurred by Indemnitor to Indemnitee under this Agreement.

(g)    **"Person"** means any individual, partnership, limited partnership, limited liability company, trust, estate, corporation, custodian, nominee or any other individual or entity acting on its own or in any representative capacity.

(h)    **"Proceeding"** means any threatened, pending or completed claim, demand action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding against Indemnitee, whether brought directly or in the name or right of LeFever Mattson, and whether against Lefever, Lefever Mattson, or both, and whether of a civil, criminal, administrative or investigative nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is, may or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of LeFever Mattson, (ii) any action taken by Indemnitee or any action or inaction

on Indemnitee's part, including while LeFever was or is acting as a director or officer of LeFever Mattson, or (iii) the fact that he or she is or was serving at the request of LeFever Mattson as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of LeFever Mattson or any Affiliate, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

<h1 style="text-align:center">ARTICLE II</h1>

<h2 style="text-align:center">REPRESENTATIONS AND WARRANTIES</h2>

**Section II.01.   Representations and Warranties.** Indemnitor represents and warrants:

(a)      All of the Recitals set forth above are true, correct and complete in all respects.

(b)      Indemnitor is an individual residing in the State of California, and has all necessary power, authority and capacity to enter into and perform the terms of this Agreement.

(c)      Indemnitor and/or its Affiliates have received direct and indirect financial benefit in connection with the Third Party Transactions, and will receive direct and indirect financial benefit in exchange for Indemnitor's execution of this Agreement.

(d)      The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the fulfillment of or compliance with the terms and conditions of this Agreement, is not prevented or limited by, and does not conflict with or result in a breach of, the terms, conditions, or provisions of any contractual or other restriction on Indemnitor or any of its Affiliates, or agreement or instrument of any nature to which Indemnitor and/or its Affiliates is/are now a party, and it does not constitute a default under any of the foregoing.

(e)      This Agreement constitutes the valid and legally binding obligation of Indemnitor enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, or similar laws affecting the enforcement of creditor's rights generally.

(f)      There is no action or proceeding pending or, to the best of Indemnitor's knowledge, threatened, against, or materially affecting, Indemnitor or Indemnitor's assets before any court or administrative agency that might adversely affect Indemnitors' ability to perform the obligations under this Agreement.

<h1 style="text-align:center">ARTICLE III</h1>

<h2 style="text-align:center">INDEMNIFICATION AND GUARANTY</h2>

**Section III.01.   Indemnification and Payment Obligations.** Indemnitor, on behalf of itself and its Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (collectively referred to as the "**Indemnitor Parties**"), hereby agrees to indemnify, defend and hold harmless LeFever, LeFever Mattson, and their Affiliates, agents, successors, assigns, attorneys, employees and all other representatives (but specifically excluding Indemnitor Parties) (collectively referred to as the "**Indemnitee Parties**") from and against:

(a)      **Third-Party Transactions**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Third Party Transaction.

(b)      **Proceedings**. Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with any Proceeding in any way related to a Third Party Transaction.

(c)      **Settlement/Negotiations**.  Indemnitor Parties shall indemnify, defend and hold Indemnitee Parties harmless from and against any and all Liabilities incurred by an Indemnitee Party in connection with the negotiation, settlement and/or other compromise of any claim or controversy in any way related to a Third Party Transaction.

**Section III.02.   Expenses.** Indemnitor shall advance the Expenses incurred by any Indemnitee Party in connection with any Proceeding, as well as in all other instances when an Indemnitee Party is entitled to indemnification hereunder. Such advancement of expenses shall be made as soon as reasonably practicable, but in any event no later than thirty

(30) days after the receipt by Indemnitor of a written statement or statements requesting such advances from time to time (which statement(s) shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause an Indemnitee Party to waive any privilege accorded by applicable law shall not be included with the invoice). Expense advances shall be unsecured and interest free and made without regard to the ability of any Indemnitee Party to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by Indemnitor. This Section 3.02 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement.

Section III.03. **Payment**. All payments by Indemnitor hereunder shall be paid in lawful money of the United States of America. Each payment obligation for Liabilities and/or Damages shall give rise to a separate cause of action, and separate lawsuits may, but need not, be brought hereunder as each cause of action arises. Amounts owed hereunder shall be funded by Indemnitor, promptly when the obligations are due, if applicable, or in any event not later than thirty (30) days after receipt of written demand from Indemnitee. If Indemnitor fails to pay or reimburse an Indemnitee Party as required hereunder within thirty (30) days following written demand therefor, Indemnitee may exercise any right or remedy set forth herein or available to it at law or in equity, and the Indemnitee shall additionally be entitled to interest on the unpaid amount accrued at a rate equal to the lesser of ten percent (10%) per annum and the highest rate permitted by applicable law.

Section III.04. **Guaranty**. Indemnitor hereby unconditionally, irrevocably, and absolutely guarantees to Indemnitee Parties the full, prompt, and complete payment when due of each of the Liabilities to be indemnified against by Indemnitor pursuant to this Agreement.

Section III.05. **Unconditional Nature of Guaranty**.

(a)     The obligations of Indemnitor under this Agreement are irrevocable, absolute, and unconditional and shall remain in full force and effect until the Liabilities and all obligations related to the Third Party Transactions have been fully and finally paid and performed. This Agreement is made without defense, offset, or counterclaim, each of which is hereby waived by Indemnitor. This Agreement the obligations hereunder shall not be affected, limited, modified, or impaired upon the happening from time to time of any event or circumstance which might otherwise constitute a defense available to, or a discharge of Indemnitor with respect to, its obligations under this Agreement.

(b)     Indemnitor agrees that no act or omission of any kind or at any time shall in any way impair the rights of Indemnitee to enforce any right, power, or benefit under this Agreement, and, no setoff, counterclaim, reduction, or diminution of any obligation which Indemnitor has or may have against Indemnitee, or any assignee or successor thereof shall be available hereunder.

Section III.06. **Indemnitee's Rights to Proceed Against Indemnitor.** Indemnitee, in its sole discretion, shall have the right to proceed first and directly against Indemnitor under this Agreement, without proceeding against or exhausting any other remedies which it may have against any entity or Person which may have guaranteed or is otherwise responsible or liable for Liabilities or Damages.

Section III.07. **Waivers.** Except as specifically set forth herein, Indemnitor expressly waives demand, presentment, protest, and notice of the acceptance of this Agreement or other action taken in reliance hereon and all other demands and notices of any description in connection with this Agreement, the Liabilities, Damages or otherwise.

## ARTICLE IV

## NOTICES AND DEFENSE OF CLAIMS

Section IV.01. **Notice of Indemnification**. Indemnitee shall notify the Indemnitor in writing of any matter with respect to which Indemnitee and/or an Indemnitee Party intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to Indemnitor shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding or matter for which indemnification is sought. The failure by Indemnitee to notify Indemnitor will not relieve the Indemnitor from any liability which it may have to Indemnitee and/or any Indemnitee Party hereunder or other than under this Agreement, and any delay in so notifying the Indemnitor shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Indemnitor.

Section IV.02. **Assumption of Defense.** In the event the Indemnitor may be obligated to indemnify Indemnitee and/or any Indemnitee Party, Indemnitor shall be entitled assume the defense of such matter with counsel approved by

Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of Indemnitor's election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Indemnitor, the Indemnitor will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Indemnitor's assumption of the defense of any such Proceeding, the Indemnitor shall be obligated to pay the fees and expenses of Indemnitee's counsel in the event of any of the following: (i) to the extent the employment of counsel by Indemnitee is authorized by the Indemnitor, (ii) counsel for the Indemnitor or Indemnitee shall have reasonably concluded that there is a conflict of interest between Indemnitor and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Indemnitor's assumption of the defense, (iv) the Indemnitor is not financially or legally able to perform its indemnification obligations, or (v) the Indemnitor shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Indemnitor shall have the right to conduct such defense as it sees fit in its sole discretion. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense.

Section IV.03. **Cooperation.**   Indemnitee shall give the Indemnitor such information and cooperation in connection with the Proceeding as may be reasonably appropriate; provided that such cooperation is at no cost or Expense to Indemnitee or any Indemnitee Party.

Section IV.04. **Delivery of Notices.** Unless specifically stated otherwise in this Agreement, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth below, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered United States mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third (3rd) business day following deposit with the United States Postal Service; or (d) electronic transmission (email) provided that the transmission is completed no later than 4:00 p.m. Pacific on a business day and the original also is sent via overnight courier or United States Mail, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

| To Indemnitor: | Address: | 6359 Auburn Blvd., Suite B |
| | Attention: | Ken Mattson |
| | Email: | mrskwm@hotmail.com |
| To Indemnitee: | Address: | 6359 Auburn Blvd., Suite B |
| | | Citrus Heights, CA 95621 |
| | Attention: | Tim LeFever |
| | Email: | tlefever@lefma.com |

Any Party may change its address for purposes of this Section 4.04 by giving written notice as provided in this Section 4.04. All notices and demands delivered by a Party's attorney on a Party's behalf shall be deemed to have been delivered by said Party. Notices shall be valid only if served in the manner provided in this Section 4.04.

## ARTICLE V

## INDEMNIFICATION PROCESS

Section V.01. **Entitlement To Indemnification**.    Upon written request by Indemnitee for indemnification pursuant to Section 4.01(a), a determination with respect to Indemnitee Party's entitlement thereto shall be made in the specific case (A) by a majority vote of the Disinterested Directors, even though constituting less than a quorum of the Board, or (B) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee.  If it is determined that an Indemnitee Party is entitled to indemnification, payment to Indemnitee shall be made within thirty (30) days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be considered Expenses, to the extent permitted by applicable law.

Section V.02. **Independent Counsel.**  In the event the determination of entitlement to indemnification is to be

made by Independent Counsel pursuant to Section 5.01, the Independent Counsel shall be selected as provided in this Section 5.02. Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to Indemnitor advising it of the identity of the Independent Counsel so selected. Within ten (10) days after such written notice of selection shall have been given, Indemnitor may deliver to the Indemnitee a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in Article I of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected by Indemnitee shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within twenty (20) days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 4.01(a) hereof, and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, the Indemnitee may petition a court of competent jurisdiction for resolution of any objection and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 5.01 hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 6.01 of this Agreement, the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

Section V.03. **Burden of Proof**. In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 4.01(a) of this Agreement, and the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by such person, persons or entity of any determination contrary to that presumption.

Section V.04. **Expenses**. The Indemnitor agrees to pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

## ARTICLE VI

## REMEDIES

Section VI.01. **Commencement of Action**. In the event that (i) a determination is made pursuant to Section 5.01 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 3.02 or 5.04 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 5.01 of this Agreement within ninety (90) days after the later of the receipt by the Indemnitor of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made within thirty (30) days after a determination has been made that an Indemnitee Party is entitled to indemnification, or (v) the Indemnitor or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of Indemnitee's entitlement to such indemnification or advancement of Expenses. Alternatively, Indemnitee, at his, her or its option, may seek an award in arbitration with respect to Indemnitee's entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 6.01(a). The Indemnitor shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

Section VI.02. **Effect of Determination of Availability of Indemnification**. Neither (i) the failure of to have made a determination in accordance with Section 5.01 above that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination in accordance with Section 5.01 above that Indemnitee has not met the applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Article VI shall be conducted in all respects as a de novo trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Article VI, the Indemnitor shall, to the fullest extent not prohibited by law, have the burden of proving

Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

**Section VI.03. Defenses.** To the fullest extent not prohibited by law, the Indemnitor shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Article VI that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Indemnitor is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Article V of this Agreement that Indemnitee is entitled to indemnification, the Indemnitor shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Article VI, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

**Section VI.04.** Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of a Proceeding.

## ARTICLE VII

## GENERAL PROVISIONS

**Section VII.01. Term**. This Agreement shall continue until and terminate upon the later of (a) seven (7) years after the Effective Date; or (b) one (1) year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee pursuant to this Agreement relating thereto.

**Section VII.02. Final Expression; Modifications.** Each Party hereto acknowledges that this writing is intended as a final expression and a complete and exclusive statement respecting the subject matter hereof. This Agreement supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to this Agreement. No course of prior dealing between or among any Party or Parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement or modify any terms, and there are no conditions to the full effectiveness, of this Agreement.

**Section VII.03. No Remedy Exclusive; Effect of Waiver.** No remedy conferred in this Agreement upon or reserved to any Party hereto is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default, omission, or failure of performance hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. No waiver, amendment, release, or modification of this Agreement shall be established by conduct, custom, or course of dealing, but solely by an instrument in writing duly executed by the Parties hereto. A waiver on one occasion shall not be a bar to or waiver of any right on any other occasion.

**Section VII.04. Expenses.** The non-prevailing party agrees to pay all out-of-pocket costs and expenses of the prevailing party (as determined by a final, non-appealable judgment), including reasonable attorneys' fees, incurred by the prevailing party in connection with any dispute or enforcement proceedings under this Agreement.

**Section VII.05. Benefit and Assignment.** This Agreement is binding upon and inures to the benefit of each Party hereto, and their respective successors and assigns. No Party may assign all or any part of this Agreement without the prior written consent of all other Parties hereto.

**Section VII.06. Severability.** The invalidity or unenforceability of any one or more phrases, sentences, clauses, or sections contained in this Agreement shall not affect the validity or enforceability of the remaining portions of this Agreement, or any part thereof.

**Section VII.07. Waiver; Amendment.** This Agreement and any term, covenant, or condition hereof may not be changed, waived, discharged, modified, or terminated except by a writing executed by the Parties hereto. No waiver by any Party of any default hereunder shall operate as a waiver of any term or covenant of any other agreement or of any other default or of the same default on any prior or subsequent occasion, unless otherwise consented to by the Party entitled to enforce the default.

**Section VII.08. Interpretation.** Whenever used herein, the singular shall include the plural, the plural the singular,

and the use of any gender shall include all genders

**Section VII.09.  Further Assurances.** Each Party shall each execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and do all such other acts and things, as may be required by law or as may be necessary or advisable to carry out the intent and purpose of this Agreement. Without limiting the generality of the foregoing, each Party shall execute such documents and file such instruments or notices as may be necessary or desirable.

**Section VII.10.  JURY TRIAL WAIVER.** INDEMNITOR AND INDEMNITEE EACH WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION, OR PROCEEDING OR ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT OF ANY PARTY'S RIGHTS AND REMEDIES AND ACKNOWLEDGE THAT SUCH PARTY MAKES THE WAIVER KNOWINGLY, VOLUNTARILY, WITHOUT DURESS AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THE WAIVER WITH SUCH PARTY'S ATTORNEYS.

**Section VII.11.  GOVERNING LAW; SUBMISSION TO JURISDICTION.** THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. ANY LEGAL SUIT, ACTION, OR PROCEEDING RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF CALIFORNIA, EACH PARTY IRREVOCABLY CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION, OR PROCEEDING.

**Section VII.12.  No Third-Party Beneficiaries.** The provisions of this Agreement are not intended for the benefit of and shall not confer any rights to any creditor (including Lender) or other person to whom any debts, liabilities, or obligations are owed by any of the Parties hereto.

**Section VII.13.  Non-Exclusivity.** Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

**Section VII.14.  Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same agreement. Counterparts may be executed and delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

**Section VII.15.  Captions.** The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

[SIGNATURE PAGE FOLLOWS]

20271005.2

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date set forth above.

**INDEMNITOR**

By: _____
Name:  Kenneth W. Mattson

**INDEMNITEE**

LeFever

By: _____
Name:  Timothy LeFever

LeFever Mattson, a California corporation

By: _____

Name:  Kenneth W. Mattson

Title:   Chief Executive Officer

20271005.2

# EXHIBIT B

**Randy Sue Pollock**
Attorney at Law
_____

286 Santa Clara Avenue
Oakland, California 94610

Tel: (510) 763-9967
Fax: (510) 380-6551
rsp@rspollocklaw.com
www.rspollocklaw.com

May 14, 2024

**VIA E-MAIL: tlefever@lefma.com**

Tim LeFever
6359 Auburn Blvd., Suite B.
Citrus Heights, CA 95621

Re:    **Ken Mattson**

Dear Mr. LeFever:

I have been engaged to represent Mr. Mattson in connection with possible criminal proceedings arising out of his work for LeFever Mattson. I write you both in your individual and representative capacities. As part of my review, I need a great deal of information and data regarding the issues raised by you and the DOJ. This letter is to request you provide me with the information described below as soon as practicable.

First, I read an email dated May 9, 2024, the subject line of which is Divi Divi / Ken Mattson. It alleges Mr. Mattson:

1)    Engaged in a large number of unauthorized and improper transactions concerning his interest in Divi Divi Tree;

2)    He improperly transferred limited partnership interests unknown to the Board or Shareholders of LeFever Mattson;

3)    He improperly made distributions;

4)    He entered into an Indemnity Agreement for the benefit of LeFever Mattson;

5)    You referred his attorney to "the proper authorities."

In order to properly evaluate this information and better advise Mr. Mattson, I request all documents, including all forms of written and electronic communication which you or LeFever Mattson have access to which refer, relate or evidence these statements. This would include communications between you and Scott Smith.

In order to attempt to understand and resolve any possible criminal exposure, we also request that you provide any documents, as broadly described above, which you believe suggest any other actions by Mr. Mattson which may be improper, unethical or fraudulent, which caused any damage, potential damage or loss to LeFever Mattson, you, any investor in any entity or property, or any other third-party.

Tim LeFever
May 14, 2024
Page 2

I also request all structural documents, such as Articles, By-Laws, Minutes, Operating Agreements, and Resolutions for LeFever Mattson, Divi Divi Tree LP and any other entity which you contend has been damaged or potentially damaged by any improper action by Mr. Mattson.

Mr. Mattson certainly wants to be able to evaluate and rectify, if appropriate, any situation where his actions may have been problematic. Your prompt cooperation will be of great assistance in that regard.

Sincerely,

Randy Sue Pollock

Randy Sue Pollock

## Randy Sue Pollock

| | |
|---|---|
| **From:** | Scott Smith <ssmith@lefma.com> |
| **Sent:** | Tuesday, May 21, 2024 5:50 PM |
| **To:** | Randy Sue Pollock |
| **Subject:** | RE: Ken Mattson |



Caution: External (ssmith@lefma.com)

First-Time Sender: Details

Report This Email   FAQ   GoDaddy Advanced Email Security, Powered by INKY

Hello Randy Sue, upon the conclusion of a meeting where Ken answers my questions, I have no problem providing you information and documents serving as evidence of the statements in clauses (1) and (2) of your letter to Tim LeFever. These statements come directly from a single source. Can you please let me know what you are referencing insofar as clause (3) in your letter which reads "He improperly made distributions"? I do not believe this statement was included in Tim LeFever's email notice sent on May 9, and I am unaware of the source. I'll provide you the agreement referenced in clause (4) of your letter at the conclusion of our meeting. I am uncertain as to what your letter is referring to insofar as clause (5), and the statement that "You referred his attorney to the proper authorities". I believe you are referring to a statement in Tim's notice that we've referred this matter to the proper authorities, but please confirm. If you intended to ask who those authorities are, I can tell you that we were referring to the SEC and US Attorneys Office.

If and when Ken is ready to meet, I will also require of him the completion of certain action items he's left undone. In particular, Ken needs to execute grant deeds in favor of LeFever Mattson concerning a number of properties that are part of our Pinyon Creek II development. Ken improperly titled these properties in his entity, KS Mattson Partners, LP. These properties belong to LeFever Mattson and he needs to effect their transfer to LeFever Mattson immediately. The deeds at issue have been sent to him already on a number of occasions, so this request should not come as a surprise. I would also request that you ask your client to consider resigning from LeFever Mattson's board of directors. It is clear that Ken is incapable of performing the necessary functions of a board member and satisfying his duties as a director under California law. This has been and will continue to be to his own detriment, and we believe it both necessary and appropriate for Ken to resign immediately. Please advise before our meeting takes place of whether he is willing to step down, and if he is, I will prepare a letter of resignation for your review.

If all of this is acceptable to you, please let me know the time and place you would like this meeting to occur. I hope it is clear that if this meeting is to take place, it needs to happen as soon as possible. Please let me know as well whether you plan to attend.

Thank you,

Scott
Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

1

## Randy Sue Pollock

| | |
|---|---|
| **From:** | Randy Sue Pollock |
| **Sent:** | Wednesday, May 22, 2024 8:01 PM |
| **To:** | Scott Smith |
| **Subject:** | Ken Mattson |

Mr. Smith,

In light of the federal rcriminal investigation, I cannot make Ken available to answer your questions. In connection with your query regarding improper distributions, it appears to me that you are making general claims of financial misconduct. If you are not claiming improper distributions, that is fine, however I need to review all documents relating to your allegations of financial impropriety. You are correct that my reference to your communications with governmental authorities would include the SEC and US attorney's office, I would like to review those communications.

I believe Ken is entitled to unfettered access to the requested documents and must demand that they be immediately provided without condition. As to your question regarding deeds, I do not yet have information about this, but will review it. If you could also send documents confirming the proper title for these properties, I will expedite my review of those issues. Please advise immediately if you will in fact provide the requested documents or not.
Please let us know if in connection with this request you are representing Mr. LeFever and LeFever-Mattson.

***RANDY SUE POLLOCK***
Law Office of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, CA 94610
T 510-763-9967
F 510-380-6551
C 510-703-3370
**www.rspollocklaw.com**

1

**Randy Sue Pollock**

| | |
|---|---|
| **From:** | Scott  Smith <ssmith@lefma.com> |
| **Sent:** | Friday, May 24, 2024 5:07 PM |
| **To:** | Randy Sue Pollock |
| **Subject:** | RE: Ken Mattson |

External (ssmith@lefma.com)

Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY

Hi Randy Sue, and apologies for the delay in responding to your email. I've been busy all day putting out fires lit by your client. I still have a couple to go before my weekend starts, but I will endeavor to respond to your email as soon as possible early next week.

Thank you,

Scott

Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

**From:** Randy Sue Pollock <rsp@rspollocklaw.com>
**Sent:** Wednesday, May 22, 2024 8:01 PM
**To:** Scott Smith <ssmith@lefma.com>
**Subject:** Ken Mattson

Mr. Smith,

In light of the federal rcriminal investigation, I cannot make Ken available to answer your questions. In connection with your query regarding improper distributions, it appears to me that you are making general claims of financial misconduct. If you are not claiming improper distributions, that is fine, however I need to review all documents relating to your allegations of financial impropriety. You are correct that my reference to your communications with governmental authorities would include the SEC and US attorney's office, I would like to review those communications.

I believe Ken is entitled to unfettered access to the requested documents and must demand that they be immediately provided without condition. As to your question regarding deeds, I do not yet have information about this, but will review it. If you could also send documents confirming the proper title for these properties, I will expedite my review of those issues. Please advise immediately if you will in fact provide the requested documents or not.
Please let us know if in connection with this request you are representing Mr. LeFever and LeFever-Mattson.

*RANDY SUE POLLOCK*
Law Office of Randy Sue Pollock
286 Santa Clara Avenue
Oakland, CA 94610
T 510-763-9967

# EXHIBIT C

## Randy Sue Pollock

| | |
|---|---|
| **From:** | Scott Smith <ssmith@lefma.com> |
| **Sent:** | Thursday, May 23, 2024 5:20 PM |
| **To:** | Randy Sue Pollock |
| **Subject:** | FW: Special Meeting of the Board of Directors |

External (ssmith@lefma.com)

Report This Email FAQ GoDaddy Advanced Email Security, Powered by INKY

Hi Randy Sue, I hope your vacation is off to a wonderful start!

I do not know whether or not your client forwarded the below email to you, but as a courtesy, I wanted to let you know that a LeFever Mattson board meeting will take place tomorrow morning as planned. Your client is under no obligation to attend, and his absence will not affect the meeting or our ability to conduct and conclude business at the meeting. We will, however, address various company issues and make decisions likely affecting the interest of all shareholders. The meeting will take place by phone but only directors (Tim LeFever, Ken Mattson and myself) are invited to attend.

Thank you,

Scott

Scott C. Smith,
General Counsel, LeFever Mattson
6359 Auburn Blvd · Citrus Heights, CA 95621
Email: ssmith@lefma.com
Tel: (415) 279-5932

**From:** TIM LEFEVER <lefever96@aol.com>
**Sent:** Tuesday, May 21, 2024 6:52 PM
**To:** Ken Mattson <mrskwm@hotmail.com>; Scott Smith <ssmith@lefma.com>
**Subject:** Special Meeting of the Board of Directors

Ken and Scott,

Pursuant to Article III, Section 11 of the LeFever Mattson Bylaws, please accept this email as notice of a Special Meeting of the Board of Directors of LeFever Mattson to be held on Friday, May 24, 2024 at 9am, by phone call that I will initiate.

Please confirm that you will be on that call.

Tim

Sent from my iPhone

1

**Randy Sue Pollock**

| | |
|---|---|
| **From:** | Randy Sue Pollock |
| **Sent:** | Thursday, May 23, 2024 5:31 PM |
| **To:** | Scott Smith |
| **Subject:** | Re: Special Meeting of the Board of Directors |

Thank you. Trying to focus on Mexico but I need to know what's going on.

Rsp

Randy Sue Pollock
Attorney at Law
286 Santa Clara Avenue
Oakland, CA 94610
T: 510-763-9967
F: 510-380-6551
C: 510-703-3370
www.rspollocklaw.com

Sent from my iPhone...

Please excuse autocorrect non sequiturs and typos

On May 23, 2024, at 6:20 PM, Scott Smith <ssmith@lefma.com> wrote:

External (ssmith@lefma.com)

Report This Email  FAQ  GoDaddy Advanced Email Security, Powered by INKY

Hi Randy Sue, I hope your vacation is off to a wonderful start!

I do not know whether or not your client forwarded the below email to you, but as a courtesy, I wanted to let you know that a LeFever Mattson board meeting will take place tomorrow morning as planned. Your client is under no obligation to attend, and his absence will not affect the meeting or our ability to conduct and conclude business at the meeting. We will, however, address various company issues and make decisions likely affecting the interest of all shareholders. The meeting will take place by phone but only directors (Tim LeFever, Ken Mattson and myself) are invited to attend.

Thank you,

1